**'08 CIV 5282**

**ROBERT A. PINEL – RAP 9070**
**FLAMM, BOROFF & BACINE, P.C.**
**Westfield Corporate Center**
**4905 West Tilghman Street, Suite 310**
**Allentown, Pennsylvania 18064**
**610-336-6800**
**Attorneys for Plaintiff**

**Judge Hellerstein**

RECEIVED
JUN 10 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| DLJ MORTGAGE CAPITAL, INC., | : |
| Plaintiff, | : |
| – vs. – | : |
| SECURED BANKERS MORTGAGE COMPANY, | : |
| Defendant. | : |

Case No. _____

**COMPLAINT**
**FOR DAMAGES**

Plaintiff DLJ Mortgage Capital, Inc. ("Plaintiff" or "DLJMC"), by and through its

attorneys, Flamm, Boroff & Bacine, P.C., files this its Complaint for Damages against

Defendant Secured Bankers Mortgage Company. ("Defendant" or "SBMC"), as follows:

### PRELIMINARY STATEMENT

1.      This Complaint alleges the failure of Defendant to comply with a written

agreement with Plaintiff.

2.      Defendant failed to repurchase mortgage loans as required by a written

purchase agreement with Plaintiff.  As a result, Plaintiff has been damaged in excess of

$1.1 million, including interest, penalties, and, reasonable attorney's fees and costs.

### JURISDICTION AND VENUE

3.      Jurisdiction of the parties and this Complaint are properly in this Court under

the diversity of jurisdictions provisions of 28 U.S.C. §1332(a)(1) and (b).

4.    There is complete diversity between the parties.  Every issue of law and fact in this action is wholly between citizen corporations of different states.  The amount in controversy exceeds $75,000.00.

5.    Venue is proper as to this Defendant pursuant to 28 U.S.C. §1391(a)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.  Additionally, by contract the parties agreed that venue of this dispute is to be situated in the state or federal courts of New York County in the State of New York.

6.    Venue is also proper in this district pursuant to the provisions of 28 U.S.C. §1391(c) because Defendant is subject to personal jurisdiction in this district and is deemed to reside within it for purposes of 28 U.S.C. §1391(a)(1).

## PARTIES

7.    Plaintiff is a Delaware corporation qualified to do business in the State of New York.  Its principal place of business is at 11 Madison Avenue, New York City, New York County, State of New York.

8.    Defendant is a California company doing business in the State of New York.  Its principal place of business is 14761 Califa Street, Van Nuys, California 91411.

## STATEMENT OF FACTS

9.    On or about April 1, 2005, Plaintiff entered into a Purchase, Warranties and Interim Servicing Agreement with Defendant (the "MLPA").  (A copy of the MLPA is attached as Exhibit A.)

10.    Under the terms of the MLPA, Plaintiff agreed to purchase certain mortgage loans from Defendant. Defendant agreed that in certain instances it would repurchase certain mortgage loans that it had sold to Plaintiff.

11.    Plaintiff gave notice to Defendant that certain mortgage loans needed to be repurchased pursuant to the provisions of the MLPA. These notices were sent on November 28, 2006, December 21, 2006, January 26, 2007, February 20, 2007, March 23, 2007 and April 17, 2007. The mortgage loans to be repurchased are identified in the notices. (Copies of these notices are attached as Exhibits B, C, D, E, F and G.)

12.    Defendant failed and refused to repurchase the mortgage loans as required by the terms of the MLPA. As a result of Defendant's refusal to comply with the MLPA, Plaintiff has been damaged in an amount exceeding $1.1 million.

## FIRST COUNT
## (BREACH OF CONTRACT)

13.    Paragraphs 1 - 12 of this Complaint are incorporated herein by reference.

14.    Defendant failed to comply with its obligations under the terms of the MLPA by failing and refusing to repurchase the mortgage loans.

15.    Despite Plaintiff's demand for compliance, Defendant failed and refused to meet is obligations under the MLPA.

16.    As a result of Defendant's failure to comply with the MLPA, Plaintiff has been damaged in an amount not less than $1.1 million, including interest and penalties.

17.    Under the terms of the MLPA, Plaintiff is also entitled to collect from Defendant its reasonable attorney's fees and costs for bringing this action.

274433 v2                                3

## SECOND COUNT
### (UNJUST ENRICHMENT)

18.    Paragraphs 1-17 of this Complaint are incorporated herein by reference.

19.    For each of the mortgage loans at issue, Defendant received payment from Plaintiff when the mortgage loans were purchased from Defendant.

20.    Defendant has wrongfully refused to comply with its obligation to repurchase the mortgage loans, causing Plaintiff to lose the use of the money due and owing, and requiring Plaintiff to incur attorney's fees and costs to recover the amounts due under the MLPA. It would be unjust and inequitable to allow Defendant to benefit in this manner.

21.    By reason of the foregoing, Defendant has been unjustly enriched at Plaintiff's expense and Plaintiff suffered damage in an amount to be proven at trial.

## THIRD COUNT
### (INDEMNIFICATION)

22.    Paragraphs 1-21 of this Complaint are incorporated herein by reference.

23.    Pursuant to the MLPA, Defendant agreed to indemnify Plaintiff for any and all claims, losses, damage, penalties, fines, forfeitures, legal fees and related costs, judgment, and any other costs, fees and expenses that Plaintiff may sustain in any way related to Defendant's failure to observe and perform its duties, obligation, and covenants in compliance with the terms of the MLPA.

24.    Defendant's obligation expressly includes the legal fees and related costs and any other costs, fees and expenses that Plaintiff may sustain in connection with Defendant's failure to observe and perform its obligations to repurchase the loans, including but not limited to attorney's and other expenses incurred in this action.

274433 v2                                    4

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that judgment issue:

a)  against Defendant in an amount not less than $1.1 million, including penalties

and interest, in an amount to be proven to trial;

b)  requiring Defendant to pay all attorney's fees and costs incurred by Plaintiff in

initiating and pursuing this litigation; and

c)  for any and all such relief to which Plaintiff is entitled at law or at equity.

FLAMM, BOROFF & BACINE, P.C.
Attorneys for Plaintiffs DLJ Mortgage Capital, Inc.

By:  _Robert A. Pinel_

Robert A. Pinel, Esq.

Dated:  _June 5, 2008_

# EXHIBIT A

DLJ MORTGAGE CAPITAL, INC.

Purchaser,

SECURED BANKERS MORTGAGE COMPANY

Seller and Servicer

SELLER'S PURCHASE, WARRANTIES AND INTERIM SERVICING AGREEMENT
Dated as of April 1, 2005

## TABLE OF CONTENTS

**Page**

### ARTICLE I DEFINITIONS

Section 1.01   Defined Terms. ................................................................................................ 2

### ARTICLE II SERVICING OF MORTGAGE LOANS; RECORD TITLE AND POSSESSION OF MORTGAGE FILES; BOOKS AND RECORDS; CUSTODIAL AGREEMENT; DELIVERY OF MORTGAGE LOAN DOCUMENTS

Section 2.01   Agreement to Purchase. ................................................................................ 15
Section 2.02   Purchase Price. ............................................................................................. 15
Section 2.03   Servicing of Mortgage Loans. ...................................................................... 16
Section 2.04   Record Title and Possession of Mortgage Files; Maintenance of Servicing Files. ............................................................................................................. 16
Section 2.05   Books and Records. ...................................................................................... 17
Section 2.06   Transfer of Mortgage Loans. ....................................................................... 17
Section 2.07   Delivery of Mortgage Loan Documents. ...................................................... 18
Section 2.08   Quality Control Procedures. ........................................................................ 19
Section 2.09   Closing. ........................................................................................................ 19

### ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER AND THE SERVICER; REPURCHASE; REVIEW OF MORTGAGE LOANS

Section 3.01   Representations and Warranties of the Seller and the Servicer. ..................... 21
Section 3.02   Representations and Warranties as to Individual Mortgage Loans. ................. 24
Section 3.03   Repurchase; Substitution. ............................................................................. 36
Section 3.04   Repurchase of Convertible Mortgage Loans. ............................................... 38
Section 3.05   Repurchase of Mortgage Loans With Early Payment Defaults. ...................... 38
Section 3.06   Purchase Price Protection. ............................................................................ 38
Section 3.07   Acknowledgement of Anti-Predatory Lending Policies. .................................. 39

### ARTICLE IV ADMINISTRATION AND SERVICING OF THE MORTGAGE LOANS DURING THE INTERIM SERVICING PERIOD

Section 4.01   The Servicer to Act as Servicer. .................................................................... 40
Section 4.02   Collection of Mortgage Loan Payments. ...................................................... 41
Section 4.03   Realization Upon Defaulted Mortgage Loans. ............................................. 41
Section 4.04   Establishment of Custodial Accounts; Deposits in Custodial Accounts. ......... 42
Section 4.05   Permitted Withdrawals From the Custodial Account. ...................................... 44
Section 4.06   Establishment of Escrow Accounts; Deposits in Accounts. ............................. 45
Section 4.07   Permitted Withdrawals From the Escrow Account. ......................................... 46
Section 4.08   Payment of Taxes, Insurance and Charges; Maintenance of Primary Mortgage Insurance or LPMI Policies; Collections Thereunder. .................................. 46
Section 4.09   Transfer of Accounts. ................................................................................... 47

Section 4.10   Maintenance of Hazard Insurance. ...................................................................... 47
Section 4.11   Maintenance of Mortgage Impairment Insurance Policy. .............................. 48
Section 4.12   Maintenance of Fidelity Bond and Errors and Omissions Insurance. .............. 49
Section 4.13   Title, Management and Disposition of REO Property. ..................................... 49
Section 4.14   Notification of Maturity Date. .......................................................................... 51

## ARTICLE V PAYMENTS TO THE PURCHASER

Section 5.01   Distributions. ....................................................................................................... 52
Section 5.02   Statements to the Purchaser. ............................................................................. 52
Section 5.03   Monthly Advances by the Servicer. .................................................................. 53
Section 5.04   Liquidation Reports. ........................................................................................... 54

## ARTICLE VI GENERAL SERVICING PROCEDURES

Section 6.01   Assumption Agreements. ..................................................................................... 55
Section 6.02   Satisfaction of Mortgages and Release of Mortgage Files. ............................ 56
Section 6.03   Servicing Compensation. .................................................................................... 57
Section 6.04   Annual Statement as to Compliance. ................................................................. 57
Section 6.05   Annual Independent Certified Public Accountants' Servicing Report. ............ 57
Section 6.06   Purchaser's Right to Examine Servicer Records. ............................................. 58
Section 6.07   Servicer Shall Provide Information as Reasonably Required. .......................... 58

## ARTICLE VII SERVICING TRANSFER

Section 7.01   Transfer. ................................................................................................................ 60
Section 7.02   Additional Obligations. ....................................................................................... 62

## ARTICLE VIII THE SELLER AND THE SERVICER

Section 8.01   Indemnification; Third Party Claims. ................................................................ 63
Section 8.02   Merger or Consolidation of the Seller or the Servicer. ................................... 63
Section 8.03   Limitation on Liability of the Seller and Others. ............................................. 64
Section 8.04   Servicer Not to Resign. ....................................................................................... 64
Section 8.05   No Transfer of Servicing. .................................................................................... 65

## ARTICLE IX DEFAULT

Section 9.01   Events of Default. ................................................................................................ 66
Section 9.02   Waiver of Defaults. ............................................................................................. 68

## ARTICLE X TERMINATION

Section 10.01   Termination. ....................................................................................................... 69
Section 10.02   Termination Without Cause. ............................................................................ 69

## ARTICLE XI RECONSTITUTION OF MORTGAGE LOANS

Section 11.01   Reconstitution of Mortgage Loans. .................................................................... 70

## ARTICLE XII MISCELLANEOUS PROVISIONS

Section 12.01   Successor to the Servicer. ................................................................................. 73
Section 12.02   Amendment. ................................................................................................... 74
Section 12.03   Recordation of Agreement. .............................................................................. 74
Section 12.04   Governing Law. .............................................................................................. 74
Section 12.05   Notices. .......................................................................................................... 74
Section 12.06   Severability of Provisions. ............................................................................... 75
Section 12.07   Exhibits. ......................................................................................................... 75
Section 12.08   General Interpretive Principles. ....................................................................... 76
Section 12.09   Reproduction of Documents. ........................................................................... 76
Section 12.10   Confidentiality of Information. ........................................................................ 77
Section 12.11   Recordation of Assignments of Mortgage. ...................................................... 77
Section 12.12   Assignment by Purchaser. ............................................................................... 77
Section 12.13   No Partnership. ............................................................................................... 77
Section 12.14   Execution; Successors and Assigns. ................................................................ 77
Section 12.15   Entire Agreement. ........................................................................................... 78
Section 12.16   No Solicitation. ............................................................................................... 78
Section 12.17   Costs. ............................................................................................................. 78

## EXHIBITS

A-1          Contents of Mortgage File
A-2          Contents of Servicing File
B            Form of Custodial Account Letter Agreement
C            Form of Escrow Account Letter Agreement
D            Form of Assignment, Assumption and Recognition Agreement
E            Form of Monthly Servicing Report
F            Mortgage Loan Schedule
G            Request for Release of Documents and Receipt
H            Servicing Transfer Procedures
I            Form of Bring Down Letter

This is a Seller's Purchase, Warranties and Interim Servicing Agreement, dated as of April 1, 2005 and is executed between DLJ Mortgage Capital, Inc., as purchaser (the "Purchaser"), and Secured Bankers Mortgage Company, as seller (in such capacity, the "Seller") and as servicer (in such capacity, the "Servicer").

# W I T N E S S E T H :

WHEREAS, the Purchaser has heretofore agreed to purchase from the Seller and the Seller has heretofore agreed to sell to the Purchaser certain Mortgage Loans, together with the servicing rights associated with such Mortgage Loans, from time to time, pursuant to the terms of a letter agreement by and between the Seller and the Purchaser (the "Purchase Price and Terms Letter").

WHEREAS, each of the Mortgage Loans is secured by a mortgage, deed of trust or other security instrument creating a first or second lien on a residential dwelling located in the jurisdiction indicated on the Mortgage Loan Schedule, which is annexed hereto as Exhibit F. The Mortgage Loans as described herein shall be delivered in groups of whole loans (each, a "Mortgage Loan Package") on various dates as provided herein (each, a "Closing Date"); and

WHEREAS, the Purchaser, the Seller and the Servicer wish to prescribe the representations and warranties of the Seller with respect to itself and the Mortgage Loans and the management, interim servicing, transfer and control of the Mortgage Loans by the Servicer;

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Purchaser, the Seller and the Servicer agree as follows:

ARTICLE I
DEFINITIONS

Section 1.01          Defined Terms.

Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the following meaning specified in this Article:

Accepted Servicing Practices:  With respect to any Mortgage Loan, those mortgage servicing practices (including collection procedures) of prudent mortgage banking institutions which service mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located, and which are in accordance with Fannie Mae servicing practices and procedures, for MBS pool mortgages, as defined in the Fannie Mae Guides including future updates.

Additional Balance:  With respect to any HELOC, any future Draw made by the related Mortgagor pursuant to the related Loan Agreement after the related Cut-off Date.

Adjustable Rate Mortgage Loan:  An Adjustable Rate Mortgage Loan purchased pursuant to this Agreement.

Adjustment Date:  With respect to each Adjustable Rate Mortgage Loan, the date set forth in the related Mortgage Note on which the Mortgage Interest Rate on the Mortgage Loan is adjusted in accordance with the terms of the Mortgage Note.

Agreement:  This Seller's Purchase, Warranties and Interim Servicing Agreement including all exhibits hereto, amendments hereof and supplements hereto.

Amortization Period:  With respect to any HELOC, the period of time subsequent to the Draw Period during which the Mortgagor is obligated to make Minimum Monthly Payments equal to interest accrued on the Scheduled Principal Balance plus, unless otherwise set forth in the related Purchase Price and Terms Letter, 1/120th of such Scheduled Principal Balance.

Appraised Value: With respect to any Mortgaged Property, the lesser of (i) the value thereof as determined by an appraisal made for the originator of the Mortgage Loan at the time of origination of the Mortgage Loan by an appraiser who met the underwriting requirements of the originator, and (ii) the purchase price paid for the related Mortgaged Property by the Mortgagor with the proceeds of the Mortgage Loan, provided, however, in the case of a Refinanced Mortgage Loan, such value of the Mortgaged Property is based solely upon the value determined by an appraisal made for the originator of such Refinanced Mortgage Loan at the time of origination of such Refinanced Mortgage Loan by an appraiser who met the underwriting requirements of the originator.

Assignment:  An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the transfer of the Mortgage.

2

BIF: The Bank Insurance Fund, or any successor thereto.

Billing Cycle: With respect to any HELOC and Due Date, the calendar month preceding such Due Date.

Business Day: Any day other than (i) a Saturday or a Sunday, or (ii) a legal holiday in the State of New York, or (iii) a day on which banks in the State of New York are authorized or obligated by law or executive order to be closed.

Closing Date: The date or dates set forth in the related Purchase Price and Terms Letter on which the Purchaser from time to time shall purchase and the Seller from time to time shall sell to the Purchaser, the Mortgage Loans listed on the related Mortgage Loan Schedule with respect to the related Mortgage Loan Package.

Code: The Internal Revenue Code of 1986, as the same may be amended from time to time (or any successor statute thereto).

Condemnation Proceeds: All awards or settlements in respect of a Mortgaged Property, whether permanent or temporary, partial or entire, by exercise of the power of eminent domain or condemnation, to the extent not required to be released to a Mortgagor in accordance with the terms of the related Mortgage Loan Documents.

Convertible Mortgage Loan: Any Adjustable Rate Mortgage Loan purchased pursuant to this Agreement as to which the related Mortgage Note permits the Mortgagor to convert the Mortgage Interest Rate on such Mortgage Loan to a fixed Mortgage Interest Rate.

Co-op Lease: With respect to a Co-op Loan, the lease with respect to a dwelling unit occupied by the Mortgagor and relating to the stock allocated to the related dwelling unit.

Co-op Loan: A Mortgage Loan secured by the pledge of stock allocated to a dwelling unit in a residential cooperative housing corporation and a collateral assignment of the related Co-op Lease.

Co-op Stock: With respect to a Co-op Loan, the single outstanding class of stock, partnership interest or other ownership instrument in the related residential cooperative housing corporation.

Credit Limit: With respect to any HELOC, the maximum loan balance permitted under the terms of the related Loan Agreement.

Credit Score: The credit score for each Mortgage Loan other than a HELOC shall be the minimum of two credit bureau scores obtained at origination or such other time by the Seller. If two credit bureau scores are obtained, the Credit Score will be the lower score. If three credit bureau scores are obtained, the Credit Score will be the middle of the three. When there is more than one applicant, the lowest of the applicants' Credit Scores will be used. There is only one (1) score for any loan regardless of the number of borrowers and/or applicants. The credit score for each HELOC shall be determined in accordance with the Underwriting Standards.

3

<u>Custodial Account</u>:  Each separate demand account or accounts created and maintained pursuant to Section 4.04 which shall be entitled "_____, in trust for the [Purchaser], Owner of Whole Loan Series 2005 WL-_____" and shall be established as an Eligible Account, in the name of the Person that is the "Purchaser" with respect to the related Mortgage Loans.

<u>Cut-off Date</u>:  With respect to each Mortgage Loan Package, the date on or prior to the related Closing Date set forth in the related Purchase Price and Terms Letter.

<u>Determination Date</u>:  The 15th day (or if such 15th day is not a Business Day, the Business Day immediately preceding such 15th day) of the month of the related Remittance Date.

<u>Draw</u>:  With respect to any HELOC, a borrowing by the Mortgagor under the related Loan Agreement.

<u>Draw Period</u>:  With respect to any HELOC, the period commencing after the date of origination of such Mortgage Loan, during which the related Mortgagor is permitted to make Draws.

<u>Due Date</u>:  The day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

<u>Due Period</u>:  With respect to any Remittance Date, the period commencing on the second day of the month preceding the month of such Remittance Date and ending on the first day of the month of the Remittance Date.

<u>Eligible Account</u>:  An account established and maintained: (a) within FDIC · insured accounts (or other accounts with comparable insurance coverage acceptable to the Rating Agencies) created, maintained and monitored by the Servicer so that all funds deposited therein are fully insured, (b) with the corporate trust department of a financial institution assigned a long-term debt rating of not less than Baa3, and a short term debt rating of P3, from Moody's Investors Services, Inc. and, if ownership of the Mortgage Loans is evidenced by mortgaged backed securities, the equivalent ratings of the rating agencies, and held such that the rights of the Purchaser and the owner of the Mortgage Loans shall be fully protected against the claims of any creditors of the Seller and of any creditors or depositors of the institution in which such account is maintained or (c) in a separate non-trust account without FDIC or other insurance in an eligible Institution.  In the event that a Custodial Account is established pursuant to clause (b) or (c) of the preceding sentence, the Servicer shall provide the Purchaser with written notice on the Business Day following the date on which the applicable institution fails to meet the applicable ratings requirements.

<u>Eligible Institution</u>:  An institution having (i) the highest short-term debt rating, and one of the two highest long-term debt ratings of the Rating Agency; or (ii) with respect to any Custodial Account, an unsecured long-term debt rating of at least one of the two highest unsecured long-term debt ratings of the Rating Agencies.

<u>Equity</u>:  With respect to any second lien Mortgage Loan, the Appraised Value, less the unpaid principal balance of the related First Lien.

4

Equity Loan-to-Value: With respect to any second lien Mortgage Loan, the original principal balance of such Mortgage Loan, divided by the Equity.

Escrow Account: Each separate trust account or accounts created and maintained pursuant to Section 4.06 which shall be entitled "_____, in trust for the [Purchaser], Owner of Whole Loan Series 2005- WL-_____, and various Mortgagors" and shall be established as an Eligible Account, in the name of the Person that is the "Purchaser" with respect to the related Mortgage Loans.

Escrow Payments: With respect to any Mortgage Loan, the amounts constituting ground rents, taxes, assessments, water rates, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, and any other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to the Mortgage, applicable law or any other related document.

Event of Default: Any one of the conditions or circumstances enumerated in Section 9.01.

Fannie Mae: The entity formerly known as the Federal National Mortgage Association, or any successor thereto.

Fannie Mae Guides: The Fannie Mae Sellers' Guide and the Fannie Mae Servicers' Guide and all amendments or additions thereto, including, but not limited to, future updates thereof.

FDIC: The Federal Deposit Insurance Corporation, or any successor thereto.

Fidelity Bond: A fidelity bond to be maintained by the Servicer pursuant to Section 4.12.

FIRREA: The Financial Institutions Reform, Recovery, and Enforcement Act of 1989.

First Lien: With respect to any second lien Mortgage Loan, the mortgage loan relating to the corresponding Mortgaged Property having a first priority lien.

First Remittance Date: The eighteenth (18th) day of the month following each respective Closing Date, or if such day is not a Business Day, the first Business Day immediately preceding such date.

Fixed Rate Mortgage Loan: A Mortgage Loan purchased pursuant to this Agreement which bears a fixed Mortgage Interest Rate during the life of the loan.

Freddie Mac: The entity formerly known as the Federal Home Loan Mortgage Corporation, or any successor thereto.

5

Freddie Mac Guides:  The Freddie Mac Sellers' Guide and the Freddie Mac Servicers' Guide and all amendments or additions thereto, including, but not limited to, any future updates thereof.

GAAP:  Generally accepted accounting procedures, consistently applied.

Gross Margin:  With respect to any Adjustable Rate Mortgage Loan, the fixed percentage amount set forth in the related Mortgage Note and the related Mortgage Loan Schedule that is added to the Index on each Adjustment Date in accordance with the terms of the related Mortgage Note to determine the new Mortgage Interest Rate for such Mortgage Loan.

HELOC:  Any Mortgage Loan that is an individual adjustable rate, residential home equity revolving line of credit secured by a first or second deed of trust or mortgage, including any Additional Balances with respect thereto, each HELOC sold and subject to this Agreement being identified on the related Mortgage Loan Schedule and being identified as a HELOC.

HUD:  The United States Department of Housing and Urban Development or any successor thereto.

Index:  With respect to any Adjustable Rate Mortgage Loan, the index identified on the Mortgage Loan Schedule and set forth in the related Mortgage Note for the purpose of calculating the Mortgage Interest Rate thereon.

Insurance Proceeds:  With respect to each Mortgage Loan, proceeds of insurance policies insuring the Mortgage Loan or the related Mortgaged Property.

Interest Only Mortgage Loan:  A Mortgage Loan that only requires payments of interest for a period of time specified in the related Mortgage Note.

Interim Servicing Fee:  As to each Mortgage Loan Package, the amount of the fee the Purchaser shall pay to the Servicer for servicing the related Mortgage Loans in accordance with the terms of this Agreement during the Interim Servicing Period, which shall be equal to seven dollars ($7) per Mortgage Loan per month. Such fee shall be payable monthly (a pro rata Interim Servicing Fee shall be paid for any partial month within the Interim Servicing Period).

Interim Servicing Period:  As to each Mortgage Loan Package, the period of time from and including the Closing Date to the Servicing Transfer Date.

Lender Paid Mortgage Insurance Policy Program or LPMI Policies:  A program or policy in which, for any Mortgage Loan underwritten with an LTV greater than 80.00% and less than 97.00%, the owner or servicer of such Mortgage Loan is responsible for the premiums associated with the mortgage insurance policy.

Liquidation Proceeds:  Amounts received in connection with the partial or complete liquidation of a defaulted Mortgage Loan, whether through the sale or assignment of such Mortgage Loan, trustee's sale, foreclosure sale or otherwise.

6

Loan Agreement:  With respect to any HELOC, the credit line account agreement executed by the related Mortgagor and any amendment or modification thereof.

Loan-to-Value Ratio or LTV:  With respect to any Mortgage Loan, the ratio of the original outstanding principal amount of the Mortgage Loan, or with respect to any HELOC, the related Credit Limit, and, with respect to any second lien Mortgage Loan, the outstanding principal amount of any related First Lien as of the date of origination of such mortgage loan, to (i) the Appraised Value of the related Mortgaged Property at origination with respect to a Refinanced Mortgage Loan, and (ii) the lesser of the Appraised Value of the related Mortgaged Property at origination or the purchase price of the related Mortgaged Property with respect to all other Mortgage Loans.

Maximum Mortgage Interest Rate:  With respect to each Adjustable Rate Mortgage Loan, a rate that is set forth on the related Mortgage Loan Schedule and in the related Mortgage Note and is the maximum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be increased on any Adjustment Date.

MERS:  Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

MERS Mortgage Loan:  Any Mortgage Loan registered with MERS on the MERS System.

MERS System:  The system of recording transfers of mortgages electronically maintained by MERS.

MIN:  The Mortgage Identification Number for any MERS Mortgage Loan.

Minimum Monthly Payment:  With respect to any HELOC and any month, the minimum monthly payment required to be paid by the related Mortgagor in that month pursuant to the terms of the related Loan Agreement.

Minimum Mortgage Interest Rate:  With respect to each Adjustable Rate Mortgage Loan, a rate that is set forth on the related Mortgage Loan Schedule and in the related Mortgage Note and is the minimum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be decreased on any Adjustment Date.

MOM Loan:  Any Mortgage Loan as to which MERS is acting as mortgagee, solely as nominee for the originator of such Mortgage Loan and its successors and assigns.

Monthly Advance:  The payment required to be made by the Servicer with respect to any Remittance Date pursuant to Section 5.03.

Monthly Payment:  With respect to any Mortgage Loan that is not a HELOC, the scheduled monthly payment on a Mortgage Loan due on any Due Date allocable to principal and/or interest on such Mortgage Loan pursuant to the terms of the related Mortgage Note.  With respect to any HELOC, the Minimum Monthly Payment.

7

Mortgage: With respect to a Mortgage Loan that is not a Co-op Loan, the mortgage, deed of trust or other instrument securing a Mortgage Note which creates a first or second lien on an unsubordinated estate in fee simple in real property securing the Mortgage Note; except that with respect to real property located in jurisdictions in which the use of leasehold estates for residential properties is a widely-accepted practice, the mortgage, deed of trust or other instrument securing the Mortgage Note may secure and create a first or second lien upon a leasehold estate of the Mortgagor. With respect to a Co-op Loan, the related Security Agreement.

Mortgage File: With respect to each Mortgage Loan, the documents pertaining thereto specified in Exhibit A-1 and any additional documents required to be added to the Mortgage File pursuant to this Agreement.

Mortgage Interest Rate: The annual rate at which interest accrues on any Mortgage Loan in accordance with the provisions of the related Mortgage Note.

Mortgage Loan: An individual Mortgage Loan (including any HELOC) which is the subject of this Agreement, each Mortgage Loan originally sold and subject to this Agreement being identified on the Mortgage Loan Schedule, which Mortgage Loan includes without limitation the Mortgage File, the Monthly Payments, Principal Prepayments, Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds, REO Disposition Proceeds, any escrow accounts related to the Mortgage Loan, and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan, excluding replaced or repurchased mortgage loans.

Mortgage Loan Documents: The documents contained in a Mortgage File.

Mortgage Loan Package: As defined in the Recitals to this Agreement.

Mortgage Loan Remittance Rate: With respect to each Mortgage Loan, the Mortgage Interest Rate less the rate at which the premium for any LPMI Policy accrues, if applicable.

Mortgage Loan Schedule: The schedule of Mortgage Loans annexed hereto as Exhibit F, such schedule setting forth the following information with respect to each Mortgage Loan in the related Mortgage Loan Package:

(1)    the Seller's Mortgage Loan identifying number;

(2)    the Mortgagor's name;

(3)    the street address of the Mortgaged Property including the state and zip code;

(4)    a code indicating whether the Mortgaged Property is owner-occupied;

(5)    the type of residential property constituting the Mortgaged Property;

8

(6)    the original months to maturity or the remaining months to maturity from the Cut-off Date, in any case based on the original amortization schedule and, if different, the maturity expressed in the same manner but based on the actual amortization schedule;

(7)    the Loan-to-Value Ratio at origination and as of the Cut-off Date;

(8)    with respect to any second lien Mortgage Loan, the Equity Loan-to-Value Ratio at origination and as of the Cut-off Date;

(9)    the Mortgage Interest Rate at origination and as of the Cut-off Date;

(10)    the Mortgage Loan origination date;

(11)    the paid through date;

(12)    the stated maturity date of the Mortgage Loan and of the First Lien, if applicable;

(13)    the amount of the Monthly Payment as of the Cut-off Date;

(14)    the original principal amount of the Mortgage Loan and the principal balance of the related First Lien, if applicable, as of the date of origination;

(15)    the Scheduled Principal Balance of the Mortgage Loan and the principal balance of the related First Lien, if applicable, as of the Cut-off Date;

(16)    a code indicating the purpose of the Mortgage Loan (i.e., purchase, rate and term refinance, equity take-out refinance);

(17)    a code indicating the documentation style (i.e. full, alternative or reduced);

(18)    the number of times during the twelve (12) month period preceding the Closing Date that any Monthly Payment has been received thirty (30) or more days after its Due Date;

(19)    the date on which the first payment is due;

(20)    a code indicating whether or not the Mortgage Loan is insured as to payment defaults by a Primary Mortgage Insurance Policy; and, in the case of any Mortgage Loan which is insured as to payment defaults by a Primary Mortgage Insurance Policy, the name of the provider of such Primary Mortgage Insurance Policy;

(21)    a code indicating whether or not the Mortgage Loan is insured as to payment defaults by a LPMI Policy and, in the case of any Mortgage Loan which is insured as to payment defaults by a LPMI Policy, a percentage representing the amount of the related insurance premium;

(22)    a code indicating whether or not the Mortgage Loan is the subject of a Prepayment Penalty as well as the terms of the Prepayment Penalty;

9

(23)    the Primary Mortgage Insurance Policy certificate number, if applicable;

(24)    the Primary Mortgage Insurance Policy coverage percentage, if applicable;

(25)    a code indicating the Credit Score of the Mortgagor at the time of origination of the Mortgage Loan;

(26)    a code indicating the credit grade and specific loan/underwriting program of each Mortgage Loan as assigned by the Seller pursuant to the Underwriting Standards;

(27)    the loan type (i.e. fixed, adjustable; 2/28, 3/27, 5/25, etc.);

(28)    with respect to each Adjustable Rate Mortgage Loan, the first Adjustment Date and the Adjustment Date frequency;

(29)    with respect to each Adjustable Rate Mortgage Loan, the Gross Margin;

(30)    with respect to each Adjustable Rate Mortgage Loan, the Maximum Mortgage Interest Rate under the terms of the Mortgage Note;

(31)    with respect to each Adjustable Rate Mortgage Loan, the Minimum Mortgage Interest Rate under the terms of the Mortgage Note;

(32)    with respect to each Adjustable Rate Mortgage Loan, the Periodic Rate Cap;

(33)    with respect to each Adjustable Rate Mortgage Loan, the first Adjustment Date immediately following the related Cut-off Date;

(34)    with respect to each Adjustable Rate Mortgage Loan, the Index;

(35)    a code indicating whether the Mortgage Loan is a second lien Mortgage Loan;

(36)    a code indicating whether the Mortgage Loan is a MERS Mortgage Loan;

(37)    a code indicating whether the Mortgage Loan is an Interest Only Mortgage Loan;

(38)    with respect to each Interest Only Mortgage Loan, the duration of the related interest only period;

(39)    a code indicating whether the Mortgage Loan is a HELOC;

(40)    with respect to any HELOC, the Credit Limit;

(41)    with respect to any HELOC, the Amortization Period;

(42)    with respect to any HELOC, the Draw Period;

10

(43)    with respect to any HELOC, the termination fee(s), if any; and

(44)    with respect to any HELOC, the teaser rate, if applicable.

With respect to the Mortgage Loans in the aggregate in each Mortgage Loan Package, the Mortgage Loan Schedule shall set forth the following information, as of the Cut-off Date unless otherwise specified:

(1)    the number of Mortgage Loans;

(2)    the current aggregate outstanding principal balance of the Mortgage Loans;

(3)    the weighted average Mortgage Interest Rate of the Mortgage Loans;

(4)    the weighted average original months to maturity of the Mortgage Loans and the weighted average remaining months to maturity of the Mortgage Loans.

Mortgage Note: The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

Mortgaged Property: With respect to a Mortgage Loan that is not a Co-op Loan, the underlying real property securing repayment of a Mortgage Note, consisting of a fee simple parcel of real estate or a leasehold estate, the term of which is equal to or longer than the term of the related Mortgage Note. With respect to a Co-op Loan, the related Co-op Stock and Co-op Lease securing the indebtedness of the Mortgagor under the related Mortgage Loan.

Mortgagor: The obligor on a Mortgage Note.

OCC: Office of the Comptroller of the Currency, its successors and assigns.

Officers' Certificate: A certificate signed by the Chairman of the Board, the Vice Chairman of the Board, the President, a Senior Vice President or a Vice President and by the Treasurer or the Secretary or one of the Assistant Treasurers or Assistant Secretaries of the Seller, and delivered to the Purchaser as required by this Agreement.

Opinion of Counsel: A written opinion of counsel, who may be an employee of the party on behalf of whom the opinion is being given, reasonably acceptable to the Purchaser.

OTS: Office of Thrift Supervision.

Pass-Through Transfer: As defined in Section 11.01(a)(ii).

Periodic Rate Cap: With respect to each Adjustable Rate Mortgage Loan and any Adjustment Date therefor, a number of percentage points per annum that is set forth in the related Mortgage Loan Schedule and in the related Mortgage Note, which is the maximum amount by which the Mortgage Interest Rate for such Mortgage Loan may increase (without regard to the Maximum Mortgage Interest Rate) or decrease (without regard to the Minimum

Mortgage Interest Rate) on such Adjustment Date from the Mortgage Interest Rate in effect immediately prior to such Adjustment Date, which may be a different amount with respect to the first Adjustment Date.

Person: Any individual, corporation, partnership, joint venture, association, limited liability company, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Prepayment Penalty: With respect to each Mortgage Loan, the penalty if the Mortgagor prepays such Mortgage Loan as provided in the related Mortgage Note or Mortgage.

Primary Mortgage Insurance Policy: Each policy of primary mortgage insurance represented to be in effect pursuant to Section 3.02(cc), or any replacement policy therefor obtained by the Servicer pursuant to Section 4.08.

Prime Rate: The prime rate announced to be in effect from time to time as published as the average rate in The Wall Street Journal (Northeast Edition).

Principal Prepayment: Any full or partial payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any Prepayment Penalty or premium thereon and which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Purchase Price: As defined in Section 2.02.

Purchase Price and Terms Letter: As defined in the Recitals to this Agreement which may also be a form of trade execution notice.

Purchaser: DLJ Mortgage Capital, Inc., its successors in interest and assigns.

Qualified Appraiser: With respect to each Mortgage Loan, an appraiser, duly appointed by the Seller, who had no interest, direct or indirect in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan, and such appraiser and the appraisal made by such appraiser both satisfy the requirements of Fannie Mae or Freddie Mac and Title XI of FIRREA and the regulations promulgated thereunder, all as in effect on the date the Mortgage Loan was originated.

Qualified Insurer: An insurance company duly qualified as such under the laws of the states in which the Mortgaged Properties are located, duly authorized and licensed in such states to transact the applicable insurance business and to write the insurance provided by the insurance policy issued by it, approved as an insurer by Fannie Mae and Freddie Mac.

Rating Agencies: Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., Moody's Investors Service, Inc. or, in the event that some or all ownership of the Mortgage Loans is evidenced by mortgage-backed securities, the nationally recognized rating agencies issuing ratings with respect to such securities, if any.

Refinanced Mortgage Loan:  A Mortgage Loan which was made to a Mortgagor who owned the Mortgaged Property prior to the origination of such Mortgage Loan and the proceeds of which were used in whole or part to satisfy an existing mortgage.

REMIC:  A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

Remittance Date:  The 18th day of each month, beginning with the First Remittance Date, or if such day is not a Business Day, the first Business Day immediately preceding such date.

REO Disposition:  The final sale by the Servicer of any REO Property.

REO Disposition Proceeds:  Amounts received by the Servicer in connection with an REO Disposition.

REO Property:  A Mortgaged Property acquired by or on behalf of the Purchaser in full or partial satisfaction of the related Mortgage as described in Section 4.13.

Repurchase Price:  With respect to any Mortgage Loan, a price equal to (i) the greater of (A) the product of the percentage of par stated in the related Purchase Price and Terms Letter and the outstanding principal balance (or, with respect to any HELOC, the Scheduled Principal Balance) of the Mortgage Loan and (B) the outstanding principal balance of the Mortgage Loan (or, with respect to any HELOC, the Scheduled Principal Balance), plus (ii) interest on such outstanding principal balance at the related Mortgage Interest Rate from the date through which interest was last distributed to the Purchaser (from payments from the related Mortgagor or from Monthly Advances) through the day prior to the date of repurchase, plus (iii) third party expenses incurred in connection with the transfer of the Mortgage Loan being repurchased; less amounts received or advanced in respect of such repurchased Mortgage Loan which are being held in the Custodial Account for distribution in the month of repurchase, plus (iv) any unreimbursed Servicing Advances or Servicing Fees.

SAIF:  The Savings Association Insurance Fund, or any successor thereto.

Scheduled Principal Balance:  As to each Mortgage Loan, (i) the principal balance of such Mortgage Loan at the Cut-off Date after giving effect to payments of principal due on or before such date, whether or not received, minus (ii) all amounts previously distributed to the Purchaser with respect to the Mortgage Loan representing payments or recoveries of principal or advances in lieu thereof.

Security Agreement:  With respect to a Co-op Loan, the agreement or mortgage creating a security interest in favor of the originator of the Co-op Loan in the related Co-op Stock.

Seller's Officer's Certificate:  A certificate signed by the Chairman of the Board, President, any Vice President or Treasurer of Seller stating the date by which Seller expects to receive any missing documents sent for recording from the applicable recording office.

13

Servicing Advances:  All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the performance by the Servicer of its servicing obligations, including, but not limited to, the cost of (a) the preservation, restoration and protection of a Mortgaged Property, (b) any enforcement, administrative or judicial proceedings, or any legal work or advice specifically related to servicing the Mortgage Loans, including but not limited to, foreclosures, bankruptcies, condemnations, drug seizures, elections, foreclosures by subordinate or superior lienholders, and other legal actions incidental to the servicing of the Mortgage Loans (provided that such expenses are reasonable and that the Servicer specifies the Mortgage Loan(s) to which such expenses relate, and provided further that any such enforcement, administrative or judicial proceeding does not arise out of a breach of any representation, warranty or covenant of the Seller hereunder), (c) the management and liquidation of any REO Property, (d) taxes, assessments, water rates, sewer rates and other charges which are or may become a lien upon the Mortgaged Property, and Primary Mortgage Insurance Policy premiums and fire and hazard insurance coverage, (e) any expenses reasonably sustained by the Servicer, with respect to the liquidation of the Mortgaged Property in accordance with the terms of this Agreement and (f) compliance with the obligations under Section 4.08.

Servicing File:  With respect to each Mortgage Loan, the documents pertaining thereto specified in Exhibit A-2 and copies of all documents for such Mortgage Loan specified in Exhibit A-1.

Servicing Officer:  Any officer of the Servicer involved in, or responsible for, the administration and servicing of the Mortgage Loans whose name appears on a list of servicing officers furnished by the Servicer to the Purchaser upon request, as such list may from time to time be amended.

Servicing Transfer Date:  The date on which the responsibility for the servicing of the Mortgage Loans transfers from the Servicer to the Purchaser or its designee, as outlined in the Purchase Price and Terms Letter.

Underwriting Standards:  As to each first lien Mortgage Loan, the Purchaser's underwriting guidelines in effect as of the related Closing Date.  As to each second lien Mortgage Loan, the Seller's underwriting guidelines in effect as of the related Closing Date.

Whole Loan Transfer:  As defined in Section 11.01(a)(i).

14

ARTICLE II

SERVICING OF MORTGAGE LOANS;
RECORD TITLE AND POSSESSION OF MORTGAGE FILES;
BOOKS AND RECORDS; CUSTODIAL AGREEMENT;
DELIVERY OF MORTGAGE LOAN DOCUMENTS

Section 2.01          Agreement to Purchase.

The Seller agrees to sell and the Purchaser agrees to purchase on each Closing Date pursuant to this Agreement and the related Purchase Price and Terms Letter the Mortgage Loans being sold by the Seller and listed on the Mortgage Loan Schedule, together with the servicing rights associated therewith, having an aggregate Scheduled Principal Balance in an amount as set forth in the related Purchase Price and Terms Letter, or in such other amount as agreed by the Purchaser and the Seller as evidenced by the actual aggregate principal balance of the Mortgage Loans accepted by the Purchaser on such Closing Date. The Seller shall deliver in an electronic format the Mortgage Loan Schedule for the Mortgage Loans to be purchased on such Closing Date to the Purchaser at least four (4) Business Days prior to such Closing Date.

Section 2.02          Purchase Price.

The Purchase Price for the Mortgage Loans in a Mortgage Loan Package shall be equal to the sum of (i) the percentage of par as stated in the related Purchase Price and Terms Letter (subject to adjustment as provided therein), multiplied by the aggregate Scheduled Principal Balance of Mortgage Loans, other than HELOCS, listed on the related Mortgage Loan Schedule, and with respect to each HELOC listed on the related Mortgage Loan Schedule, the lesser of (a) percentage of par as stated in the related Purchase Price and Terms Letter (subject to adjustment as provided therein), multiplied by the aggregate Scheduled Principal Balance of HELOCs listed on the related Mortgage Loan Schedule and (b) 100% of the Scheduled Principal Balance of each HELOC plus $4,000, plus (ii) accrued interest on the aggregate Scheduled Principal Balance of the Mortgage Loans at the weighted average Mortgage Interest Rate of such Mortgage Loans from the Cut-off Date to but not including such Closing Date, minus (iii) with respect to each HELOC, unless otherwise set forth in the Purchase Price and Terms Letter, $35.00 (the "Purchase Price"). If so provided in the Purchase Price and Terms Letter, portions of the Mortgage Loans shall be priced separately.

The Purchase Price as set forth in the preceding paragraph for the Mortgage Loans in a Mortgage Loan Package shall be paid on the Closing Date by wire transfer of immediately available funds.

With respect to each Mortgage Loan, the Purchaser shall be entitled to (1) the principal portion of all Monthly Payments due after the Cut-off Date, (2) all other recoveries of principal collected on or after the Cut-off Date (provided, however, that the principal portion of all Monthly Payments due on or before the Cut-off Date and collected by the Servicer or any successor servicer after the Cut-off Date shall belong to the Seller), and (3) all payments of interest on the Mortgage Loans (minus that portion of any such payment which is allocable to the period prior to the Cut-off Date). The Scheduled Principal Balance of each Mortgage Loan as of

15

the Cut-off Date is determined after application of payments of principal due on or before the Cut-off Date whether or not collected, together with any unscheduled Principal Prepayments collected prior to the Cut-off Date; provided, however, that Monthly Payments for a Due Date beyond the Cut-off Date shall not be applied to the principal balance as of the Cut-off Date. Such Monthly Payments shall be the property of the Purchaser. The Seller shall deposit any such Monthly Payments into the Custodial Account.

Section 2.03          Servicing of Mortgage Loans.

On each Closing Date, the Mortgage Loans in the related Mortgage Loan Package will be sold by the Seller to the Purchaser on a servicing released basis. Subject to, and upon the terms and conditions of this Agreement, the Seller hereby transfers, assigns and delivers to the Purchaser the right to service each such Mortgage Loan sold by it as of such Closing Date.

Simultaneously with the execution and delivery of this Agreement, for each Mortgage Loan Package, the Servicer hereby agrees to service the Mortgage Loans listed on the Mortgage Loan Schedule, during the Interim Servicing Period in accordance with Accepted Servicing Practices and this Agreement.

Section 2.04          Record Title and Possession of Mortgage Files;
                      Maintenance of Servicing Files.

As of each Closing Date, the Seller will have sold, transferred, assigned, set over and conveyed to the Purchaser, without recourse, and the Seller hereby acknowledges that the Purchaser will have, all the right, title and interest of the Seller in and to the Mortgage Loans. In accordance with Section 2.07, the Seller shall deliver at its own expense, the Mortgage Files for the related Mortgage Loans to Purchaser or its designee. In addition, on or before each Closing Date, the Seller shall deliver at its own expense, the related Servicing Files for the related Mortgage Loans to the Servicer. The possession of each Servicing File by the Servicer is at the will of the Purchaser, for the sole purpose of servicing the related Mortgage Loan during the Interim Servicing Period, and such retention and possession by the Servicer is in a custodial capacity only. From each Closing Date, the ownership of each related Mortgage Loan, including the Mortgage Note, the Mortgage, the contents of the related Mortgage File and all rights, benefits, proceeds and obligations arising therefrom or in connection therewith, has been vested in the Purchaser. All rights arising out of the Mortgage Loans including, but not limited to, all funds received on or in connection with the Mortgage Loans and all records or documents with respect to the Mortgage Loans prepared by or which come into the possession of the Seller shall be received and held by the Seller in trust for the benefit of the Purchaser as the owner of the Mortgage Loans. Any portion of the Mortgage Files retained by the Seller shall be appropriately identified in the Seller's computer system to clearly reflect the ownership of the Mortgage Loans by the Purchaser. The Servicer shall release its custody of the contents of the Servicing Files only in accordance with written instructions of the Purchaser, except when such release is required as incidental to the Servicer's servicing of the Mortgage Loans or is in connection with a repurchase of any Mortgage Loan or Loans with respect thereto pursuant to this Agreement, such written instructions shall not be required. Servicing Files for the Mortgage Loans shall be delivered to the Purchaser or its designee on or before the Servicing Transfer Date.

In addition, in connection with the assignment of any MERS Mortgage Loan, the Seller agrees that it will cause, at its own expense, the MERS® System to indicate that such Mortgage Loans have been assigned by the Seller to the Purchaser in accordance with this Agreement by including (or deleting, in the case of Mortgage Loans which are repurchased in accordance with this Agreement) in such computer files the information required by the MERS® System to identify the Purchaser of such Mortgage Loans. The Seller further agrees that it will not, and will not permit the Servicer to, and the Servicer agrees that it will not, alter the information referenced in this paragraph with respect to any Mortgage Loan during the term of this Agreement unless and until such Mortgage Loan is repurchased in accordance with the terms of this Agreement.

Section 2.05         Books and Records.

The sale of each Mortgage Loan will be reflected on the Seller's balance sheet and other financial statements as a sale of assets by the Seller. The Seller shall maintain, a complete set of books and records for the Mortgage Loans sold by it which shall be appropriately identified in the Seller's computer system to clearly reflect the ownership of the Mortgage Loans by the Purchaser. In particular, the Seller shall maintain in its possession, available for inspection by the Purchaser, or its designee and shall deliver to the Purchaser upon demand, evidence of compliance with all federal, state and local laws, rules and regulations, and requirements of Fannie Mae or Freddie Mac, as applicable, including but not limited to documentation as to the method used in determining the applicability of the provisions of the Flood Disaster Protection Act of 1973, as amended, to the Mortgaged Property, documentation evidencing insurance coverage and eligibility of any condominium project for approval by Seller and periodic inspection reports as required by Section 4.13. To the extent that original documents are not required for purposes of realization of Liquidation Proceeds or Insurance Proceeds, documents maintained by the Seller may be in the form of microfilm or microfiche or such other reliable means of recreating original documents, including but not limited to, optical imagery techniques so long as the Seller complies with the requirements of the Fannie Mae Guides.

In addition to the foregoing, the Seller shall provide to any supervisory agents or examiners that regulate the Purchaser, including but not limited to, the OTS, the FDIC and other similar entities, access, during normal business hours, upon reasonable advance notice to the Seller and without charge to the Seller or such supervisory agents or examiners, to any documentation regarding the Mortgage Loans that may be required by any applicable regulator.

Section 2.06         Transfer of Mortgage Loans.

The Seller and Servicer shall keep at its office books and records in which, subject to such reasonable regulations as it may prescribe, the Seller and Servicer shall note transfers of Mortgage Loans. No transfer of a Mortgage Loan may be made unless such transfer is in compliance with the terms of Section 12.12. For the purposes of this Agreement, the Seller and Servicer shall be under no obligation to deal with any person with respect to this Agreement or any Mortgage Loan unless a properly executed Assignment, Assumption and Recognition Agreement in the form of Exhibit D with respect to such Mortgage Loan has been delivered to the Seller and Servicer. Upon receipt of notice of the transfer, the Seller and Servicer shall mark

17

its books and records to reflect the ownership of the Mortgage Loans by such assignee, and the previous Purchaser shall be released from its obligations hereunder with respect to the Mortgage Loans sold or transferred.

Section 2.07          Delivery of Mortgage Loan Documents.

The Seller shall deliver and release to the Purchaser or its designee the Mortgage Loan Documents no later than five (5) Business Days prior to the Closing Date pursuant to a bailee letter agreement. If the Seller cannot deliver the original recorded Mortgage Loan Documents on the Closing Date, the Seller shall, promptly upon receipt thereof and in any case not later than 90 days from the Closing Date, deliver such original recorded documents to the Purchaser or its designee (unless the Seller is delayed in making such delivery by reason of the fact that such documents shall not have been returned by the appropriate recording office). If delivery is not completed within 90 days of the Closing Date solely because such documents shall not have been returned by the appropriate recording office, the Seller shall deliver or cause to be delivered to the Purchaser or its designee, a Seller's Officer's Certificate which shall (i) identify the recorded document, (ii) state that the recorded document has not been delivered to the Purchaser or its designee due solely to a delay caused by the public recording office, and (iii) state the amount of time generally required by the applicable recording office to record and return a document submitted for recordation. In the event that documents have not been received by the date specified in the Seller's Officer's Certificate, a subsequent Seller's Officer's Certificate shall be delivered by such date specified in the prior Seller's Officer's Certificate, stating a revised date for receipt of documentation. The procedure shall be repeated until the documents have been received and delivered. The Seller shall use its best efforts to effect delivery of all delayed recorded documents within 120 days of the Closing Date.

Pursuant to Section 12.11, the Seller shall be responsible for recording the Assignments of Mortgage (or Form UCC-3's for Co-op Loans). The Seller shall pay all initial recording fees, for the Assignments of Mortgage (or Form UCC-3's for Co-op Loans) and any other fees in connection with the transfer of the Mortgage Loan Documents to the Purchaser or its designee.

No later than five (5) days prior to the related Closing Date, the Seller shall provide a copy of the commitment for title insurance to the Purchaser or its designee.

Any review by the Purchaser or its designee of the Mortgage Files shall in no way alter or reduce the Seller's obligations hereunder.

If the Purchaser or its designee discovers any defect with respect to any document constituting part of a Mortgage File, the Purchaser shall, or shall cause its designee to, give written specification of such defect to the Seller and the Seller shall cure or repurchase such Mortgage Loan in accordance with Section 3.03.

The Servicer shall forward to the Purchaser, or its designee, original documents evidencing an assumption, modification, consolidation or extension of any Mortgage Loan entered into in accordance with Section 4.01 or 6.01 within one week of their execution and shall also provide the original of any document submitted for recordation or a copy of such document

18

certified by the appropriate public recording office to be a true and complete copy of the original within five (5) days of its return from the appropriate public recording office.

Section 2.08    Quality Control Procedures.

The Seller must have an internal quality control program that verifies, on a regular basis, the existence and accuracy of the legal documents, credit documents, property appraisals, and underwriting decisions. The program must be capable of evaluating and monitoring the overall quality of its loan production and servicing activities. The program is to ensure that the Mortgage Loans are originated and serviced in accordance with prudent mortgage banking practices and accounting principles; guard against dishonest, fraudulent, or negligent acts; and guard against errors and omissions by officers, employees, or other authorized persons.

Section 2.09    Closing.

The closing for the purchase and sale of the Mortgage Loans shall take place on a Closing Date. The closing shall be either: by telephone, confirmed by letter or wire as the parties shall agree, or conducted in person, at such place as the parties shall agree.

The closing for the Mortgage Loans to be purchased on the Closing Date shall be subject to each of the following conditions:

(a)    at least five (5) Business Days prior to the Closing Date, the Seller shall deliver to the Purchaser a magnetic diskette, or transmit by modem or e-mail, a listing on a loan-level basis of the information contained in the Mortgage Loan Schedule;

(b)    all of the representations and warranties of the Seller and the Servicer under this Agreement shall be materially true and correct as of the Closing Date or, with respect to representations and warranties made as of a date other than the Closing Date, as of such date, and no event shall have occurred which, with notice or the passage of time, would constitute a material default under this Agreement;

(c)    the Purchaser shall have received, or the Purchaser's attorneys shall have received in escrow, all closing documents, in such forms as are agreed upon and acceptable to the Purchaser, duly executed by all signatories other than the Purchaser as required pursuant to the terms hereof;

(d)    the Seller and the Servicer shall have delivered and released to the Purchaser (or its designee) on or prior to the Closing Date all documents required pursuant to the terms of this Agreement; and

(e)    all other terms and conditions of this Agreement and the Purchase Price and Terms Letters shall have been materially complied with.

Subject to the foregoing conditions, the Purchaser shall pay to the Seller on the Closing Date the Purchase Price pursuant to Section 2.02 of this Agreement, by wire transfer of immediately available funds to the account designated by the Seller.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF
THE SELLER AND THE SERVICER; REPURCHASE; REVIEW OF MORTGAGE LOANS

Section 3.01          Representations and Warranties of the Seller and the
                      Servicer.

Secured Bankers Mortgage Company, in its capacity as Seller and Servicer (for the purposes of this Section 3.01 only, the "Company"), represents, warrants and covenants to the Purchaser that as of each Closing Date or as of such date specifically provided herein:

(a) The Company is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all licenses necessary to carry out its business as now being conducted, and is licensed and qualified to transact business in and is in good standing under the laws of each state in which any Mortgaged Property is located or is otherwise exempt under applicable law from such licensing or qualification or is otherwise not required under applicable law to effect such licensing or qualification and no demand for such licensing or qualification has been made upon the Company by any such state, and in any event the Company is in compliance with the laws of any such state to the extent necessary to ensure the enforceability of each Mortgage Loan and the servicing of the Mortgage Loans in accordance with the terms of this Agreement;

(b) The Company has the full power and authority and legal right to hold, transfer and convey each Mortgage Loan, to sell each Mortgage Loan and to execute, deliver and perform, and to enter into and consummate all transactions contemplated by this Agreement and the related Purchase Price and Terms Letter and to conduct its business as presently conducted; the Company has duly authorized the execution, delivery and performance of this Agreement and any agreements contemplated hereby, has duly executed and delivered this Agreement and the related Purchase Price and Terms Letter, and any agreements contemplated hereby, and this Agreement and the related Purchase Price and Terms Letter and each Assignment of Mortgage to the Purchaser and any agreements contemplated hereby, constitute the legal, valid and binding obligations of the Company, enforceable against it in accordance with their respective terms , except as such enforceability may be limited by bankruptcy, insolvency, moratorium, reorganization and similar laws, and by equitable principles affecting the enforceability of the rights of creditors; and all requisite corporate action has been taken by the Company to make this Agreement , the related Purchase Price and Terms Letter and all agreements contemplated hereby valid and binding upon the Company in accordance with their terms;

(c) Neither the execution and delivery of this Agreement, the related Purchase Price and Terms Letter, the sale of the Mortgage Loans to the Purchaser, the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement and the related Purchase Price and Terms Letter will conflict with any of the terms, conditions or provisions of the Company's charter or by-laws or materially conflict with or result in a material breach of any of the terms, conditions or provisions of any legal restriction or any agreement or instrument to which the Company is now a party or by which it is bound, or constitute a default or result in an acceleration under any of the foregoing,

21

or result in the material violation of any law, rule, regulation, order, judgment or decree to which the Company or its property is subject;

(d) There is no litigation, suit, proceeding or investigation pending or threatened, or any order or decree outstanding, which is reasonably likely to have a material adverse effect on the sale of the Mortgage Loans, the execution, delivery, performance or enforceability of this Agreement or the related Purchase Price and Terms Letter, or which is reasonably likely to have a material adverse effect on the financial condition of the Company;

(e) No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Company of or compliance by the Company with this Agreement and the related Purchase Price and Terms Letter, except for consents, approvals, authorizations and orders which have been obtained;

(f) The consummation of the transactions contemplated by this Agreement and the related Purchase Price and Terms Letter are in the ordinary course of business of the Company, and the transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by the Company pursuant to this Agreement and the related Purchase Price and Terms Letter are not subject to bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction;

(g) The origination and servicing practices with respect to each Mortgage Note and Mortgage have been legal and in accordance with applicable laws and regulations, and in all material respects proper and prudent in the mortgage origination and servicing business. With respect to escrow deposits and payments that the Company is entitled to collect, all such payments are in the possession of, or under the control of, the Company, and there exist no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made. All escrow payments have been collected and are being maintained in full compliance with applicable state and federal law and the provisions of the related Mortgage Note and Mortgage. As to any Mortgage Loan that is the subject of an escrow, escrow of funds is not prohibited by applicable law and has been established in an amount sufficient to pay for every escrowed item that remains unpaid and has been assessed but is not yet due and payable. No escrow deposits or other charges or payments due under the Mortgage Note have been capitalized under any Mortgage or the related Mortgage Note. All Mortgage Interest Rate adjustments have been made in strict compliance with state and federal law and the terms of the related Mortgage Note. Any interest required to be paid pursuant to state and local law has been properly paid and credited;

(h) The Company has not used selection procedures that identified the Mortgage Loans as being less desirable or valuable than other comparable mortgage loans in the Company's portfolio at the Cut-off Date;

(i) The Company will treat the sale of the Mortgage Loans to the Purchaser as a sale for reporting and accounting purposes and, to the extent appropriate, for federal income tax purposes;

(j)  The Company is an approved seller/servicer of residential mortgage loans for Fannie Mae or Freddie Mac and HUD, with such facilities, procedures and personnel necessary for the sound servicing of such mortgage loans. The Company is duly qualified, licensed, registered and otherwise authorized under all applicable federal, state and local laws, and regulations, meets the minimum capital requirements, if applicable, set forth by the OCC, and is in good standing to sell mortgage loans to and service mortgage loans for Fannie Mae or Freddie Mac and no event has occurred which would make the Company unable to comply with eligibility requirements or which would require notification to either Fannie Mae or Freddie Mac;

(k)  The Company does not believe, nor does it have any cause or reason to believe, that it cannot perform each and every covenant contained in this Agreement and the related Purchase Price and Terms Letter. The Company is solvent and the sale of the Mortgage Loans will not cause the Company to become insolvent. The sale of the Mortgage Loans is not undertaken with the intent to hinder, delay or defraud any of the Company's creditors;

(l)  No statement, tape, diskette, form, report or other document prepared by, or on behalf of, the Company pursuant to this Agreement, the related Purchase Price and Terms Letter or in connection with the transactions contemplated hereby, contains or will contain any statement that is or will be inaccurate or misleading in any material respect. The Company has prudently originated and underwritten each Mortgage Loan;

(m) The Company acknowledges and agrees that the Interim Servicing Fee represents reasonable compensation for performing such services and that the entire Interim Servicing Fee shall be treated by the Company, for accounting and tax purposes, as compensation for the servicing and administration of the Mortgage Loans pursuant to this Agreement;

(n)  The Company has delivered to the Purchaser financial statements as to its last two complete fiscal years. All such financial statements fairly present the pertinent results of operations and changes in financial position for each of such periods and the financial position at the end of each such period of the Company and its subsidiaries and have been prepared in accordance with GAAP consistently applied throughout the periods involved, except as set forth in the notes thereto. There has been no change in the business, operations, financial condition, properties or assets of the Company since the date of the Company's financial statements that would have a material adverse effect on its ability to perform its obligations under this Agreement or the related Purchase Price and Terms Letter;

(o)  The Company has not dealt with any broker, investment banker, agent or other person that may be entitled to any commission or compensation in connection with the sale of the Mortgage Loans; and

(p)  The Company is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the MERS Mortgage Loans for as long as such Mortgage Loans are registered with MERS.

23

Section 3.02        <u>Representations and Warranties as to Individual Mortgage Loans.</u>

The Seller hereby represents and warrants to the Purchaser, as to each Mortgage Loan, as of the applicable Closing Date as follows:

(a) The information set forth in the Mortgage Loan Schedule, including any diskette or other related data tapes sent to the Purchaser, is complete, true and correct in all material respects as of the Cut-off Date;

(b) With respect to a first lien Mortgage Loan that is not a Co-op Loan, the Mortgage creates a first lien or a first priority ownership interest in an estate in fee simple in real property securing the related Mortgage Note. With respect to a first lien Mortgage Loan that is a Co-op Loan, the Mortgage creates a first lien or a first priority ownership interest in the stock ownership and leasehold rights associated with the cooperative unit securing the related Mortgage Note;

(c) With respect to a second lien Mortgage Loan that is not a Co-op Loan, the Mortgage creates a second lien or a second priority ownership interest in an estate in fee simple in real property securing the related Mortgage Note. With respect to a second lien Mortgage Loan that is a Co-op Loan, the Mortgage creates a second lien or a second priority ownership interest in the stock ownership and leasehold rights associated with the cooperative unit securing the related Mortgage Note;

(d) All payments due on or prior to the Cut-off Date for such Mortgage Loan have been made as of the Closing Date, the Mortgage Loan is not 30 days or more delinquent in payment and has not been dishonored; there are no material defaults under the terms of the Mortgage Loan; the Seller has not advanced funds, or induced, solicited or knowingly received any advance of funds from a party other than the owner of the Mortgaged Property subject to the Mortgage, directly or indirectly, for the payment of any amount required by the Mortgage Loan; as to each first lien Mortgage Loan, there has been no more than one delinquency of 30 days or more during the immediately preceding twelve-month period ; and as to each second lien Mortgage Loan, there has been no delinquency of 30 days or more during the immediately preceding twelve-month period;

(e) All taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents which previously became due and owing have been paid, or escrow funds have been established in an amount sufficient to pay for every such escrowed item which remains unpaid and which has been assessed but is not yet due and payable;

(f) The terms of the Mortgage Note and the Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments which have been recorded to the extent any such recordation is required by law, or, necessary to protect the interest of the Purchaser. No instrument of waiver, alteration or modification has been executed, and no Mortgagor has been released, in whole or in part, from the terms thereof except in connection with an assumption agreement and which assumption agreement is part of the

24

Mortgage File and the terms of which are reflected in the Mortgage Loan Schedule; the substance of any such waiver, alteration or modification has been approved by the issuer of any related Primary Mortgage Insurance Policy and title insurance policy, to the extent required by the related policies;

(g) The Mortgage Note and the Mortgage are not subject to any right of rescission, set-off, counterclaim or defense, including, without limitation, the defense of usury, nor will the operation of any of the terms of the Mortgage Note or the Mortgage, or the exercise of any right thereunder, render the Mortgage Note or Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto; and the Mortgagor was not a debtor in any state or federal bankruptcy or insolvency proceeding at the time the Mortgage Loan was originated;

(h) All buildings or other customarily insured improvements upon the Mortgaged Property are insured by an insurer acceptable under the Fannie Mae Guides, against loss by fire, hazards of extended coverage and such other hazards as are provided for in the Fannie Mae Guides or by Freddie Mac, as well as all additional requirements set forth in Section 4.10 of this Agreement. All such standard hazard policies are in full force and effect and on the date of origination contained a standard mortgagee clause naming the Seller and its successors in interest and assigns as loss payee and such clause is still in effect and all premiums due thereon have been paid. If required by the Flood Disaster Protection Act of 1973, as amended, the Mortgage Loan is covered by a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration which policy conforms to Fannie Mae and Freddie Mac requirements, as well as all additional requirements set forth in Section 4.10 of this Agreement. Such policy was issued by an insurer acceptable under Fannie Mae or Freddie Mac guidelines. The Mortgage obligates the Mortgagor thereunder to maintain all such insurance at the Mortgagor's cost and expense, and upon the Mortgagor's failure to do so, authorizes the holder of the Mortgage to maintain such insurance at the Mortgagor's cost and expense and to seek reimbursement therefor from the Mortgagor;

(i) Any and all requirements of any federal, state or local law including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity or disclosure laws applicable to the Mortgage Loan have been complied with in all material respects;

(j) The Mortgage has not been satisfied, canceled or subordinated, in whole or in part, or rescinded, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part nor has any instrument been executed that would effect any such release, cancellation, subordination or rescission. The Seller has not waived the performance by the Mortgagor of any action, if the Mortgagor's failure to perform such action would cause the Mortgage Loan to be in default, nor has the Seller waived any default resulting from any action or inaction by the Mortgagor;

(k) With respect to any first lien Mortgage Loan, the related Mortgage is a valid, subsisting, enforceable and perfected first lien on the Mortgaged Property and, with respect to any second lien Mortgage Loan, the related Mortgage is a valid, subsisting, enforceable and

25

perfected second lien on the Mortgaged Property, including for Mortgage Loans that are not Co-op Loans, all buildings on the Mortgaged Property and all installations and mechanical, electrical, plumbing, heating and air conditioning systems affixed to such buildings, and all additions, alterations and replacements made at any time with respect to the foregoing securing the Mortgage Note's original principal balance. The Mortgage and the Mortgage Note do not contain any evidence of any security interest or other interest or right thereto. Such lien is free and clear of all adverse claims, liens and encumbrances having priority over the first or second lien, as applicable, of the Mortgage subject only to (1) with respect to any second lien Mortgage Loan, the related First Lien, (2) the lien of non-delinquent current real property taxes and assessments not yet due and payable, (3) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording which are acceptable to mortgage lending institutions generally and either (A) which are referred to or otherwise considered in the appraisal made for the originator of the Mortgage Loan, or (B) which do not adversely affect the appraised value of the Mortgaged Property as set forth in such appraisal, and (4) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property. Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Mortgage Loan establishes and creates (1) with respect to any first lien Mortgage Loan, a valid, subsisting, enforceable and perfected first lien and first priority security interest and (2) with respect to any second lien Mortgage Loan, a valid, subsisting, enforceable and perfected second lien and second priority security interest, in each case, on the property described therein, and the Seller has the full right to sell and assign the same to the Purchaser;

(l) The Mortgage Note and the related Mortgage are original and genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in all respects in accordance with its terms subject to bankruptcy, insolvency, moratorium, reorganization and other laws of general application affecting the rights of creditors and by general equitable principles and the Seller has taken all action necessary to transfer such rights of enforceability to the Purchaser. All parties to the Mortgage Note and the Mortgage had the legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note and the Mortgage. The Mortgage Note and the Mortgage have been duly and properly executed by such parties. No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of Seller or the Mortgagor, or, on the part of any other party involved in the origination of the Mortgage Loan. The proceeds of the Mortgage Loan, other than a HELOC, have been fully disbursed and there is no requirement for future advances thereunder, and any and all requirements as to completion of any on-site or off-site improvements and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making or closing the Mortgage Loan and the recording of the Mortgage were paid or are in the process of being paid, and the Mortgagor is not entitled to any refund of any amounts paid or due under the Mortgage Note or Mortgage;

(m) The Seller or its affiliate is the sole owner of record and holder of the Mortgage Loan and the indebtedness evidenced by the Mortgage Note, and upon recordation the Purchaser or its designee will be the owner of record of the Mortgage and the indebtedness evidenced by the Mortgage Note, and upon the sale of the Mortgage Loan to the Purchaser, the Servicer will retain the Servicing File in trust for the Purchaser only for the purpose of servicing

26

and supervising the servicing of the Mortgage Loan. Immediately prior to the transfer and assignment to the Purchaser on the Closing Date, the Mortgage Loan, including the Mortgage Note and the Mortgage, were not subject to an assignment or pledge, and the Seller had good and marketable title to and was the sole owner thereof and had full right to transfer and sell the Mortgage Loan to the Purchaser free and clear of any encumbrance, equity, lien, pledge, charge, claim or security interest and has the full right and authority subject to no interest or participation of, or agreement with, any other party, to sell and assign the Mortgage Loan pursuant to this Agreement and following the sale of the Mortgage Loan, the Purchaser will own such Mortgage Loan free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, claim or security interest. The Seller intends to relinquish all rights to possess, control and monitor the Mortgage Loan, except for the purposes of servicing the Mortgage Loan as set forth in this Agreement;

(n) Each Mortgage Loan that is not a Co-op Loan or a HELOC is covered by an ALTA lender's title insurance policy or other generally acceptable form of policy or insurance acceptable to Fannie Mae or Freddie Mac, issued by a title insurer acceptable to Fannie Mae or Freddie Mac and qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring (subject to the exceptions contained in (k)(1), (2), (3) and (4) above) the Seller, its successors and assigns, as to the first or second, as applicable, priority lien of the Mortgage in the original principal amount of the Mortgage Loan. Where required by applicable state law or regulation, the Mortgagor has been given the opportunity to choose the carrier of the required mortgage title insurance. The Seller, its successors and assigns, are the sole insureds of such lender's title insurance policy, such title insurance policy has been duly and validly endorsed to the Purchaser or the assignment to the Purchaser of the Seller's interest therein does not require the consent of or notification to the insurer and such lender's title insurance policy is in full force and effect and will be in full force and effect upon the consummation of the transactions contemplated by this Agreement and the related Purchase Price and Terms Letter. No claims have been made under such lender's title insurance policy, and no prior holder of the related Mortgage, including the Seller, has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy. Each Mortgage Loan that is a HELOC (i) is covered by an ALTA lender's title insurance policy or other generally acceptable form of policy or insurance, or (ii) has included in the related Mortgage File such other evidence or inquiry of title, in each case, as is required for compliance with the Underwriting Standards;

(o) There is no default, breach, violation or event of acceleration existing under the Mortgage or the related Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event permitting acceleration; and neither the Seller nor any prior mortgagee has waived any default, breach, violation or event permitting acceleration. With respect to each second lien Mortgage Loan, (i) the First Lien is in full force and effect, (ii) there is no default, breach, violation or event of acceleration existing under such prior mortgage or the related mortgage note, (iii) no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration thereunder, and either (A) the prior mortgage contains a provision which allows or (B) applicable law requires, the mortgagee under the second lien Mortgage Loan to receive notice of, and affords such mortgagee an opportunity to cure any default by payment in full or otherwise under the prior mortgage;

(p) There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such liens) affecting the related Mortgaged Property which are or may be liens prior to or equal to the lien of the related Mortgage;

(q) All improvements subject to the Mortgage which were considered in determining the appraised value of the Mortgaged Property lie wholly within the boundaries and building restriction lines of the Mortgaged Property (and wholly within the project with respect to a condominium unit) and no improvements on adjoining properties encroach upon the Mortgaged Property except those which are insured against by the title insurance policy referred to in clause (m) above and all improvements on the property comply with all applicable zoning and subdivision laws and ordinances;

(r) The Mortgage Loan was originated by or for the Seller. The Mortgage Loan complies with all the terms, conditions and requirements of the Underwriting Standards. With respect to each Mortgage Loan that is not a HELOC, the Mortgage Notes and Mortgages (exclusive of any riders) are on forms generally acceptable to Fannie Mae or Freddie Mac. Seller is currently selling loans to Fannie Mae and/or Freddie Mac which are the same document forms as the Mortgage Notes and Mortgages (inclusive of any riders). With respect to each HELOC, the Mortgage Notes, Mortgages and Loan Agreements (inclusive of any riders) are on forms created by one of the document preparation companies approved or recommended by the Purchaser. The Mortgage Loan bears interest at the Mortgage Interest Rate set forth in the Mortgage Loan Schedule, and Monthly Payments under the Mortgage Note are due and payable on the first day of each month. The Mortgage contains the usual and enforceable provisions of the originator at the time of origination for the acceleration of the payment of the unpaid principal amount of the Mortgage Loan if the related Mortgaged Property is sold without the prior consent of the mortgagee thereunder;

(s) The Mortgaged Property is not subject to any material damage by waste, fire, earthquake, windstorm, flood or other casualty. At origination of the Mortgage Loan there was, and there currently is, no proceeding pending for the total or partial condemnation of the Mortgaged Property. There have not been any condemnation proceedings with respect to the Mortgaged Property and there are no such proceedings scheduled to commence at a future date;

(t) The related Mortgage contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby. There is no homestead or other exemption available to the Mortgagor which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage subject to applicable federal and state laws and judicial precedent with respect to bankruptcy and right of redemption;

(u) If the Mortgage constitutes a deed of trust, a trustee, authorized and duly qualified if required under applicable law to act as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses, except as may be required by local law, are or will become payable by the Purchaser to the trustee under the deed of trust, except in connection with a trustee's sale or attempted sale after default by the Mortgagor;

28

(v) The Mortgage File for each Mortgage Loan that is not a HELOC contains an appraisal of the related Mortgaged Property signed prior to the final approval of the mortgage loan application by a Qualified Appraiser, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan, and the appraisal and appraiser both satisfy the requirements of Fannie Mae or Freddie Mac and Title XI of FIRREA and the regulations promulgated thereunder, all as in effect on the date the Mortgage Loan was originated. The appraisal is in a form acceptable to Fannie Mae or Freddie Mac. The Mortgage File for each HELOC contains any appraisal or such other determination of value of the related Mortgaged Property as is required for compliance with the Underwriting Standards;

(w) All parties which have had any interest in the Mortgage, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (A) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (B) (1) organized under the laws of such state, or (2) qualified to do business in such state, or (3) federal savings and loan associations or national banks or a Federal Home Loan Bank or savings bank having principal offices in such state, or (4) not doing business in such state;

(x) The related Mortgage Note is not and has not been secured by any collateral except the lien of the corresponding Mortgage and the security interest of any applicable security agreement or chattel mortgage referred to above and such collateral does not serve as security for any other obligation;

(y) The Mortgagor has received all disclosure materials required by applicable law with respect to the making of such mortgage loans;

(z) The Mortgage Loan does not contain "graduated payment" features; to the extent any Mortgage Loan contains any buydown provision, such buydown funds have been maintained and administered in accordance with, and such Mortgage Loan otherwise complies with, Fannie Mae/Freddie Mac requirements relating to buydown loans;

(aa)    The Mortgagor is not in bankruptcy or insolvent and the Seller has no knowledge of any circumstances or condition with respect to the Mortgage, the Mortgaged Property, the Mortgagor or the Mortgagor's credit standing that could reasonably be expected to cause investors to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent, or materially adversely affect the value or marketability of the Mortgage Loan;

(bb)    The Mortgage Loans have an original term to maturity of not more than 30 years with interest payable in arrears on the first day of each month. Except with respect to HELOCs and Interest Only Mortgage Loans, each Mortgage Note requires a monthly payment which is sufficient to fully amortize the original principal balance over the original term thereof and to pay interest at the related Mortgage Interest Rate; provided, however, in the case of a balloon Mortgage Loan, the Mortgage Loan matures at least five (5) years after the first payment date thereby requiring a final payment of the outstanding principal balance prior to the full amortization of the Mortgage Loan. No Mortgage Loan contains terms or provisions which

would result in negative amortization. The Monthly Payment on each Interest Only Mortgage Loan during the related interest-only period is equal to the product of the related Mortgage Interest Rate and the principal balance of such Mortgage Loan on the first day of each month and after such interest-only period, except with respect to Interest Only Mortgage Loans that are Adjustable Rate Mortgage Loans, such Mortgage Loan is payable in equal monthly installments of principal and interest;

(cc)    Except for Mortgage Loans underwritten in accordance with the Lender Paid Mortgage Insurance Policy Program, if a Mortgage Loan has an LTV greater than 80%, the excess of the principal balance of the Mortgage Loan over 75% of the Appraised Value, with respect to a Refinanced Mortgage Loan, or the lesser of the Appraised Value or the purchase price of the Mortgaged Property, with respect to a purchase money Mortgage Loan, is and will be insured as to payment defaults by a Primary Mortgage Insurance Policy issued by a Qualified Insurer. All provisions of such Primary Mortgage Insurance Policy have been and are being complied with, such policy is in full force and effect, and all premiums due thereunder have been paid. No action, inaction, or event has occurred and no state of facts exists that has, or will result in the exclusion from, denial of, or defense to coverage. Any Mortgage Loan subject to a Primary Mortgage Insurance Policy obligates the Mortgagor thereunder to maintain the Primary Mortgage Insurance Policy and to pay all premiums and charges in connection therewith. The mortgage interest rate for the Mortgage Loan as set forth on the Mortgage Loan Schedule is net of any such insurance premium;

(dd)    The Assignment of Mortgage is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located;

(ee)    As to Mortgage Loans that are not Co-op Loans and that are not secured by an interest in a leasehold estate, the Mortgaged Property is located in the state identified in the Mortgage Loan Schedule and consists of a single parcel of real property with a detached single family residence erected thereon, or a townhouse, or a two-to four-family dwelling, or an individual condominium unit in a condominium project, or an individual unit in a planned unit development or a de minimis planned unit development, provided, however, that no residence or dwelling is a single parcel of real property with a cooperative housing corporation erected thereon, or a mobile or manufactured home. As of the date of origination, no portion of the Mortgaged Property was used for commercial purposes, and since the date of origination no portion of the Mortgaged Property has been used for commercial purposes;

(ff) Except with respect to HELOCs and Interest Only Mortgage Loans, principal payments on the Mortgage Loan commenced no more than sixty (60) days after the funds were disbursed in connection with the Mortgage Loan. The Mortgage Note is payable on the first day of each month in equal monthly installments of principal and interest, with interest calculated and payable in arrears, sufficient to amortize the Mortgage Loan fully by the stated maturity date, over an original term of not more than thirty years from commencement of amortization with respect to each Mortgage Loan; provided, however, in the case of a balloon Mortgage Loan, the Mortgage Loan matures at least five (5) years after the first payment date thereby requiring a final payment of the outstanding principal balance prior to the full amortization of the Mortgage Loan;

(gg)    With respect to each Mortgage Loan that contains a Prepayment Penalty, such Prepayment Penalty is enforceable and will be enforced by the Seller, and such Prepayment Penalty is permitted pursuant to federal, state and local law. No Mortgage Loan will impose a prepayment penalty for a term in excess of five years from the date such Mortgage Loan was originated. Except as otherwise set forth on the Mortgage Loan Schedule, with respect to each Mortgage Loan that contains a Prepayment Penalty, such Prepayment Penalty is at least equal to the lesser of (A) the maximum amount permitted under applicable law and (B) six months interest at the related Mortgage Interest Rate on the amount prepaid in excess of 20% of the original principal balance of such Mortgage Loan;

(hh)    As of the date of origination of the Mortgage Loan, the Mortgaged Property was lawfully occupied under applicable law, and all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities;

(ii) If the Mortgaged Property is a condominium unit or a planned unit development (other than a de minimis planned unit development), or stock in a cooperative housing corporation, such condominium, cooperative or planned unit development project meets the Seller's eligibility requirements as set forth in Underwriting Standards;

(jj) There is no pending action or proceeding directly involving the Mortgaged Property in which compliance with any environmental law, rule or regulation is an issue; there is no violation of any environmental law, rule or regulation with respect to the Mortgaged Property; and nothing further remains to be done to satisfy in full all requirements of each such law, rule or regulation constituting a prerequisite to use and enjoyment of said property;

(kk)    The Mortgagor has not notified the Seller, and the Seller has no knowledge of any relief requested or allowed to the Mortgagor under the Servicemembers' Civil Relief Act;

(ll) No Mortgage Loan was made in connection with the construction or rehabilitation of a Mortgaged Property or facilitating the trade-in of a Mortgaged Property;

(mm)   No action has been taken or failed to be taken by the Seller on or prior to the Closing Date which has resulted or will result in an exclusion from, denial of, or defense to coverage under any Primary Mortgage Insurance Policy (including, without limitation, any exclusions, denials or defenses which would limit or reduce the availability of the timely payment of the full amount of the loss otherwise due thereunder to the insured) whether arising out of actions, representations, errors, omissions, negligence, or fraud of the Seller, or for any other reason under such coverage;

(nn)    Each Mortgage Loan has been serviced in all material respects in compliance with Accepted Servicing Practices;

(oo)    With respect to each Co-op Loan, the related Mortgage is a valid, enforceable and subsisting first security interest on the related cooperative shares securing the

related cooperative note, subject only to (a) liens of the cooperative for unpaid assessments representing the Mortgagor's pro rata share of the cooperative's payments for its blanket mortgage, current and future real property taxes, insurance premiums, maintenance fees and other assessments to which like collateral is commonly subject and (b) other matters to which like collateral is commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Security Agreement. There are no liens against or security interest in the cooperative shares relating to each Co-op Loan (except for unpaid maintenance, assessments and other amounts owed to the related cooperative which individually or in the aggregate will not have a material adverse effect on such Co-op Loan), which have priority over the Seller's security interest in such cooperative shares;

(pp)    With respect to each Co-op Loan, a search for filings of financing statements has been made by a company competent to make the same, which company is acceptable to Fannie Mae and qualified to do business in the jurisdiction where the cooperative unit is located, and such search has not found anything which would materially and adversely affect the Co-op Loan;

(qq)    With respect to each Co-op Loan, the related cooperative corporation that owns title to the related cooperative apartment building is a "cooperative housing corporation" within the meaning of Section 216 of the Code, and is in material compliance with applicable federal, state and local laws which, if not complied with, could have a material adverse effect on the Mortgaged Property;

(rr) With respect to each Co-op Loan, there is no prohibition against pledging the shares of the cooperative corporation or assigning the Co-op Lease;

(ss) The Mortgage Loan was originated by a mortgagee approved by the Secretary of Housing and Urban Development pursuant to sections 203 and 211 of the National Housing Act, a savings and loan association, a savings bank, a commercial bank, credit union, insurance company or similar institution which is supervised and examined by a federal or state authority;

(tt) With respect to any ground lease to which a Mortgaged Property may be subject: (i) a true, correct and complete copy of the ground lease and all amendments, modifications and supplements thereto is included in the Servicing File, and the Mortgagor is the owner of a valid and subsisting leasehold interest under such ground lease; (ii) such ground lease is in full force and effect, unmodified and not supplemented by any writing or otherwise except as contained in the Mortgage File; (iii) all rent, additional rent and other charges reserved therein have been fully paid to the extent payable as of the Closing Date; (iv) the Mortgagor enjoys the quiet and peaceful possession of the leasehold estate, subject to any sublease; (v) the Mortgagor is not in default under any of the terms of such ground lease, and there are no circumstances which, with the passage of time or the giving of notice, or both, would result in a default under such ground lease; (vi) the lessor under such ground lease is not in default under any of the terms or provisions of such ground lease on the part of the lessor to be observed or performed; (vii) the lessor under such ground lease has satisfied any repair or construction obligations due as of the Closing Date pursuant to the terms of such ground lease; (viii) the execution, delivery and performance of the Mortgage do not require the consent (other than those consents which have been obtained and are in full force and effect) under, and will not contravene any provision of or

32

cause a default under, such ground lease; (ix) the ground lease term extends, or is automatically renewable, for at least five years beyond the maturity date of the related Mortgage Loan; and (x) the Purchaser has the right to cure defaults on the ground lease;

      (uu)    With respect to any broker fees collected and paid on any of the Mortgage Loans, all broker fees have been properly assessed to the borrower and no claims will arise as to broker fees that are double charged and for which the borrower would be entitled to reimbursement;

      (vv)    With respect to any Mortgage Loan as to which an affidavit has been delivered to the Purchaser certifying that the original Mortgage Note has been lost or destroyed and not been replaced, if such Mortgage Loan is subsequently in default, the enforcement of such Mortgage Loan will not be materially adversely affected by the absence of the original Mortgage Note;

      (ww)    Each Mortgage Loan constitutes a qualified mortgage under Section 860G(a)(3)(A) of the Code and Treasury Regulations Section 1.860G-2(a)(1);

      (xx)    Except as provided in Section 2.07, the Mortgage Note, the Mortgage, the Assignment of Mortgage and the other documents set forth in Exhibit A-1 and required to be delivered on the related Closing Date have been delivered to the Purchaser or its designee;

      (yy)    All information supplied by, on behalf of, or concerning the Mortgagor is true, accurate and complete and does not contain any statement that is or will be inaccurate or misleading in any material respect;

      (zz)    There does not exist on the related Mortgage Property any hazardous substances, hazardous wastes or solid wastes, as such terms are defined in the Comprehensive Environmental Response Compensation and Liability Act, the Resource Conservation and Recovery Act of 1976, or other federal, state or local environmental legislation;

      (aaa)    The Mortgagor has executed a statement to the effect that the Mortgagor has received all disclosure materials required by applicable law with respect to the making of adjustable rate mortgage loans. The Servicer shall maintain such statement in the Servicing File;

      (bbb)    No second lien Mortgage Loan has an LTV in excess of 100%. No second lien Mortgage Loan has an Equity LTV in excess of 100%;

      (ccc)    Either (a) no consent for the second lien Mortgage Loan is required by the holder of the related first lien or (b) such consent has been obtained and is contained in the Mortgage File;

      (ddd)    With respect to any second lien Mortgage Loan, the Seller has not received notice of: (1) any proceeding for the total or partial condemnation of any Mortgaged Property, (2) any subsequent, intervening mortgage, lien, attachment, lis pendens or other encumbrance affecting any Mortgaged Property or (3) any default under any mortgage, lien or other encumbrance senior to each Mortgage;

(eee)   With respect to any second lien Mortgage Loan, where required or customary in the jurisdiction in which the Mortgaged Property is located, the original lender has filed for record a request for notice of any action by the senior lienholder under the related First Lien, and the original lender has notified any senior lienholder in writing of the existence of the second lien Mortgage Loan and requested notification of any action to be taken against the Mortgagor by the senior lienholder;

(fff)   Except for any Mortgage Loan identified as a HELOC, no Mortgage Loan is a "home equity line of credit";

(ggg)   No Mortgage Loan had a Loan-to-Value Ratio at the time of origination of more than 100%;

(hhh)   As of the Closing Date, the Seller has not received a notice of default of a First Lien which has not been cured;

(iii) No First Lien provides for negative amortization;

(jjj)   None of the Mortgage Loans are classified as (a) a "high cost" loan under the Home Ownership and Equity Protection Act of 1994 or (b) a "high cost," "threshold," "covered," or "predatory" loan under any other applicable state, federal or local law;

(kkk)   None of the proceeds of the Mortgage Loan were used to finance single-premium credit insurance policies;

(lll)   No HELOC is secured by a Mortgaged Property located in the State of Texas. With respect to any Mortgage Loan which is a Texas Home Equity Loan, any and all requirements of Section 50, Article XVI of the Texas Constitution applicable to Texas Home Equity Loans which were in effect at the time of the origination of the Mortgage Loan have been complied with. Specifically, without limiting the generality of the foregoing,

(a)   all fees paid by the owner of the Mortgaged Property or such owner's spouse, to any person, that were necessary to originate, evaluate, maintain, record, insure or service the Mortgage Loan are reflected in the closing statement for such Mortgage Loan;

(b)   the Mortgage Loan was closed only at the office of the mortgage lender, an attorney at law, or a title company;

(c)   the mortgagee has not been found by a federal regulatory agency to have engaged in the practice of refusing to make loans because the applicants for the loans reside or the property proposed to secure the loans is located in a certain area;

(d)   the owner of the Mortgaged Property was not required to apply the proceeds of the Mortgage Loan to repay another debt except debt secured by the Mortgaged Property or debt to a lender other than the mortgagee;

34

(e)    the owner of the Mortgaged Property did not sign any documents or instruments relating to the Loan in which blanks were left to be filled in; and

(f)    if discussions between the mortgagee and the Mortgagor were conducted primarily in a language other than English, the mortgagee provided to the owner of the Mortgaged Property, prior to closing, a copy of the notice required by Section 50(g), Article XVI of the Texas Constitution translated into the written language in which the discussions were conducted.

All notices, acknowledgments and disclosure statements required by Section 50, Article XVI of the Texas Constitution applicable to Texas Home Equity Loans are contained in the Mortgage File for each such Mortgage Loan;

(mmm) With respect to each Mortgage Loan, the Seller shall have obtained either (i) a life of loan transferable real estate tax service contract with a company reasonably acceptable to the Purchaser and shall assign such contract to the Purchaser or its designee or (ii) the Seller shall reimburse to the Purchaser or its designee the cost of obtaining such contract;

(nnn) No Mortgage Loan which was originated on or after October 1, 2002 and before March 7, 2003 and is secured by a Mortgaged Property located in the State of Georgia has an original principal balance that is less than or equal to the applicable conforming loan limit established by Fannie Mae (as of the related origination date);

(ooo) None of the Mortgagors are foreign nationals who enjoy the benefits of either full or partial diplomatic immunity; and

(ppp) With respect to any Mortgage Loan that is a HELOC:

(a)    the Minimum Monthly Payment with respect to such HELOC is not less than the interest accrued at the applicable Mortgage Interest Rate on the average daily outstanding principal balance during the Billing Cycle relating to the date on which such Minimum Monthly Payment is due;(b)  such HELOC accrues interest at an adjustable Mortgage Interest Rate computed on the actual number of days in a Billing Cycle and a 360-day year;

(b)    such HELOC was originated and funded not later than 30 days prior to the related Closing Date;

(c)    if such HELOC has a termination fee , such termination fee shall be in the amount, and of the type, set for on the Mortgage Loan Schedule;

(d)    except as otherwise provided in the related Purchase Price and Terms Letter, the Draw Period for such HELOC shall be five, ten or fifteen years followed by an Amortization Period of ten years;

(e)    such HELOC is not a Co-op Loan or a Convertible Mortgage Loan and such HELOC does not provide for escrow arrangements; and

(f) as of the related Closing Date, the Scheduled Principal Balance of such HELOC is equal to the initial Draw less any payments of principal applied with respect thereto and there have been no subsequent Draws made in connection therewith or Additional Balances added thereto.

Section 3.03          Repurchase; Substitution.

It is understood and agreed that the representations and warranties set forth in Sections 3.01 and 3.02 shall survive the sale of the Mortgage Loans, delivery of the Mortgage File to the Purchaser, or its designee, and transfer of the servicing rights associated with such Mortgage Loans, and shall inure to the benefit of the Purchaser, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment or the examination, or lack of examination, of any Mortgage Loan Document. Upon discovery by the Seller, the Servicer or the Purchaser of a breach of any of the foregoing representations and warranties which materially and adversely affects the value of the Mortgage Loans or the interest of the Purchaser in any Mortgage Loan, the party discovering such breach shall give prompt written notice to the others. With respect to the representations and warranties which are made to the best of the Seller's knowledge, if it is discovered by the Seller, the Servicer or the Purchaser that the substance of such representation and warranty is inaccurate and such inaccuracy materially and adversely affects the value of the related Mortgage Loan or the interests of the Purchaser therein, notwithstanding such Seller's lack of knowledge with respect to the substance of such representation or warranty, such inaccuracy shall be deemed a breach of the applicable representation or warranty. The Seller shall have a period of sixty (60) days from the earlier of its discovery or its receipt of notice of any such breach within which to correct or cure such breach. The Seller hereby covenants and agrees that if any such breach is not corrected or cured within such sixty (60) day period, the Seller shall, at the Purchaser's option and not later than the next Determination Date either repurchase such Mortgage Loan at the Repurchase Price or substitute a mortgage loan for the Defective Mortgage Loan as provided below. In the event that any such breach shall involve any representation or warranty set forth in Section 3.01, and such breach is not cured within sixty days of the earlier of either discovery by or notice to the Seller of such breach, all Mortgage Loans shall, at the option of the Purchaser, be repurchased by the Seller at the Repurchase Price. Any such repurchase shall be accomplished by deposit in the Custodial Account of the amount of the Repurchase Price.

If pursuant to the foregoing provisions the Seller repurchases a Mortgage Loan that is a MERS Mortgage Loan, the Servicer shall either (i) cause MERS to execute and deliver an assignment of the Mortgage in recordable form to transfer the Mortgage from MERS to the Seller and shall cause such Mortgage to be removed from registration on the MERS® System in accordance with MERS' rules and regulations or (ii) cause MERS to designate on the MERS® System the Seller as the beneficial holder of such Mortgage Loan.

If the Seller is required to repurchase any Mortgage Loan pursuant to this Section 3.03 as a result of a breach of any of the representations and warranties set forth in Section 3.02, the Seller may, with the Purchaser's prior consent, which consent shall not be unreasonably withheld, within two (2) years from the Closing Date, remove such defective Mortgage Loan from the terms of this Agreement and substitute another mortgage loan for such defective Mortgage Loan, in lieu of repurchasing such defective Mortgage Loan. Any substitute Mortgage

Loan shall (a) have a principal balance at the time of substitution not in excess of the principal balance of the defective Mortgage Loan (the amount of any difference, plus one month's interest thereon at the Mortgage Interest Rate borne by the defective Mortgage Loan, being paid by the Seller and deemed to be a Principal Prepayment to be deposited by the Seller in the Custodial Account), (b) have a Mortgage Interest Rate not less than, and not more than one percentage point greater than, the Mortgage Interest Rate of the removed Mortgage Loan, (c) have a remaining term to stated maturity not later than, and not more than one year less than, the remaining term to stated maturity of the removed Mortgage Loan, (d) be, in the reasonable determination of the Purchaser, of the same type, quality and character (including location of the Mortgaged Property) as the removed Mortgage Loan as if the breach had not occurred, (e) have a Loan-to-Value Ratio at origination no greater than that of the removed Mortgage Loan, (f) with respect to any second lien Mortgage Loan, have an Equity Loan-to-Value Ratio at origination no greater than that of the removed Mortgage Loan, (g) have the same lien priority as that of the removed Mortgage Loan and (h) be, in the reasonable determination of the Purchaser, in material compliance with the representations and warranties contained in this Agreement and described in Section 3.02 as of the date of substitution.

The Seller shall amend the Mortgage Loan Schedule to reflect the withdrawal of the removed Mortgage Loan from this Agreement and the substitution of such substitute Mortgage Loan therefor. Upon such amendment, the Purchaser shall review the Mortgage File delivered to it relating to the substitute Mortgage Loan. The Monthly Payment on a substitute Mortgage Loan due on the Due Date in the month of substitution shall be the property of the Seller and the Monthly Payment on the Defective Mortgage Loan for which the substitution is made due on the such date shall be the property of the Purchaser.

It is understood and agreed that the obligation of the Seller set forth in this Section 3.03 to cure, repurchase or substitute for a defective Mortgage Loan, and to indemnify Purchaser pursuant to Section 8.01, constitutes the sole remedies of the Purchaser respecting a breach of the foregoing representations and warranties. If the Seller fails to repurchase or substitute for a defective Mortgage Loan in accordance with this Section 3.03, or fails to cure a defective Mortgage Loan to Purchaser's reasonable satisfaction in accordance with this Section 3.03, or to indemnify Purchaser pursuant to Section 8.01, that failure shall, upon compliance by the Purchaser with the next to the last paragraph of this Section 3.03, be an Event of Default and the Purchaser shall be entitled to pursue all available remedies. No provision of this paragraph shall affect the rights of the Purchaser to terminate this Agreement for cause, as set forth in Sections 9.01 and 10.01.

Any cause of action against the Seller relating to or arising out of the breach of any representations and warranties made in Sections 3.01 and 3.02 shall accrue as to any Mortgage Loan upon (i) the earlier of discovery of such breach by the Seller or notice thereof by the Purchaser to the Seller, (ii) failure by the Seller to cure such breach or repurchase such Mortgage Loan as specified above, and (iii) demand upon the Seller by the Purchaser for compliance with this Agreement.

In the event that any Mortgage Loan is held by a REMIC, notwithstanding any contrary provision of this Agreement, with respect to any Mortgage Loan that is not in default or as to which no default is imminent, Purchaser may, in connection with any repurchase or

substitution of a Defective Mortgage Loan pursuant to this Section 3.03, require that the Seller deliver, at the Seller's expense, an Opinion of Counsel to the effect that such repurchase or substitution will not (i) result in the imposition of taxes on "prohibited transactions" of such REMIC (as defined in Section 860F of the Code) or otherwise subject the REMIC to tax, or (ii) cause the REMIC to fail to qualify as a REMIC at any time.

Section 3.04        Repurchase of Convertible Mortgage Loans.

In the event the Mortgagor under any Convertible Mortgage Loan elects to convert said Mortgage Note to a fixed interest rate Mortgage Note, as provided in said Mortgage Note, then the Seller shall, prior to the effective date of said conversion, repurchase such Convertible Mortgage Loan from the Purchaser in accordance with Section 3.03 hereof.

Section 3.05        Repurchase of Mortgage Loans With Early Payment Defaults.

If (a) a Mortgagor is thirty (30) days or more delinquent with respect to any of the first three (3) Monthly Payments due to the Purchaser on the related Mortgage Loan immediately following the applicable Closing Date or (b) a Mortgage Loan is in bankruptcy or litigation within the first three (3) months immediately following the applicable Closing Date, the Seller, at the Purchaser's option, shall promptly repurchase such Mortgage Loan from the Purchaser within five (5) Business Days' of receipt of written notice from the Purchaser, in accordance with the procedures set forth in Section 3.03 hereof, however, any such repurchase shall be made at the Repurchase Price.

Section 3.06        Purchase Price Protection

With respect to any first lien Mortgage Loan or second lien Mortgage Loan (in each case, other than a HELOC) that prepays in full during the three (3) month period from and after the Closing Date, the Seller shall reimburse the Purchaser an amount equal to (a) the amount, if any, by which the Purchase Price paid by the Purchaser to the Seller exceeded 100% of the outstanding Scheduled Principal Balance of the Mortgage Loan as of the Cut-off Date minus (b) the amount of any Prepayment Penalty to the extent such Prepayment Penalty is (i) legally enforceable and (ii) collected and remitted to the Purchaser, in each case, with respect to such Mortgage Loan, within thirty (30) days of such prepayment in full. With respect to any HELOC, if, at the close of business on the date that is three (3) months from and after the Closing Date, such HELOC has an outstanding Scheduled Principal Balance (including any Additional Balances) of less than 50% of the outstanding Scheduled Principal Balance of such HELOC as of the related Cut-off Date, the Seller shall reimburse the Purchaser an amount equal to (a) the amount, if any, by which the Purchase Price paid by the Purchaser to the Seller exceeded 100% of the outstanding Scheduled Principal Balance of such HELOC as of the Cut-off Date minus (b) the amount of any Prepayment Penalty to the extent such Prepayment Penalty is (i) legally enforceable and (ii) collected and remitted to the Purchaser, in each case, with respect to such HELOC. Upon any assignment of a Mortgage Loan and/or this Agreement, the Purchaser may at its option retain its rights under this Section 3.06 notwithstanding such assignment.

Section 3.07          <u>Acknowledgement of Anti-Predatory Lending Policies</u>.

As of the applicable Closing Date, the Purchaser has in place internal policies and procedures that expressly prohibit its purchase of any Mortgage Loan classified as (a) a "high cost" loan under the Home Ownership and Equity Protection Act of 1994 or (b) a "high cost," "threshold," "covered," or "predatory" loan under any other applicable state, federal or local law (or a similarly classified loan using different terminology under a law, regulation or ordinance imposing heightened regulatory scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees).

ARTICLE IV

ADMINISTRATION AND SERVICING OF THE MORTGAGE LOANS DURING
THE INTERIM SERVICING PERIOD

Section 4.01            The Servicer to Act as Servicer.

The Servicer, as independent contract servicer, shall service and administer the
Mortgage Loans in accordance with this Agreement and with Accepted Servicing Practices, and
shall have full power and authority, acting alone, to do or cause to be done any and all things in
connection with such servicing and administration which the Servicer may deem necessary or
desirable and consistent with the terms of this Agreement and with Accepted Servicing Practices.
The Servicer shall service and administer the Mortgage Loans through the exercise of the same
care that it customarily employs for its own account.  Except as set forth in this Agreement, the
Servicer shall service the Mortgage Loans in strict compliance with the servicing provisions of
the Fannie Mae Guides (special servicing option), which include, but are not limited to,
provisions regarding the liquidation of Mortgage Loans, the collection of Mortgage Loan
payments, the payment of taxes, insurance and other charges, the maintenance of hazard
insurance with a Qualified Insurer, the maintenance of mortgage impairment insurance, the
maintenance of fidelity bond and errors and omissions insurance, inspections, the restoration of
Mortgaged Property, the maintenance of Primary Mortgage Insurance Policies, insurance claims,
the title, management of REO Property, permitted withdrawals with respect to REO Property,
liquidation reports, and reports of foreclosures and abandonments of Mortgaged Property, the
transfer of Mortgaged Property, the release of Mortgage Files, annual statements, and
examination of records and facilities.  In the event of any conflict, inconsistency or discrepancy
between any of the servicing provisions of this Agreement and any of the servicing provisions of
the Fannie Mae Guides, the provisions of this Agreement shall control and be binding upon the
Purchaser and the Servicer.

Consistent with the terms of this Agreement, the Servicer may waive, modify or
vary any term of any Mortgage Loan or consent to the postponement of any such term or in any
manner grant indulgence to any Mortgagor if in the Servicer's reasonable and prudent
determination such waiver, modification, postponement or indulgence is not materially adverse
to the Purchaser, provided, however, that unless the Servicer has obtained the prior written
consent of the Purchaser, the Servicer shall not permit any modification with respect to any
Mortgage Loan that would change the Mortgage Interest Rate, forgive the payment of principal
or interest, reduce or increase the outstanding principal balance (except for actual payments of
principal) or change the final maturity date on such Mortgage Loan.  In the event of any such
modification which has been agreed to in writing by the Purchaser and which permits the
deferral of interest or principal payments on any Mortgage Loan, the Servicer shall, on the
Business Day immediately preceding the Remittance Date in any month in which any such
principal or interest payment has been deferred, deposit in the Custodial Account from its own
funds, in accordance with Section 4.04, the difference between (a) the otherwise scheduled
Monthly Payment and (b) the amount paid by the Mortgagor.  The Servicer shall be entitled to
reimbursement for such advances to the same extent as for all other advances pursuant to Section
4.05.  Without limiting the generality of the foregoing, the Servicer shall continue, and is hereby

authorized and empowered, to prepare, execute and deliver, all instruments of satisfaction or cancellation, or of partial or full release, discharge and all other comparable instruments, with respect to the Mortgage Loans and with respect to the Mortgaged Properties. Notwithstanding anything herein to the contrary, the Servicer may not enter into a forbearance agreement or similar arrangement with respect to any Mortgage Loan which runs more than 180 days after the first delinquent Due Date. Any such agreement shall be approved by any applicable holder of a Primary Mortgage Insurance Policy, if required.

The Servicer is authorized and empowered by the Purchaser, in its own name, when the Servicer believes it appropriate in its reasonable judgment to register any Mortgage Loan on the MERS® System, or cause the removal from the registration of any Mortgage Loan on the MERS® System, to execute and deliver, on behalf of the Purchaser, any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a Mortgage in the name of MERS, solely as nominee for the Purchaser and its successors and assigns.

Unless a different time period is stated in this Agreement, the Purchaser shall be deemed to have given consent in connection with a particular matter if the Purchaser does not affirmatively grant or deny consent within five (5) Business Days from the date the Purchaser receives a second written request for consent for such matter from the Servicer.

The Servicer shall accurately and fully report its borrower credit files related to the Mortgage Loans to Equifax, Transunion and Experian in a timely manner.

Section 4.02        Collection of Mortgage Loan Payments.

Continuously from the date hereof until the date each Mortgage Loan ceases to be serviced subject to this Agreement, the Servicer will proceed diligently to collect all payments due under each Mortgage Loan when the same shall become due and payable and shall, to the extent such procedures shall be consistent with this Agreement, Accepted Servicing Practices, and the terms and provisions of related Primary Mortgage Insurance Policy or LPMI Policy, follow such collection procedures as it follows with respect to mortgage loans comparable to the Mortgage Loans and held for its own account. Further, the Servicer will take special care in ascertaining and estimating annual escrow payments, and all other charges that, as provided in the Mortgage, will become due and payable, so that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable.

Section 4.03        Realization Upon Defaulted Mortgage Loans.

The Servicer shall use its best efforts, consistent with the procedures that the Servicer would use in servicing loans for its own account, consistent with Accepted Servicing Practices, any Primary Mortgage Insurance or LPMI Policies and the best interest of Purchaser, to foreclose upon or otherwise comparably convert the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 4.01. Foreclosure or comparable proceedings shall be initiated within one hundred twenty (120) days of default for Mortgaged Properties for which no satisfactory arrangements can be made for

41

collection of delinquent payments. The Servicer shall use its best efforts to realize upon defaulted Mortgage Loans in such manner as will maximize the receipt of principal and interest by the Purchaser, taking into account, among other things, the timing of foreclosure proceedings. The foregoing is subject to the provisions that, in any case in which the Mortgaged Property shall have suffered damage, the Servicer shall not be required to expend its own funds toward the restoration of such property unless it shall determine in its discretion (i) that such restoration will increase the proceeds of liquidation of the related Mortgage Loan to the Purchaser after reimbursement to itself for such expenses, and (ii) that such expenses will be recoverable by the Servicer through Insurance Proceeds or Liquidation Proceeds from the related Mortgaged Property, as contemplated in Section 4.05. The Servicer shall obtain prior approval of Purchaser as to restoration expenses in excess of one thousand dollars ($1,000). The Servicer shall notify the Purchaser in writing of the commencement of foreclosure proceedings and prior to the acceptance or rejection of any offer of reinstatement. The Servicer shall be responsible for all costs and expenses incurred by it in any such proceedings or functions; provided, however, that it shall be entitled to reimbursement thereof from the related property, as contemplated in Section 4.05. Notwithstanding anything to the contrary contained herein, in connection with a foreclosure or acceptance of a deed in lieu of foreclosure, in the event the Servicer has reasonable cause to believe that a Mortgaged Property is contaminated by hazardous or toxic substances or wastes, or if the Purchaser otherwise requests an environmental inspection or review of such Mortgaged Property, such an inspection or review is to be conducted by a qualified inspector at the Purchaser's expense. Upon completion of the inspection, the Servicer shall promptly provide the Purchaser with a written report of the environmental inspection. After reviewing the environmental inspection report, the Purchaser shall determine how the Servicer shall proceed with respect to the Mortgaged Property.

In the event that a Mortgage Loan becomes part of a REMIC, and becomes REO Property, such property shall be disposed of by the Servicer, with the consent of the Purchaser as required pursuant to this Agreement, within three (3) years after becoming an REO Property, unless the Servicer provides to the trustee under such REMIC an opinion of counsel to the effect that the holding of such REO Property subsequent to three years after its becoming REO Property, will not result in the imposition of taxes on "prohibited transactions" as defined in Section 860F of the Code, or cause the transaction to fail to qualify as a REMIC at any time that certificates are outstanding. The Servicer shall manage, conserve, protect and operate each such REO Property for the certificateholders solely for the purpose of its prompt disposition and sale in a manner which does not cause such property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code, or any "net income from foreclosure property" which is subject to taxation under the REMIC provisions of the Code. Pursuant to its efforts to sell such property, the Servicer shall either itself or through an agent selected by the Servicer, protect and conserve such property in the same manner and to such an extent as is customary in the locality where such property is located. Additionally, the Servicer shall perform the tax withholding and reporting related to Sections 1445 and 6050J of the Code.

Section 4.04          <u>Establishment of Custodial Accounts; Deposits in Custodial Accounts.</u>

The Seller shall segregate and hold all funds collected and received pursuant to each Mortgage Loan separate and apart from any of its own funds and general assets and shall

42

establish and maintain one or more Custodial Accounts. Each Custodial Account shall be an Eligible Account. Funds deposited in a Custodial Account may be drawn on in accordance with Section 4.05. The creation of any Custodial Account shall be evidenced by a letter agreement in the form shown in <u>Exhibit B</u> hereto. The original of such letter agreement shall be furnished to the Purchaser on the Closing Date, and upon the request of any subsequent purchaser.

The Seller shall deposit in the Custodial Account on a daily basis, and retain therein the following payments and collections received or made by it subsequent to the Cut-off Date, or received by it prior to the Cut-off Date but allocable to a period subsequent thereto, other than in respect of principal and interest on the Mortgage Loans due on or before the Cut-off Date:

(i)     all payments on account of principal, including Principal Prepayments, on the Mortgage Loans;

(ii)     all payments on account of interest on the Mortgage Loans adjusted to the Mortgage Interest Rate;

(iii)     all Liquidation Proceeds;

(iv)     any amounts required to be deposited by the Servicer in connection with any REO Property pursuant to Section 4.13;

(v)     all Insurance Proceeds including amounts required to be deposited pursuant to Sections 4.08, 4.10 and 4.11, other than proceeds to be held in the Escrow Account and applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor in accordance with Accepted Servicing Practices, the loan documents or applicable law;

(vi)     all Condemnation Proceeds affecting any Mortgaged Property which are not released to the Mortgagor in accordance with the Seller's normal servicing procedures, the loan documents or applicable law;

(vii)     any Monthly Advances;

(viii)     all proceeds of any Mortgage Loan repurchased in accordance with Sections 3.03, 3.04 and 3.05;

(ix)     any amounts required to be deposited by the Servicer pursuant to Section 4.11 in connection with the deductible clause in any blanket hazard insurance policy, such deposit shall be made from the Servicer's own funds, without reimbursement therefor; and

(x)     any amounts required to be deposited in the Custodial Account pursuant to Section 4.01 or Section 6.02.

The foregoing requirements for deposit in the Custodial Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of late payment charges and assumption fees, to the extent permitted by Section 6.01, need not be deposited by the Seller in the Custodial Account. Any interest paid on funds deposited in the Custodial Account by the depository institution shall accrue to the benefit of the Servicer and the Servicer shall be entitled to retain and withdraw such interest from the Custodial Account pursuant to Section 4.05(iv).

Section 4.05        Permitted Withdrawals From the Custodial Account.

The Servicer may, from time to time, withdraw from the Custodial Account for the following purposes:

(i)        to make payments to the Purchaser in the amounts and in the manner provided for in Section 5.01;

(ii)        to reimburse itself for Monthly Advances, the Servicer's right to reimburse itself pursuant to this subclause (ii) being limited to amounts received on the related Mortgage Loan which represent late collections (net of the related Interim Servicing Fee) of principal and/or interest respecting which any such advance was made, it being understood that, in the case of such reimbursement, the Servicer's right thereto shall be prior to the rights of the Purchaser, except that, where the Servicer is required to repurchase a Mortgage Loan, pursuant to Section 3.03, 3.04 or 3.05, the Servicer's right to such reimbursement shall be subsequent to the payment to the Purchaser of the Repurchase Price pursuant to such Section and all other amounts required to be paid to the Purchaser with respect to such Mortgage Loan;

(iii)        to reimburse itself for unreimbursed Servicing Advances and any unpaid Interim Servicing Fees, the Servicer's right to reimburse itself pursuant to this subclause (iii) with respect to any Mortgage Loan being limited to related proceeds from Liquidation Proceeds, Condemnation Proceeds and Insurance Proceeds;

(iv)        to pay to itself as part of its servicing compensation: (a) any interest earned on funds in the Custodial Account (all such interest to be withdrawn monthly not later than each Remittance Date), and (b) the Interim Servicing Fee from that portion of any payment or recovery as to interest with respect to a particular Mortgage Loan;

(v)        to pay to itself with respect to each Mortgage Loan that has been repurchased pursuant to Section 3.03, 3.04 or 3.05 all amounts received thereon and not distributed as of the date on which the related Repurchase Price is determined;

44

      (vi)     to reimburse itself for unreimbursed Monthly Advances and Servicing Advances to the extent not fully reimbursed pursuant to Section 4.05(ii) or (iii) above;

      (vii)    to transfer funds to another Eligible Account in accordance with Section 4.09 hereof;

      (viii)   to make payments in respect of the premiums due, if any, on the LPMI Policies, if applicable;

      (ix)     to remove funds inadvertently placed in the Custodial Account by the Servicer; and

      (x)     to clear and terminate the Custodial Account upon the termination of this Agreement.

Section 4.06          Establishment of Escrow Accounts; Deposits in Accounts.

The Servicer shall segregate and hold all funds collected and received pursuant to each Mortgage Loan which constitute Escrow Payments separate and apart from any of its own funds and general assets and shall establish and maintain one or more Escrow Accounts. Each Escrow Account shall be an Eligible Account. Funds deposited in the Escrow Account may be drawn on by the Servicer in accordance with Section 4.07. The creation of any Escrow Account shall be evidenced by a letter agreement in the form shown in Exhibit C. The original of such letter agreement shall be furnished to the Purchaser on the Closing Date, and upon request to any subsequent purchaser.

The Servicer shall deposit in the Escrow Account or Accounts on a daily basis, and retain therein:

      (i)     all Escrow Payments collected on account of the Mortgage Loans, for the purpose of effecting timely payment of any such items as required under the terms of this Agreement;

      (ii)    all Insurance Proceeds which are to be applied to the restoration or repair of any Mortgaged Property; and

      (iii)   all Servicing Advances for Mortgagors whose Escrow Payments are insufficient to cover escrow disbursements.

The Servicer shall make withdrawals from the Escrow Account only to effect such payments as are required under this Agreement, and for such other purposes as shall be as set forth or in accordance with Section 4.07. The Servicer shall be entitled to retain any interest paid on funds deposited in an Escrow Account by the depository institution other than interest on escrowed funds required by law to be paid to the Mortgagor and, to the extent required by law, the Servicer shall pay interest on escrowed funds to the Mortgagor notwithstanding that such Escrow Account is non-interest bearing or that interest paid thereon is insufficient for such purposes.

Section 4.07          <u>Permitted Withdrawals From the Escrow Account</u>.

Withdrawals from the Escrow Account may be made by the Servicer only:

(i)        to effect timely payments of ground rents, taxes, assessments, water rates, Primary Mortgage Insurance Policy premiums, if applicable, fire and hazard insurance premiums, condominium assessments and comparable items;

(ii)        to reimburse the Servicer for any Servicing Advance made by the Servicer with respect to a related Mortgage Loan but only from amounts received on the related Mortgage Loan which represent late payments or collections of Escrow Payments thereunder;

(iii)        to refund to the Mortgagor any funds as may be determined to be overages;

(iv)        for transfer to the Custodial Account in accordance with the terms of this Agreement;

(v)        for application to restoration or repair of the Mortgaged Property;

(vi)        to pay to the Servicer, or to the Mortgagor to the extent required by law, any interest paid on the funds deposited in the Escrow Account;

(vii)        to clear and terminate the Escrow Account on the termination of this Agreement;

(viii)    to pay to the Mortgagors or other parties Insurance Proceeds deposited in accordance with Section 4.06; and

(ix)        to remove funds inadvertently placed in the Escrow Account by the Servicer.

Section 4.08          <u>Payment of Taxes, Insurance and Charges; Maintenance of Primary Mortgage Insurance or LPMI Policies; Collections Thereunder</u>.

With respect to each Mortgage Loan, the Servicer shall maintain accurate records reflecting the status of ground rents, taxes, assessments, water rates and other charges which are or may become a lien upon the Mortgaged Property and the status of primary mortgage insurance premiums and fire and hazard insurance coverage and shall obtain, from time to time, all bills for the payment of such charges, including renewal premiums and shall effect payment thereof prior to the applicable penalty or termination date and at a time appropriate for securing maximum discounts allowable, employing for such purpose deposits of the Mortgagor in the Escrow Account which shall have been estimated and accumulated by the Servicer in amounts sufficient

46

for such purposes, as allowed under the terms of the Mortgage or applicable law. To the extent that the Mortgage does not provide for Escrow Payments, the Servicer shall determine that any such payments are made by the Mortgagor at the time they first become due. The Servicer assumes full responsibility for the timely payment of all such bills and shall effect timely payments of all such bills irrespective of the Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments and shall make advances from its own funds to effect such payments.

The Servicer will maintain in full force and effect Primary Mortgage Insurance Policies issued by a Qualified Insurer with respect to each first lien Mortgage Loan for which such coverage is herein required. Such coverage will be maintained until the Loan-to-Value ratio of the related Mortgage Loan is reduced to 80% or less in the case of a first lien Mortgage Loan having a Loan-to-Value Ratio at origination in excess of 80% or as required by state or federal law. The Servicer will not cancel or refuse to renew any Primary Mortgage Insurance Policy in effect on the Closing Date that is required to be kept in force under this Agreement unless a replacement Primary Mortgage Insurance Policy for such canceled or non-renewed policy is obtained from and maintained with a Qualified Insurer. The Servicer shall not take any action which would result in non-coverage under any applicable Primary Mortgage Insurance Policy of any loss which, but for the actions of the Servicer would have been covered thereunder. In connection with any assumption or substitution agreement entered into or to be entered into pursuant to Section 6.01, the Servicer shall promptly notify the insurer under the related Primary Mortgage Insurance Policy, if any, of such assumption or substitution of liability in accordance with the terms of such policy and shall take all actions which may be required by such insurer as a condition to the continuation of coverage under the Primary Mortgage Insurance Policy. If such Primary Mortgage Insurance Policy is terminated as a result of such assumption or substitution of liability, the Servicer shall obtain a replacement Primary Mortgage Insurance Policy as provided above.

In connection with its activities as servicer, the Servicer agrees to prepare and present, on behalf of itself and the Purchaser, claims to the insurer under any Primary Mortgage Insurance Policy or LPMI Policy in a timely fashion in accordance with the terms of such Primary Mortgage Insurance Policy or LPMI Policy and, in this regard, to take such action as shall be necessary to permit recovery under any Primary Mortgage Insurance Policy or LPMI Policy respecting a defaulted first lien Mortgage Loan. Pursuant to Section 4.04, any amounts collected by the Servicer under any Primary Mortgage Insurance Policy or LPMI Policy shall be deposited in the Custodial Account, subject to withdrawal pursuant to Section 4.05.

Section 4.09        Transfer of Accounts.

The Servicer may transfer a Custodial Account or an Escrow Account to a different Eligible Account from time to time. Such transfer shall be made only upon obtaining the prior written consent of the Purchaser, which consent will not be unreasonably withheld.

Section 4.10        Maintenance of Hazard Insurance.

The Servicer shall cause to be maintained for each Mortgage Loan fire and hazard insurance with extended coverage as is acceptable to Fannie Mae and Freddie Mac and

47

customary in the area where the Mortgaged Property is located in an amount which is equal to the lesser of (i) the maximum insurable value of the improvements securing such Mortgage Loan and (ii) the greater of (a) the outstanding principal balance of the Mortgage Loan, and (b) an amount such that the proceeds thereof shall be sufficient to prevent the Mortgagor and/or the mortgagee from becoming a co- insurer. If required by the Flood Disaster Protection Act of 1973, as amended, each Mortgage Loan shall be covered by a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration in effect with an insurance carrier acceptable to Fannie Mae and/or Freddie Mac, in an amount representing coverage not less than the least of (i) the outstanding principal balance of the Mortgage Loan, (ii) the maximum insurable value of the improvements securing such Mortgage Loan and (iii) the maximum amount of insurance which is available under the Flood Disaster Protection Act of 1973, as amended. If at any time during the term of the Mortgage Loan, the Servicer determines in accordance with applicable law and pursuant to the Fannie Mae Guides that a Mortgaged Property is located in a special flood hazard area and is not covered by flood insurance or is covered in an amount less than the amount required by the Flood Disaster Protection Act of 1973, as amended, the Servicer shall notify the related Mortgagor that the Mortgagor must obtain such flood insurance coverage, and if said Mortgagor fails to obtain the required flood insurance coverage within forty-five (45) days after such notification, the Servicer shall immediately force place the required flood insurance on the Mortgagor's behalf. The Servicer shall also maintain on each REO Property, fire and hazard insurance with extended coverage in an amount which is at least equal to the maximum insurable value of the improvements which are a part of such property, and, to the extent required and available under the Flood Disaster Protection Act of 1973, as amended, flood insurance in an amount as provided above. Any amounts collected by the Servicer under any such policies other than amounts to be deposited in the Escrow Account and applied to the restoration or repair of the Mortgaged Property or REO Property, or released to the Mortgagor in accordance with Accepted Servicing Practices, shall be deposited in the Custodial Account, subject to withdrawal pursuant to Section 4.05. It is understood and agreed that no other additional insurance need be required by the Servicer or maintained on property acquired in respect of the Mortgage Loan, other than pursuant to this Agreement, the Fannie Mae Guides or such applicable state or federal laws and regulations as shall at any time be in force and as shall require such additional insurance. All such policies shall be endorsed with standard mortgagee clauses with loss payable to the Servicer and its successors and/or assigns and shall provide for at least thirty days prior written notice of any cancellation, reduction in the amount or material change in coverage to the Servicer. The Servicer shall not interfere with the Mortgagor's freedom of choice in selecting either his insurance carrier or agent, provided, however, that the Servicer shall not accept any such insurance policies from insurance companies unless such companies are Qualified Insurers.

Section 4.11          Maintenance of Mortgage Impairment Insurance Policy.

In the event that the Servicer shall obtain and maintain a blanket policy issued by an issuer acceptable to Fannie Mae and/or Freddie Mac insuring against hazard losses on all of the Mortgage Loans, then, to the extent such policy provides coverage in an amount equal to the amount required pursuant to Section 4.10 and otherwise complies with all other requirements of Section 4.10, it shall conclusively be deemed to have satisfied its obligations as set forth in Section 4.10, it being understood and agreed that such policy may contain a deductible clause, in which case the Servicer shall, in the event that there shall not have been maintained on the

related Mortgaged Property or REO Property a policy complying with Section 4.10, and there shall have been a loss which would have been covered by such policy, deposit in the Custodial Account the amount not otherwise payable under the blanket policy because of such deductible clause. In connection with its activities as servicer of the Mortgage Loans, the Servicer agrees to prepare and present, on behalf of the Purchaser, claims under any such blanket policy in a timely fashion in accordance with the terms of such policy. Upon request of the Purchaser, the Servicer shall cause to be delivered to the Purchaser a certified true copy of such policy and shall use its best efforts to obtain a statement from the insurer thereunder that such policy shall in no event be terminated or materially modified without thirty (30) days' prior written notice to the Purchaser.

Section 4.12        <u>Maintenance of Fidelity Bond and Errors and Omissions Insurance</u>.

The Servicer shall maintain, at its own expense, a blanket fidelity bond and an errors and omissions insurance policy, with broad coverage with responsible companies on all officers, employees or other persons acting in any capacity with regard to the Mortgage Loans to handle funds, money, documents and papers relating to the Mortgage Loans. The Fidelity Bond shall be in the form of a mortgage banker's blanket bond and shall protect and insure the Servicer against losses, including forgery, theft, embezzlement and fraud of such persons. The errors and omissions insurance shall protect and insure the Servicer against losses arising out of errors and omissions and negligent acts of such persons. Such errors and omissions insurance shall also protect and insure the Servicer against losses in connection with the failure to maintain any insurance policies required pursuant to this Agreement and the release or satisfaction of a Mortgage Loan without having obtained payment in full of the indebtedness secured thereby. No provision of this Section 4.12 requiring the Fidelity Bond or errors and omissions insurance shall diminish or relieve the Servicer from its duties and obligations as set forth in this Agreement. The minimum coverage under any such bond and insurance policy shall be at least equal to the corresponding amounts required by Fannie Mae in the Fannie Mae Guides or by Freddie Mac in the Freddie Mac Guides. The Servicer shall deliver to the Purchaser a certificate from the surety and the insurer as to the existence of the Fidelity Bond and errors and omissions insurance policy and shall obtain a statement from the surety and the insurer that such Fidelity Bond or insurance policy shall in no event be terminated or materially modified without thirty (30) days' prior written notice to the Purchaser. The Seller shall notify the Purchaser within five (5) business days of receipt of notice that such Fidelity Bond or insurance policy will be, or has been, materially modified or terminated. The Purchaser (or any party having the status of Purchaser hereunder) and any subsidiary thereof and their successors or assigns as their interests may appear must be named as loss payees on the Fidelity Bond and as additional insured on the errors and omissions policy. Upon request by the Purchaser, the Servicer shall provide the Purchaser with an insurance certificate certifying coverage under this Section 4.12, and will provide an update to such certificate upon request, or upon renewal or material modification of coverage.

Section 4.13        <u>Title, Management and Disposition of REO Property</u>.

In the event that title to the Mortgaged Property is acquired in foreclosure, by deed in lieu of foreclosure or other method resulting in full or partial satisfaction of the related Mortgage, the deed or certificate of sale shall be taken in the name of the Purchaser or its

49

designee, or in the event the Purchaser or its designee is not authorized or permitted to hold title to real property in the state where the REO Property is located, or would be adversely affected under the "doing business" or tax laws of such state by so holding title, the deed or certificate of sale shall be taken in the name of such Person or Persons as shall be consistent with an opinion of counsel obtained by the Servicer from an attorney duly licensed to practice law in the state where the REO Property is located. Any Person or Persons holding such title other than the Purchaser shall acknowledge in writing that such title is being held as nominee for the benefit of the Purchaser.

The Servicer shall notify the Purchaser in accordance with the Fannie Mae Guides of each acquisition of REO Property upon such acquisition, together with a copy of the drive by appraisal or brokers price opinion of the Mortgaged Property obtained in connection with such acquisition, and thereafter assume the responsibility for marketing such REO Property in accordance with Accepted Servicing Practices. Thereafter, the Servicer shall continue to provide certain administrative services to the Purchaser relating to such REO Property as set forth in this Section 4.13.

The Servicer shall, either itself or through an agent selected by the Servicer, and in accordance with the Fannie Mae Guides manage, conserve, protect and operate each REO Property in the same manner that it manages, conserves, protects and operates other foreclosed property for its own account, and in the same manner that similar property in the same locality as the REO Property is managed. The Servicer shall cause each REO Property to be inspected promptly upon the acquisition of title thereto and shall cause each REO Property to be inspected at least monthly thereafter or more frequently as required by the circumstances. The Servicer shall make or cause to be made a written report of each such inspection. Such reports shall be retained in the Servicing File and copies thereof shall be forwarded by the Servicer to the Purchaser.

The Servicer shall use its best efforts to dispose of the REO Property as soon as possible and shall sell such REO Property in any event within three (3) years after title has been taken to such REO Property, unless the Servicer determines, and gives an appropriate notice to the Purchaser to such effect, that a longer period is necessary for the orderly liquidation of such REO Property. If a longer period than three (3) years is permitted under the foregoing sentence and is necessary to sell any REO Property, the Servicer shall report monthly to the Purchaser as to the progress being made in selling such REO Property. No REO Property shall be marketed for less than the appraised value, without the prior consent of the Purchaser. No REO Property shall be sold for less than ninety five percent (95%) of its appraised value, without the prior consent of the Purchaser. If as of the date title to any REO Property was acquired by the Servicer there were outstanding unreimbursed Servicing Advances with respect to the REO Property, the Servicer shall be entitled to immediate reimbursement from the Purchaser for any related unreimbursed Servicing Advances. All requests for reimbursement of Servicing Advances shall be in accordance with the Fannie Mae Guides. The disposition of REO Property shall be carried out by the Servicer at such price, and upon such terms and conditions, as the Servicer deems to be in the best interests of the Purchaser. The Servicer shall provide monthly reports to Purchaser in reference to the status of the marketing of the REO Properties.

Notwithstanding anything to the contrary contained herein, the Purchaser may, at the Purchaser's sole option, terminate the Servicer as servicer of any such REO Property without payment of any termination fee with respect thereto, provided that the Servicer shall on the date said termination takes effect be reimbursed by withdrawal from the Custodial Account for any unreimbursed Monthly Advances of the Servicer's funds made pursuant to Section 5.03 and any unreimbursed Servicing Advances in each case relating to the Mortgage Loan underlying such REO Property notwithstanding anything to the contrary set forth in Section 4.05. In the event of any such termination, the provisions of Section 11.02 hereof shall apply to said termination and the transfer of servicing responsibilities with respect to such REO Property to the Purchaser or its designee.

Section 4.14          Notification of Maturity Date.

With respect to each Mortgage Loan, the Servicer shall execute and deliver to the Mortgagor any and all necessary notices required under applicable law and the terms of the related Mortgage Note and Mortgage regarding the maturity date if required under applicable law.

ARTICLE V

PAYMENTS TO THE PURCHASER

Section 5.01            Distributions.

On each Remittance Date, the Servicer shall distribute by wire transfer to the Purchaser (i) all amounts credited to the Custodial Account as of the close of business on the preceding Determination Date, net of charges against or withdrawals from the Custodial Account pursuant to Section 4.05, plus (ii) all Monthly Advances, if any, which the Servicer is obligated to distribute pursuant to Section 5.03, minus (iii) any amounts attributable to Monthly Payments collected but due on a Due Date or Dates subsequent to the preceding Determination Date, which amounts shall be remitted on the Remittance Date next succeeding the Due Period for such amounts, and any Principal Prepayments received during the month of such Remittance Date, which amounts shall be remitted on the next succeeding Remittance Date.

With respect to each HELOC, the Seller shall remit to the Purchaser on a daily basis all collections received with respect thereto, together with a daily remittance report in the form of Exhibit E hereto.

With respect to any remittance received by the Purchaser after the Business Day on which such payment was due, the Servicer shall pay to the Purchaser interest on any such late payment at an annual rate equal to the Prime Rate, adjusted as of the date of each change, plus three percentage points, but in no event greater than the maximum amount permitted by applicable law. Such interest shall be deposited in the Custodial Account by the Servicer on the date such late payment is made and shall cover the period commencing with the day following the Business Day on which such payment was due and ending with the Business Day on which such payment is made, both inclusive. Such interest shall be remitted along with the distribution payable on the next succeeding Remittance Date. The payment by the Servicer of any such interest shall not be deemed an extension of time for payment or a waiver of any Event of Default by the Servicer.

Section 5.02            Statements to the Purchaser.

The Servicer shall furnish to the Purchaser an individual loan accounting report, as of the last Business Day of each month, in the Servicer's assigned loan number order to document Mortgage Loan payment activity on an individual Mortgage Loan basis. With respect to each month, the corresponding individual loan accounting report shall be received by the Purchaser no later than the fifth (5th) Business Day of the following month on a disk or tape or other computer-readable format in such format as may be mutually agreed upon by both the Purchaser and the Servicer and in hard copy, which report shall contain the following:

(i)        With respect to each Monthly Payment, the amount of such remittance allocable to principal (including a separate breakdown of any Principal Prepayment, including the date of such prepayment, and any Prepayment Penalties or premiums, along with a detailed report of interest

52

on principal prepayment amounts remitted in accordance with Section 4.04);

(ii)     with respect to each Monthly Payment, the amount of such remittance allocable to interest;

(iii)     the amount of servicing compensation received by the Servicer during the prior distribution period;

(iv)     the aggregate Scheduled Principal Balance of the Mortgage Loans;

(v)     the aggregate of any expenses reimbursed to the Servicer during the prior distribution period pursuant to Section 4.05;

(vi)     the number and aggregate outstanding principal balances of Mortgage Loans (a) delinquent (1) 30 to 59 days, (2) 60 to 89 days, and (3) 90 days or more; (b) as to which foreclosure has commenced; and (c) as to which REO Property has been acquired; and

(vii)     the amount of any Monthly Advances.

The Servicer shall also provide a monthly servicing report, sorted in the Purchaser's assigned loan number order, in the form of Exhibit E hereto, with each such report.

The Servicer shall prepare and file any and all information statements or other filings required to be delivered to any governmental taxing authority or to the Purchaser pursuant to any applicable law with respect to the Mortgage Loans and the transactions contemplated hereby. In addition, the Servicer shall provide the Purchaser with such information concerning the Mortgage Loans as is necessary for the Purchaser to prepare its federal income tax return as the Purchaser may reasonably request from time to time.

In addition, not more than sixty (60) days after the end of each calendar year, the Servicer shall furnish to each Person who was a Purchaser at any time during such calendar year an annual statement in accordance with the requirements of applicable federal income tax law as to the aggregate of remittances for the applicable portion of such year.

Section 5.03          Monthly Advances by the Servicer.

Not later than the close of business on the Business Day preceding each Remittance Date, the Servicer shall deposit in the Custodial Account an amount equal to all Monthly Payments, whether or not deferred pursuant to Section 4.01, which were due on a Mortgage Loan on the immediately preceding Due Date and delinquent at the close of business on the related Determination Date.

The Servicer's obligation to make such Monthly Advances as to any Mortgage Loan will continue through the earliest to occur of: (a) the Servicing Transfer Date; (b) the last Monthly Payment due prior to the payment in full of the Mortgage Loan; or (c) through the

Remittance Date prior to the date on which the Mortgaged Property is liquidated, unless the Servicer deems such advance to be non-recoverable. In such event, the Servicer shall deliver to the Purchaser an Officer's Certificate of the Servicer to the effect that an officer of the Servicer has reviewed the related Servicing File and has made the reasonable determination that any additional advances are non-recoverable.

Section 5.04          Liquidation Reports.

Upon the foreclosure sale of any Mortgaged Property or the acquisition thereof by the Purchaser pursuant to a deed in lieu of foreclosure, the Servicer shall submit to the Purchaser a liquidation report with respect to such Mortgaged Property. The Servicer shall also provide reports on the status of REO Property containing such information as the Purchaser may reasonably require.

ARTICLE VI

GENERAL SERVICING PROCEDURES

Section 6.01          Assumption Agreements.

The Servicer shall, to the extent it has knowledge of any conveyance or prospective conveyance by any Mortgagor of the Mortgaged Property (whether by absolute conveyance or by contract of sale, and whether or not the Mortgagor remains or is to remain liable under the Mortgage Note and/or the Mortgage), exercise its rights to accelerate the maturity of such Mortgage Loan under any "due-on-sale" clause to the extent permitted by law; provided, however, that the Servicer shall not exercise any such rights if prohibited by law or the terms of the Mortgage Note from doing so or if the exercise of such rights would impair or threaten to impair any recovery under the related Primary Mortgage Insurance Policy, if any. If the Servicer reasonably believes it is unable under applicable law to enforce such "due-on-sale" clause, the Servicer, with the approval of the Purchaser (such approval not to be unreasonably withheld), will enter into an assumption agreement with the person to whom the Mortgaged Property has been conveyed or is proposed to be conveyed, pursuant to which such person becomes liable under the Mortgage Note and, to the extent permitted by applicable state law, the Mortgagor remains liable thereon. If the Servicer is prohibited under applicable law from (a) entering into an assumption agreement with the Person to whom the Mortgaged Property has been conveyed or is proposed to be conveyed or (b) requiring the original Mortgagor to remain liable under the Mortgage Note, the Servicer, with the prior consent of the Purchaser and the primary mortgage insurer, if any, is authorized to enter into a substitution of liability agreement with the person to whom the Mortgaged Property has been conveyed or is proposed to be conveyed pursuant to which the original Mortgagor is released from liability and such Person is substituted as mortgagor and becomes liable under the related Mortgage Note. Any such substitution of liability agreement shall be in lieu of an assumption agreement. The Purchaser shall be deemed to have consented to any assumption for which the Purchaser was given notification and requested to consent, but for which neither a consent nor an objection was given by the Purchaser within two Business Days of such notification.

In connection with any such assumption or substitution of liability, the Servicer shall follow the underwriting practices and procedures of the Fannie Mae Guides. With respect to an assumption or substitution of liability, the Mortgage Interest Rate borne by the related Mortgage Note and the amount of the Monthly Payment may not be changed. If the credit of the proposed transferee does not meet such underwriting criteria, the Servicer diligently shall, to the extent permitted by the Mortgage or the Mortgage Note and by applicable law, accelerate the maturity of the Mortgage Loan. The Servicer shall notify the Purchaser that any such substitution of liability or assumption agreement has been completed by forwarding to the Purchaser the original of any such substitution of liability or assumption agreement, which document shall be added to the related Mortgage File and shall, for all purposes, be considered a part of such Mortgage File to the same extent as all other documents and instruments constituting a part thereof. All fees collected by the Servicer for entering into an assumption or substitution of liability agreement shall belong to the Servicer.

55

Notwithstanding the foregoing paragraphs of this Section or any other provision of this Agreement, the Servicer shall not be deemed to be in default, breach or any other violation of its obligations hereunder by reason of any assumption of a Mortgage Loan by operation of law or any assumption which the Servicer may be restricted by law from preventing, for any reason whatsoever. For purposes of this Section 6.01, the term "assumption" is deemed to also include a sale of the Mortgaged Property subject to the Mortgage that is not accompanied by an assumption or substitution of liability agreement.

Section 6.02          Satisfaction of Mortgages and Release of Mortgage Files.

Upon the payment in full of any Mortgage Loan, or the receipt by the Servicer of a notification that payment in full will be escrowed in a manner customary for such purposes, the Servicer will immediately notify the Purchaser by a certification, which certification shall include a statement to the effect that all amounts received or to be received in connection with such payment which are required to be deposited in the Custodial Account pursuant to Section 4.04 have been or will be so deposited, of a Servicing Officer and shall request delivery to it of the portion of the Mortgage File held by the Purchaser. The Purchaser shall no later than five (5) Business Days after receipt of such certification and request, release or cause to be released to the Servicer, the related Mortgage Loan Documents and, upon its receipt of such documents, the Servicer shall promptly prepare and deliver to the Purchaser the requisite satisfaction or release. No later than three (3) Business Days following its receipt of such satisfaction or release, the Purchaser shall deliver, or cause to be delivered, to the Servicer the release or satisfaction properly executed by the owner of record of the applicable Mortgage or its duly appointed attorney in fact. If such Mortgage Loan is a MERS Mortgage Loan, the Servicer is authorized to cause the removal from the registration on the MERS System of such Mortgage and to execute and deliver, on behalf of the Purchaser, any and all instruments of satisfaction or cancellation or of partial or full release. No expense incurred in connection with any instrument of satisfaction or deed of reconveyance shall be chargeable to the Custodial Account.

In the event the Servicer satisfies or releases a Mortgage without having obtained payment in full of the indebtedness secured by the Mortgage or should it otherwise prejudice any right the Purchaser may have under the Mortgage Loan Documents, the Servicer, upon written demand, shall remit within two (2) Business Days to the Purchaser the then outstanding principal balance of the related Mortgage Loan by deposit thereof in the Custodial Account.

From time to time and as appropriate for the servicing or foreclosure of the Mortgage Loans, including for the purpose of collection under any Primary Mortgage Insurance Policy, the Purchaser shall, upon request of the Servicer and delivery to the Purchaser of a servicing receipt signed by a Servicing Officer, release the portion of the Mortgage File held by the Purchaser to the Servicer. Such servicing receipt shall obligate the Servicer to return such Mortgage Loan Documents to the Purchaser when the need therefor by the Servicer no longer exists, unless the Mortgage Loan has been liquidated and the Liquidation Proceeds relating to the Mortgage Loan have been deposited in the Custodial Account or the Mortgage File has been delivered to an attorney, or to a public trustee or other public official as required by law, for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgaged Property either judicially or non-judicially, and the Servicer has delivered to the Purchaser a certificate of a Servicing Officer certifying as to the name and address of the Person

56

to which such Mortgage File was delivered and the purpose or purposes of such delivery. Upon receipt of a certificate of a Servicing Officer stating that such Mortgage Loan was liquidated, the servicing receipt shall be released by the Purchaser to the Servicer. The Servicer shall indemnify the Purchaser, and its designee, from and against any and all losses, claims, damages, penalties, fines, forfeitures, costs and expenses (including court costs and reasonable attorney's fees) resulting from or related to the loss, damage or misplacement of any documentation delivered to the Servicer pursuant to this paragraph.

Section 6.03            Servicing Compensation.

As compensation for its services hereunder, the Servicer shall be entitled to the amount provided for as the Servicer's Interim Servicing Fee. Additional servicing compensation in the form of assumption fees, as provided in Section 6.01, and late payment charges or otherwise shall be retained by the Servicer to the extent not required to be deposited in the Custodial Account. The Servicer shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder and shall not be entitled to reimbursement therefor except as specifically provided for.

Section 6.04            Annual Statement as to Compliance.

Within sixty (60) days after the end of each calendar year, the Servicer will deliver to the Purchaser an Officers' Certificate stating, as to each signatory thereof, that (i) a review of the activities of the Servicer during the preceding calendar year and of performance under this Agreement has been made under such officers' supervision, and (ii) to the best of such officers' knowledge, based on such review, the Servicer has fulfilled all of its obligations under this Agreement throughout such year, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officers and the nature and status thereof. The first Officer's Certificate delivered by the Servicer to the Purchaser pursuant to this Section shall be delivered on or before February 28, 2005. Copies of such statement shall be provided by the Servicer to the Purchaser upon request.

Section 6.05            Annual Independent Certified Public Accountants'
                        Servicing Report.

Within sixty (60) days after the end of each calendar year, the Servicer at its expense shall cause a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants to furnish a statement to the Purchaser to the effect that such firm has examined certain documents and records relating to the Servicer's servicing of mortgage loans of the same type as the Mortgage Loans pursuant to servicing agreements substantially similar to this Agreement, which agreements may include this Agreement, and that, on the basis of such an examination, conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers or the Audit Guide for HUD Approved Title II Approved Mortgagees and Loan Correspondent Programs, such firm is of the opinion that the Servicer's servicing has been conducted in compliance with the agreements examined pursuant to this Section 6.05, except for (i) such exceptions as such firm shall believe to be immaterial, and (ii) such other exceptions as shall be set forth in such statement. The first statement delivered by the Servicer to the Purchaser pursuant to this Section shall be delivered

57

on or before February 28, 2005. Copies of such statement shall be provided by the Servicer to the Purchaser. In addition, on an annual basis, the Servicer shall provide the Purchaser with copies of its audited financial statements upon execution by the Purchaser of an agreement to keep confidential the contents of such financial statements.

   Section 6.06     <u>Purchaser's Right to Examine Servicer Records</u>.

   The Purchaser shall have the right to examine and audit upon reasonable notice to the Servicer, during business hours or at such other times as might be reasonable under applicable circumstances, any and all of the books, records, documentation or other information of the Servicer, or held by another for the Servicer or on its behalf or otherwise, which relates to the performance or observance by the Servicer of the terms, covenants or conditions of this Agreement.

   The Servicer shall provide to the Purchaser and any supervisory agents or examiners representing a state or federal governmental agency having jurisdiction over the Purchaser, including but not limited to OTS, FDIC and other similar entities, access to any documentation regarding the Mortgage Loans in the possession of the Servicer which may be required by any applicable regulations. Such access shall be afforded without charge, upon reasonable request, during normal business hours and at the offices of the Servicer, and in accordance with the federal government, FDIC, OTS, or any other similar regulations.

   Section 6.07     <u>Servicer Shall Provide Information as Reasonably Required</u>.

   The Seller shall furnish to the Purchaser during the term of this Agreement, at the Servicer's expense, such periodic, special or other reports, information or documentation, whether or not provided for herein, as shall be necessary, reasonable or appropriate in respect to the Purchaser, or otherwise in respect to the Mortgage Loans and the performance of the Servicer under this Agreement, including any reports, information or documentation reasonably required to comply with any regulations regarding any supervisory agents or examiners of the Purchaser all such reports or information to be as provided by and in accordance with such applicable instructions and directions as the Purchaser may reasonably request in relation to this Agreement or the performance of the Servicer under this Agreement. The Servicer agrees to execute and deliver all such instruments and take all such action as the Purchaser, from time to time, may reasonably request in order to effectuate the purpose and to carry out the terms of this Agreement.

   In connection with marketing the Mortgage Loans, the Purchaser may make available to a prospective purchaser audited financial statements of the Seller and the Servicer for the most recently completed two (2) fiscal years for which such statements are available, as well as a consolidated statement of condition at the end of the last two (2) fiscal years covered by any consolidated statement of operations. If it has not already done so, the Seller and the Servicer shall furnish promptly to the Purchaser or a prospective purchaser copies of the statements specified above; provided, however, that prior to furnishing such statements or information to any prospective purchaser, the Seller and the Servicer may require such

prospective purchaser to execute a confidentiality agreement in a form satisfactory to the Seller or Servicer, as applicable.

The Servicer shall make reasonably available to the Purchaser or any prospective purchaser a knowledgeable financial or accounting officer for the purpose of answering questions and to permit any prospective purchaser to inspect the Servicer's servicing facilities for the purpose of satisfying such prospective purchaser that the Servicer has the ability to service the Mortgage Loans as provided in this Agreement.

The Servicer shall maintain with respect to each Mortgage Loan and shall make available for inspection by the Purchaser or its designee the related Servicing File during the time the Purchaser retains ownership of a Mortgage Loan and thereafter in accordance with applicable laws and regulations.

ARTICLE VII

SERVICING TRANSFER

Section 7.01          Transfer.

On the Servicing Transfer Date, the Purchaser, or its designee, shall assume all servicing responsibilities related to, and the Servicer shall cease all servicing responsibilities related to, the Mortgage Loans. On or prior to the Servicing Transfer Date (or in the case of (c), (d) and (e) below, within five (5) Business Days from and after the Servicing Transfer Date), the Servicer shall take such steps as may be necessary or appropriate to effectuate and evidence the transfer of the servicing of the Mortgage Loans to the Purchaser, or its designee, including but not limited to the following:

(a) Notice to Mortgagors. The Servicer shall mail to each Mortgagor a letter advising the Mortgagor of the transfer of the servicing of the related Mortgage Loan to the Purchaser, or its designee, in accordance with the Real Estate Settlement Procedures Act, Regulation X and other applicable laws and regulations; provided, however, the content and format of the letter in a standard form shall have the prior approval of the Purchaser. The Servicer shall provide the Purchaser with copies of all such related notices no later than fifteen (15) days from and after the Servicing Transfer Date;

(b) Notice to Taxing Authorities and Insurance Companies. The Servicer shall transmit to the applicable taxing authorities and insurance companies (including Private Mortgage Insurance Policy insurers, if applicable) and/or agents, notification of the transfer of the servicing to the Purchaser, or its designee, and instructions to deliver all notices, tax bills and insurance statements, as the case may be, to the Purchaser, or its designee, from and after the Servicing Transfer Date and each assignable tax service contract shall be assigned to the Purchaser, or its designee, on the Servicing Transfer Date. The Servicer shall provide the Purchaser, or its designee, with an Officers' Certificate of a Servicing Officer, confirming that all such notices have been transmitted, together with a copy of the related standard form(s) of such notifications no later than the Servicing Transfer Date;

(c) Delivery of Servicing Records. The Servicer shall forward to the Purchaser, or its designee, all servicing records and the Servicing Files in the Servicer's possession relating to each transferring Mortgage Loan, and shall make available to the Purchaser, or its designee, during normal business hours, any such records;

(d) Escrow Payments. The Servicer shall provide the Purchaser, or its designee, with immediately available funds by wire transfer in the amount of the Escrow Payments and suspense balances and all loss draft balances associated with the Mortgage Loans. The Servicer shall provide the Purchaser, or its designee, with an accounting statement of Escrow Payments and suspense balances and loss draft balances sufficient to enable the Purchaser, or its designee, to reconcile the amount of such payment with the accounts of the Mortgage Loans. Additionally, the Servicer shall wire transfer to the Purchaser the amount of any prepaid transferring Mortgage Loan payments and all other similar amounts held by the Servicer;

60

(e) <u>Mortgage Payments Received Prior to Servicing Transfer Date</u>. Prior to the Servicing Transfer Date all payments received by the Servicer on each Mortgage Loan shall be properly applied by the Servicer to the account of the particular Mortgagor;

(f) <u>Mortgage Payments Received After Servicing Transfer Date</u>. The amount of any Monthly Payments for the Mortgage Loans received by the Servicer after the Servicing Transfer Date shall be forwarded to the Purchaser or its designee by wire transfer or overnight mail within two (2) Business Days of receipt; provided, however, that any such Monthly Payments received by the Servicer more than thirty (30) days after the Servicing Transfer Date shall be forwarded by the Servicer to the Purchaser or its designee by wire transfer or regular mail within three (3) Business Days of receipt. The Servicer shall notify the Purchaser or its designee of the particulars of the payment, such as the account number, dollar amount, date received and any special Mortgagor application instructions with respect to such Monthly Payments received by the Servicer;

(g) <u>Misapplied Payments</u>. Misapplied payments on Mortgage Loans shall be processed as follows: (i) all parties shall cooperate in correcting misapplication errors; (ii) the party receiving notice of a misapplied payment occurring prior to the Servicing Transfer Date and discovered after the Servicing Transfer Date shall immediately notify the other party; (iii) if a misapplied payment which occurred prior to the Servicing Transfer Date cannot be identified and said misapplied payment has resulted in a shortage in a Custodial Account or Escrow Account, the Servicer shall be liable for the amount of such shortage. The Servicer shall reimburse the Purchaser for the amount of such shortage within thirty (30) days after receipt of written demand therefor from the Purchaser; (iv) if a misapplied payment which occurred prior to the Servicing Transfer Date has created an improper Purchase Price as the result of an inaccurate outstanding principal balance, the party with notice of such misapplied payment shall promptly inform the other party and a wire transfer or a check shall be issued to the party shorted by the improper payment application within ten (10) Business Days after notice thereof by the other party; and (v) any wire transfer or check issued under the provisions of this Section 7.01(g) shall be accompanied by a statement indicating the corresponding Servicer and/or Purchaser Mortgage Loan identification number and an explanation of the allocation of any such payments;

(h) <u>Books and Records</u>. On the Servicing Transfer Date, the books, records and accounts of the Servicer with respect to the servicing of the Mortgage Loans shall be maintained in accordance with Accepted Servicing Practices;

(i) <u>Reconciliation</u>. The Servicer shall, on or before the Servicing Transfer Date, reconcile principal balances and make any monetary adjustments for the Mortgage Loans as agreed to by the Servicer and the Purchaser. Any such monetary adjustments will be transferred between the Servicer and the Purchaser as appropriate;

(j) <u>IRS Forms</u>. The Servicer shall file all IRS Forms 1099, 1099A, 1098 or 1041 and K-1 which are required to be filed on or before the Servicing Transfer Date in relation to the servicing and ownership of the Mortgage Loans. The Servicer shall provide copies of such forms to the Purchaser upon reasonable request and shall reimburse the Purchaser for any penalties or reasonable costs incurred by the Purchaser due to the Servicer's failure to comply with this paragraph;

61

(k) <u>Insurance Premiums</u>.  The Servicer shall pay all hazard and flood insurance premiums and Primary Mortgage Insurance Policy premiums, due within thirty (30) days after the Servicing Transfer Date, provided that the Servicer has received bills for insurance premiums at least fourteen (14) days prior to the Servicing Transfer Date; and

(l) <u>Property Taxes</u>.  The Servicer shall pay all tax bills (including interest, late charges and penalties in connection therewith) due within thirty (30) days after the Servicing Transfer Date, provided that the Servicer or its tax service provider has received bills for taxes from a taxing authority at least fourteen (14) days prior to the Servicing Transfer Date.

Section 7.02             <u>Additional Obligations</u>.

(a) <u>Insurance Policies</u>.  For ninety (90) days after the Servicing Transfer Date, the Servicer shall deliver such insurance policies or renewals and invoices as it may receive with respect to the Mortgage Loans to the Purchaser or its designee within ten (10) Business Days of its receipt of same, thereafter the Servicer shall exercise reasonable efforts to deliver such insurance policies or renewals and invoices as it may receive with respect to the Mortgage Loans to the Purchaser or its designee within a reasonable time of its receipt of same.

(b) <u>Property Taxes</u>.  For ninety (90) days after the Servicing Transfer Date, the Servicer shall deliver such tax bills as it may receive with respect to the Mortgage Loans to the Purchaser or its designee within ten (10) Business Days of its receipt of same, thereafter the Servicer shall exercise reasonable efforts to deliver such tax bills as it may receive with respect to the Mortgage Loans to the Purchaser within a reasonable time of its receipt of same.

(c) <u>Escrow Analysis</u>.  If a Mortgage Loan was originated more than twelve (12) months prior to the Servicing Transfer Date, then the Servicer shall conduct such escrow analyses with respect to such Mortgage Loan as may be required under applicable law.  With respect to any such Mortgage Loan, any adjustment to the escrow payment due, refunds of escrow overages and collections of escrow shortages shall have been made in accordance with applicable law prior to the Servicing Transfer Date.

ARTICLE VIII

THE SELLER AND THE SERVICER

Section 8.01    Indemnification; Third Party Claims.

The Servicer agrees to indemnify the Purchaser and hold it harmless against any and all claims, losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses that the Purchaser may sustain in any way related to the failure of the Servicer to observe and perform its duties, obligations, covenants, and agreements to service the Mortgage Loans during the Interim Servicing Period in strict compliance with the terms of this Agreement. The Seller agrees to indemnify the Purchaser and hold it harmless against any and all claims, losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses that the Purchaser may sustain in any way related to the failure of the Seller to observe and perform its duties, obligations, and covenants in strict compliance with the terms of this Agreement or as a result of the breach of a representation or warranty set forth in Sections 3.01 or 3.02 of this Agreement. An indemnifying party hereunder shall immediately notify the Purchaser if a claim is made by a third party with respect to this Agreement or a Mortgage Loan, assume (with the consent of the Purchaser) the defense of any such claim and pay all expenses in connection therewith, including counsel fees, and promptly pay, discharge and satisfy any judgment or decree which may be entered against it or the Purchaser in respect of such claim. An indemnifying party hereunder shall follow any written instructions received from the Purchaser in connection with such claim. The Purchaser shall promptly reimburse an indemnifying party hereunder for all amounts advanced by it pursuant to the two preceding sentences except when the claim relates to the failure of the Servicer to service and administer the Mortgage Loans in strict compliance with the terms of this Agreement, the failure of the Seller to perform its duties and obligations pursuant to this Agreement, the breach of representation or warranty set forth in Sections 3.01 or 3.02, or the gross negligence, bad faith or willful misconduct of either the Seller or the Servicer. The provisions of this Section 8.01 shall survive termination of this Agreement and transfer of the servicing rights.

The Purchaser agrees to indemnify the Servicer and hold it harmless against any and all claims, losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses that the Servicer may sustain in any way related to the negligent or improper servicing of the Mortgage Loans after the Servicing Transfer Date. Notwithstanding any provision to the contrary in this Section 8.01, the Purchaser shall have no obligation to indemnify or hold the Servicer harmless from and against that portion of any claim for indemnification that arises from any fact or circumstance for which Purchaser is entitled to indemnification by the Servicer pursuant to this Section 8.01.

Section 8.02    Merger or Consolidation of the Seller or the Servicer.

Each of the Seller and the Servicer shall keep in full effect its existence, rights and franchises as a corporation under the laws of the state of its incorporation except as permitted herein, and shall obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and

63

enforceability of this Agreement, or any of the Mortgage Loans and to perform its duties under this Agreement.

Any Person into which either the Seller or the Servicer may be merged or consolidated, or any corporation resulting from any merger, conversion or consolidation to which either the Seller or the Servicer shall be a party, or any Person succeeding to the business of either the Seller or the Servicer whether or not related to loan servicing, shall be the successor of the Seller or of the Servicer, as applicable, hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided, however, that the successor or surviving Person shall be an institution or (i) having a GAAP net worth of not less than $25,000,000, (ii) the deposits of which are insured by the FDIC, SAIF and/or BIF, or which is a HUD-approved mortgagee whose primary business is in origination and servicing of first lien mortgage loans, and (iii) who is a Fannie Mae or Freddie Mac approved seller/servicer in good standing. Notwithstanding the foregoing, if the successor or surviving Person is an institution with a GAAP net worth of less than $25,000,000, then the Purchaser may, in its sole discretion, waive such minimum GAAP net worth requirement.

Section 8.03          Limitation on Liability of the Seller and Others.

None of the Seller, the Servicer nor any of the officers, employees or agents of the Seller or the Servicer shall be under any liability to the Purchaser for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment made in good faith; provided, however, that this provision shall not protect the Seller, the Servicer or any such person against any breach of warranties or representations made herein, or failure to perform its obligations in strict compliance with any standard of care set forth in this Agreement, or any liability which would otherwise be imposed by reason of negligence, bad faith or willful misconduct, or any breach of the terms and conditions of this Agreement. The Seller, the Servicer and any officer, employee or agent of the Seller and the Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by the Purchaser respecting any matters arising hereunder. The Servicer shall not be under any obligation to appear in, prosecute or defend any legal action which is not incidental to its duties to service the Mortgage Loans in accordance with this Agreement and which in its reasonable opinion may involve it in any expenses or liability; provided, however, that the Servicer may, with the consent of the Purchaser, undertake any such action which it may deem necessary or desirable in respect to this Agreement and the rights and duties of the parties hereto. In such event, the reasonable legal expenses and costs of such action and any liability resulting therefrom shall be expenses, costs and liabilities for which the Purchaser will be liable, and the Servicer shall be entitled to be reimbursed therefor from the Purchaser upon written demand.

Section 8.04          Servicer Not to Resign.

The Servicer shall not resign from the obligations and duties hereby imposed on it except by mutual consent of the Servicer and the Purchaser or upon the determination that its duties hereunder are no longer permissible under applicable law and such incapacity cannot be cured by the Servicer. Any such determination permitting the resignation of the Servicer shall be evidenced by an Opinion of Counsel to such effect delivered to the Purchaser which Opinion of

64

Counsel shall be in form and substance acceptable to the Purchaser. No such resignation shall become effective until a successor shall have assumed the Servicer's responsibilities and obligations hereunder in the manner provided in Section 12.01.

Section 8.05          No Transfer of Servicing.

With respect to the retention of the Servicer to service the Mortgage Loans hereunder, the Servicer acknowledges that the Purchaser has acted in reliance upon the Servicer's independent status, the adequacy of its servicing facilities, plan, personnel, records and procedures, its integrity, reputation and financial standing and the continuance thereof. Without in any way limiting the generality of this Section 8.05, the Servicer shall not either assign this Agreement or the servicing hereunder or delegate its rights or duties hereunder or any portion thereof, or sell or otherwise dispose of all or substantially all of its property or assets, without the prior written approval of the Purchaser, which consent shall be granted or withheld in the Purchaser's sole discretion.

Without in any way limiting the generality of this Section 8.05, in the event that the Servicer either shall assign this Agreement or the servicing responsibilities hereunder or delegate its duties hereunder or any portion thereof without the prior written consent of the Purchaser, then the Purchaser shall have the right to terminate this Agreement as set forth in Section 10.02, without any payment of any penalty or damages and without any liability whatsoever to the Servicer (other than with respect to accrued but unpaid Monthly Advances, Servicing Advances and Interim Servicing Fees remaining unpaid) or any third party.

65

ARTICLE IX

DEFAULT

Section 9.01          Events of Default.

In case one or more of the following Events of Default by the Servicer shall occur and be continuing, that is to say:

(i)      any failure by the Servicer to remit to the Purchaser any payment required to be made under the terms of this Agreement which continues unremedied for a period of one (1) Business Day after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Purchaser; or

(ii)      failure on the part of the Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer set forth in this Agreement, or if any of the representations and warranties of the Servicer in Section 3.01 proves to be untrue in any material respect, which failure or breach continues unremedied for a period of thirty (30) days (except that such number of days shall be fifteen (15) in the case of a failure to pay any premium for any insurance policy required to be maintained under this Agreement) after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Purchaser; or

(iii)      a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of sixty (60) days; or

(iv)      the Servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Servicer or of or relating to all or substantially all of its property; or

(v)      the Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

66

(vi)    the Servicer ceases to be approved by Fannie Mae or Freddie Mac as a mortgage loan seller and servicer for more than thirty (30) days; or

(vii)    the Servicer attempts to assign its right to servicing compensation hereunder or the Servicer attempts, without the consent of the Purchaser, to sell or otherwise dispose of all or substantially all of its property or assets or to assign this Agreement or the servicing responsibilities hereunder or to delegate its duties hereunder or any portion thereof; or

(viii)    the Servicer ceases to be (a) licensed to service first lien residential mortgage loans in each jurisdiction in which a Mortgaged Property is located and such licensing is required, and (b) qualified to transact business in any jurisdiction where it is currently so qualified, but only to the extent such non-qualification materially and adversely affects the Servicer's ability to perform its obligations hereunder; or

(ix)    the Servicer fails to meet the eligibility criteria set forth in the last sentence of Section 8.02.

then, and in each and every such case, so long as an Event of Default shall not have been remedied, the Purchaser, by notice in writing to the Servicer may, in addition to whatever rights the Purchaser may have under Sections 3.03 and 8.01 and at law or equity or to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof without compensating the Servicer for the same. On or after the receipt by the Servicer of such written notice of termination, all authority and power of the Servicer under this Agreement, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the successor appointed pursuant to Section 12.01. Upon written request from the Purchaser, the Servicer shall prepare, execute and deliver, any and all documents and other instruments, place in such successor's possession all Servicing Files, and do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise, at the Servicer's sole expense. The Servicer agrees to cooperate with the Purchaser and such successor in effecting the termination of the Servicer's responsibilities and rights hereunder, including, without limitation, the transfer to such successor for administration by it of all cash amounts which shall at the time be credited by the Servicer to the Custodial Account or Escrow Account or thereafter received with respect to the Mortgage Loans or any REO Property.

If any of the Mortgage Loans are MERS Mortgage Loans, in connection with the termination or resignation (as described in Section 8.04) of the Servicer hereunder, either (i) the successor Servicer shall represent and warrant that it is a member of MERS in good standing and shall agree to comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS, or (ii) the predecessor Servicer shall cooperate with the successor Servicer either (x) in causing MERS to

execute and deliver an assignment of Mortgage in recordable form to transfer the Mortgage from MERS to the Purchaser and to execute and deliver such other notices, documents and other instruments as may be necessary or desirable to effect a transfer of such Mortgage Loan or servicing of such Mortgage Loan on the MERS® System to the successor Servicer or (y) in causing MERS to designate on the MERS® System the successor Servicer as the servicer of such Mortgage Loan.

Section 9.02     Waiver of Defaults.

The Purchaser may waive only by written notice any default by the Servicer in the performance of its obligations hereunder and its consequences.  Upon any such waiver of a past default, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement.  No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived in writing.

# ARTICLE X

## TERMINATION

Section 10.01          Termination.

The respective obligations and responsibilities of the Servicer shall terminate upon:  (i) the earlier of (A) the Servicing Transfer Date and (B) the later of the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan or the disposition of all REO Property and the remittance of all funds due hereunder; (ii) by mutual consent of the Servicer and the Purchaser in writing; or (iii) termination of the Servicer by the Purchaser with or without cause under the terms of this Agreement.

Section 10.02          Termination Without Cause.

The Purchaser may, at its sole option, terminate any rights the Servicer may have hereunder, without cause, upon written notice.  Any such notice of termination shall be in writing and delivered to the Servicer as provided in Section 12.05 of this Agreement.  In the event of such termination, the Purchaser agrees to pay the Servicer's costs and expenses in connection with accommodating such early termination.

ARTICLE XI

RECONSTITUTION OF MORTGAGE LOANS

Section 11.01          Reconstitution of Mortgage Loans.

(a) The Seller and the Servicer acknowledge and the Purchaser agrees that with respect to some or all of the Mortgage Loans, the Purchaser may effect either:

(i)      one or more sales of the Mortgage Loans as whole loan transfers (each, a "Whole Loan Transfer"); and/or

(ii)      one or more sales of the Mortgage Loans as public or private pass-through transfers (each, a "Pass-Through Transfer").

(b) With respect to each Whole Loan Transfer or Pass-Through Transfer, as the case may be, the Seller and the Servicer agree:

(i)      to cooperate fully with the Purchaser and any prospective purchaser with respect to all reasonable requests and due diligence procedures including participating in meetings with rating agencies, bond insurers and such other parties as the Purchaser shall designate and participating in meetings with prospective purchasers of the Mortgage Loans or interests therein and providing information contained in the Mortgage Loan Schedule including any diskette or other related data tapes provided as reasonably requested by such purchasers;

(ii)      to execute all agreements required to be executed by the Seller and Servicer in connection with such Whole Loan Transfer or Pass-Through Transfer provided that any such agreements be consistent with the terms hereof and impose no greater duties, liabilities or obligations upon the Seller than those set forth herein and provided that each of the Seller and the Servicer is given an opportunity to review and reasonably negotiate in good faith the content of such documents not specifically referenced or provided for herein;

(iii)      to make all the representations and warranties set forth in Section 3.01 and solely with respect to the Seller, Section 3.02, as of the date of the Whole Loan Transfer or Pass-Through Transfer, as specified in a letter from the Purchaser to the Seller and the Servicer (substantially in the form of Exhibit I hereto) indicating the date of the Whole Loan Transfer or Pass-Through Transfer and the applicable Mortgage Loans. No other document need be prepared indicating that the Seller and the Servicer are making such representations and warranties as to the applicable Mortgage Loans as of such date;

70

(iv)    to negotiate and execute one or more master servicing agreements between the Servicer and any third party servicer which is servicing loans on behalf of the Purchaser providing for the Servicer to master service such Mortgage Loans on behalf of the Purchaser;

(v)    to negotiate and execute one or more subservicing agreements between the Servicer and any master servicer which is generally considered to be a prudent master servicer in the secondary mortgage market designated by the Purchaser in its sole discretion after consultation with the Servicer and/or one or more custodial and servicing agreements among the Purchaser or an affiliate of the Purchaser, the Servicer and a third party custodian/trustee which is generally considered to be a prudent custodian/trustee in the secondary mortgage market designated by the Purchaser in its sole discretion after consultation with the Servicer, in either case for the purpose of pooling the Mortgage Loans with other mortgage loans for resale or securitization;

(vi)    in connection with any securitization of any Mortgage Loans, to execute a pooling and servicing agreement, which pooling and servicing agreement may, at the Purchaser's direction, contain contractual provisions including, but not limited to, a 24-day certificate payment delay (54-day total payment delay), servicer advances of delinquent scheduled payments of principal and interest through liquidation (unless deemed non-recoverable) and payment of compensating interest with respect to prepayment interest shortfalls (to the extent of the monthly servicing fee payable thereto), servicing and mortgage loan representations and warranties which in form and substance conform to secondary market standards for securities backed by mortgage loans similar to the Mortgage Loans and such provisions with regard to servicing responsibilities, investor reporting, segregation and deposit of principal and interest payments, custody of the Mortgage Loans, and other covenants as are required by the Purchaser and one or more nationally recognized rating agencies for "AAA" rated mortgage pass-through transactions which are "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984, unless otherwise mutually agreed. At the sole option of the Purchaser, any REMIC residual class issued pursuant to any pooling agreement may be transferred to the Servicer;

(vii)    to deliver to the Purchaser and to any Person designated by the Purchaser (a) for inclusion in any prospectus or other offering material such publicly available information regarding the Seller and the Servicer, its financial condition and its mortgage loan delinquency, foreclosure and loss experience and any additional information requested by the Purchaser, (b) any similar non public, unaudited financial information (which the Purchaser may, at its option and at its cost, have audited by certified public accountants) and such other information as is reasonably requested by the Purchaser and which the Seller and the Servicer are capable of

71

providing without unreasonable effort or expense, and to indemnify the Purchaser and its affiliates for material misstatements or omissions contained in such information, and (c) such statements and audit letters of reputable, certified public accountants pertaining to information provided by the Seller and the Servicer pursuant to clause (a) above as shall be reasonably requested by the Purchaser; and

(viii)    to deliver to the Purchaser, and to any Person designated by the Purchaser, opinions of counsel in a form reasonably acceptable to the Purchaser as are customarily delivered by sellers and servicers and reasonably determined by the Purchaser to be necessary in connection with Whole Loan Transfers or Pass-Through Transfers, as the case may be, it being understood that the cost of any opinions of counsel (other than in-house counsel) that may be required for a Whole Loan Transfer or Pass-Through Transfer, as the case may be, shall be the responsibility of the Purchaser.

ARTICLE XII

MISCELLANEOUS PROVISIONS

Section 12.01          Successor to the Servicer.

Prior to termination of Servicer's responsibilities and duties under this Agreement pursuant to Section 4.13, 8.04, 9.01, 10.01 or 10.02, the Purchaser shall (i) succeed to and assume all of the Servicer's responsibilities, rights, duties and obligations under this Agreement, or (ii) appoint a successor having the characteristics set forth in Section 8.02 hereof and which shall succeed to all rights and assume all of the responsibilities, duties and liabilities of the Servicer under this Agreement prior to the termination of the Servicer's responsibilities, duties and liabilities under this Agreement. In connection with such appointment and assumption, the Purchaser may make such arrangements for the compensation of such successor out of payments on Mortgage Loans as the Purchaser and such successor shall agree. In the event that the Servicer's duties, responsibilities and liabilities under this Agreement should be terminated pursuant to the aforementioned Sections, the Servicer shall discharge such duties and responsibilities during the period from the date it acquires knowledge of such termination until the effective date thereof with the same degree of diligence and prudence which it is obligated to exercise under this Agreement, and shall take no action whatsoever that might impair or prejudice the rights or financial condition of its successor. The resignation or removal of the Servicer pursuant to the aforementioned Sections shall not become effective until a successor shall be appointed pursuant to this Section and shall in no event relieve the Servicer of the representations and warranties made pursuant to Section 3.01 and the indemnification obligations of the Servicer pursuant to Section 8.01.

Any successor appointed as provided herein shall execute, acknowledge and deliver to the Servicer and to the Purchaser an instrument accepting such appointment, whereupon such successor shall become fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of the Servicer, with like effect as if originally named as a party to this Agreement. Any termination or resignation of the Servicer or this Agreement pursuant to Section 4.13, 8.04, 8.05, 9.01, 10.01, or 10.02 shall not affect any claims that the Purchaser may have against the Servicer arising prior to any such termination or resignation.

The Servicer shall promptly deliver to the successor the funds in the Custodial Account and the Escrow Account and the Mortgage Files and related documents and statements held by it hereunder and the Servicer shall account for all funds. The Servicer shall execute and deliver such instruments and do such other things all as may reasonably be required to more fully and definitely vest and confirm in the successor all such rights, powers, duties, responsibilities, obligations and liabilities of the Servicer. The successor shall make arrangements as it may deem appropriate to reimburse the Servicer for unrecovered Servicing Advances which the successor retains hereunder and which would otherwise have been recovered by the Servicer pursuant to this Agreement but for the appointment of the successor servicer.

Upon a successor's acceptance of appointment as such, the Servicer shall notify by mail the Purchaser of such appointment.

73

Section 12.02          Amendment.

This Agreement may be amended or supplemented from time to time as follows: (a) with respect to Mortgage Loans not yet purchased by the Purchaser, by delivery of a written notification of amendment executed solely by the Purchaser, which amendment shall be effective from and after the date delivered to the Purchaser for all subsequent Mortgage Loans purchased hereunder; and (b) with respect to Mortgage Loans previously purchased by the Purchaser, by written agreement executed by the Purchaser, the Seller and the Servicer.

Section 12.03          Recordation of Agreement.

To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any of all the Mortgaged Properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Seller at the Seller's expense on direction of the Purchaser.

Section 12.04          Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of law provisions, except to the extent preempted by Federal law. The obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

Section 12.05          Notices.

Any demands, notices or other communications permitted or required hereunder shall be in writing and shall be deemed conclusively to have been given if personally delivered at or mailed by registered mail, postage prepaid, and return receipt requested or certified mail, return receipt requested, or transmitted by telex, telegraph or telecopier and confirmed by a similar mailed writing, as follows:

(i)      if to the Seller:

Secured Bankers Mortgage Company
14761 Califa Street
Van Nuys, California 91411
Attn: Leif Johnson

(ii)     if to the Servicer:

Secured Bankers Mortgage Company
14761 Califa Street
Van Nuys, California 91411
Attn: Leif Johnson

(iii)    if to the Purchaser:

DLJ Mortgage Capital, Inc.
c/o Credit Suisse First Boston LLC
Eleven Madison Avenue
4th Floor
New York, New York 10010
Attention: Kari Roberts

with copy to:

DLJ Mortgage Capital, Inc.
c/o Credit Suisse First Boston LLC
One Madison Avenue
9th Floor
New York, New York 10010
Attention: General Counsel

or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

Section 12.06    Severability of Provisions.

Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof. If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good faith, to develop a structure the economic effect of which is nearly as possible the same as the economic effect of this Agreement without regard to such invalidity.

Section 12.07    Exhibits.

The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

75

Section 12.08          General Interpretive Principles.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

> (i)     the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

> (ii)     accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

> (iii)     references herein to "Articles," "Sections," Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

> (iv)     a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

> (v)     the words "herein," "hereof," "hereunder," and other words of similar import refer to this Agreement as a whole and not to any particular provision;

> (vi)     the term "include" or "including" shall mean without limitation by reason of enumeration; and

> (vii)     headings of the Articles and Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect.

Section 12.09          Reproduction of Documents.

This Agreement and all documents relating thereto, including, without limitation, (i) consents, waivers and modifications which may hereafter be executed, (ii) documents received by any party at the closing, and (iii) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

Section 12.10          Confidentiality of Information.

Each party recognizes that, in connection with this Agreement, it may become privy to non-public information regarding the financial condition, operations and prospects of the other party. Except as required by law, each party agrees to keep all non-public information regarding the other party strictly confidential, and to use all such information solely in order to effectuate the purpose of the Agreement, provided that each party may provide confidential information to its employees, agents and affiliates who have a need to know such information in order to effectuate the transaction, provided further that such information is identified as confidential non-public information. In addition, confidential information may be provided to a regulatory authority with supervisory power over the Purchaser, provided such information is identified as confidential non-public information.

Section 12.11          Recordation of Assignments of Mortgage.

To the extent permitted by applicable law, each of the Assignments of Mortgage is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the Mortgaged Properties are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected at the Seller's expense in the event recordation is either necessary under applicable law or requested by the Purchaser at its sole option.

Section 12.12          Assignment by Purchaser.

The Purchaser shall have the right, without the consent of the Seller or the Servicer hereof, to assign, in whole or in part, its interest under this Agreement with respect to some or all of the Mortgage Loans, and designate any person to exercise any rights of the Purchaser hereunder, by executing an Assignment, Assumption and Recognition Agreement substantially in the form of Exhibit D hereto and the assignee or designee shall accede to the rights and obligations hereunder of the Purchaser with respect to such Mortgage Loans. In no event shall the Purchaser sell a partial interest in any Mortgage Loan without the written consent of the Seller, which consent shall not be unreasonably denied. All references to the Purchaser in this Agreement shall be deemed to include its assignee or designee.

Section 12.13          No Partnership.

Nothing herein contained shall be deemed or construed to create a co-partnership or joint venture between the parties hereto and the services of the Servicer shall be rendered as an independent contractor and not as agent for Purchaser.

Section 12.14          Execution; Successors and Assigns.

This Agreement may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same agreement. Subject to Section 8.02, this Agreement shall inure to the benefit of and be binding upon the Seller, the Servicer and the Purchaser and their respective successors and assigns.

Section 12.15          Entire Agreement.

Each of the parties to this Agreement acknowledges that no representations, agreements or promises were made to any of the other parties to this Agreement or any of its employees other than those representations, agreements or promises specifically contained herein. This Agreement and the related Purchase Price and Terms Letter set forth the entire understanding between the parties hereto and shall be binding upon all successors of all of the parties. In the event of any inconsistency between a Purchase Price and Terms Letter and this Agreement, this Agreement shall control.

Section 12.16          No Solicitation.

From and after the Closing Date, the Seller agrees that it will not take any action or permit or cause any action to be taken by any of its agents or affiliates, or by any independent contractors on the Seller's behalf, to personally, by telephone, by mail, or electronically by e-mail or through the internet or otherwise, solicit the borrower or obligor under any Mortgage Loan to refinance the Mortgage Loan, in whole or in part, without the prior written consent of the Purchaser. It is understood and agreed that all rights and benefits relating to the solicitation of any Mortgagors to refinance any Mortgage Loans and the attendant rights, title and interest in and to the list of such Mortgagors and data relating to their Mortgages (including insurance renewal dates) shall be transferred to the Purchaser pursuant hereto on the Closing Date and the Seller shall take no action to undermine these rights and benefits. Notwithstanding the foregoing, it is understood and agreed that promotions undertaken by the Seller or any affiliate of the Seller which are directed to the general public at large, or segments thereof, provided that no segment shall consist primarily of the borrowers or obligors under the Mortgage Loans, including, without limitation, mass mailing based on commercially acquired mailing lists, newspaper, radio and television advertisements shall not constitute solicitation under this Section 12.16. This Section 12.16 shall not be deemed to preclude the Seller or any of its affiliates from soliciting any Mortgagor for any other financial products or services. The Seller shall use its best efforts to prevent the sale of the name of any Mortgagor to any Person who is not an affiliate of the Seller.

Section 12.17          Costs.

The Purchaser shall pay any commissions due its salesmen, the expenses of its accountants and attorneys and the expenses and fees of any broker retained by the Purchaser with respect to the transactions covered by this Agreement. All other costs and expenses incurred in connection with the transfer and delivery of the Mortgage Loans and related servicing rights including, without limitation, fees for recording intervening assignments of mortgage and Assignments of Mortgage, the cost of obtaining tax service contracts and the legal fees and expenses of its attorneys shall be paid by the Seller. The Seller shall be responsible for causing to occur the recordation of all Assignments of Mortgage and all intervening assignments of mortgage, as applicable.

IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

DLJ MORTGAGE CAPITAL, INC.
Purchaser

By: _____
Name:
Title: **Randall Eron Shy
Vice President**

SECURED BANKERS MORTGAGE COMPANY
Seller and Servicer

By: _____
Name: Leff Johnson
Title: Managing Director

79

## Exhibit A-1

Contents of Mortgage File

With respect to each Mortgage Loan, the Mortgage File shall include each of the following items, which shall be available for inspection by the Purchaser, and which shall be retained by the Seller in the Servicing File or delivered to the Purchaser or its designee pursuant to Sections 2.04 and 2.05 of the Seller's Purchase, Warranties and Interim Servicing Agreement.

1.      The original Mortgage Note endorsed "Pay to the order of _____ without recourse," and signed in the name of the Seller by an authorized officer, with all intervening endorsements showing a complete chain of title from the originator to the Seller. If the Mortgage Loan was acquired by the Seller in a merger, the endorsement must be by "[Seller], successor by merger to the [name of predecessor]". If the Mortgage Loan was acquired or originated by the Seller while doing business under another name, the endorsement must be by "[Seller] formerly known as [previous name]". If the original note is unavailable, seller will provide an affidavit of lost note (in form acceptable to the Purchaser) stating that the original Mortgage Note was lost or destroyed, together with a copy of such Mortgage Note and indemnifying the Purchaser against any and all claims arising as a result of any person or entity claiming they are the holder of the note or that the note has been paid off and returned. With respect to any HELOC, the original Loan Agreement.

2.      A true certified copy, certified by the [title insurer], of the applicable First Lien.

3.      Except as provided below and for each Mortgage Loan that is not a MERS Mortgage Loan, the original Mortgage with evidence of recording thereon, or a copy thereof certified by the public recording office in which such mortgage has been recorded or, if the original Mortgage has not been returned from the applicable public recording office, a true certified copy, certified by the [title insurer], of the original Mortgage together with a certificate of the Seller certifying that the original Mortgage has been delivered for recording in the appropriate public recording office of the jurisdiction in which the Mortgaged Property is located and in the case of each MERS Mortgage Loan, the original Mortgage, noting the presence of the MIN of the Mortgage Loans and either language indicating that the Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded.

4.      The original or certified to be a true copy or if in electronic form identified on the Mortgage Loan Schedule, the certificate number, certified by the Seller, of the related Primary Mortgage Insurance Policy or LPMI Policy, if required.

5.      In the case of each Mortgage Loan that is not a MERS Mortgage Loan, the original Assignment, from the Seller in accordance with Purchaser's instructions, which assignment shall, but for any blanks requested by the Purchaser, be in form and substance acceptable for recording, or a copy certified by the Seller as a true and correct copy of the original Assignment which has been sent for recordation. If the Mortgage Loan was acquired or

originated by the Seller while doing business under another name, the Assignment must be by "[Seller] formerly known as [previous name]".

6.    With respect to Mortgage Loans that are not HELOCs or Co-op Loans, the original policy of title insurance, including riders and endorsements thereto, or if the policy has not yet been issued, a written commitment or interim binder or preliminary report of title issued by the title insurance or escrow company.  With respect to Mortgage Loans that are HELOCs, such evidence or inquiry of title as is required for compliance with the Underwriting Standards.

7.    Originals of all recorded intervening Assignments, or copies thereof, certified by the public recording office in which such Assignments have been recorded showing a complete chain of title from the originator to the Seller, with evidence of recording thereon, or a copy thereof certified by the public recording office in which such Assignment has been recorded or, if the original Assignment has not been returned from the applicable public recording office, a true certified copy, certified by the [title insurer] of the original Assignment together with a certificate of the [title insurer] certifying that the original Assignment has been delivered for recording in the appropriate public recording office of the jurisdiction in which the Mortgaged Property is located.

8.    Originals, or copies thereof certified by the public recording office in which such documents have been recorded, of each assumption, extension, modification, written assurance or substitution agreements, if applicable, or if the original of such document has not been returned from the applicable public recording office, a true certified copy, certified by the [title insurer], of such original document together with certificate of Seller certifying the original of such document has been delivered for recording in the appropriate recording office of the jurisdiction in which the Mortgaged Property is located.

9.    If the Mortgage Note or Mortgage or any other material document or instrument relating to the Mortgage Loan has been signed by a person on behalf of the Mortgagor, the original power of attorney or other instrument that authorized and empowered such person to sign bearing evidence that such instrument has been recorded, if so required in the appropriate jurisdiction where the Mortgaged Property is located (or, in lieu thereof, a duplicate or conformed copy of such instrument, together with a certificate of receipt from the recording office, certifying that such copy represents a true and complete copy of the original and that such original has been or is currently submitted to be recorded in the appropriate governmental recording office of the jurisdiction where the Mortgaged Property is located), or if the original power of attorney or other such instrument has been delivered for recording in the appropriate public recording office of the jurisdiction in which the Mortgaged Property is located.

10.    With respect to a Co-op Loan: (i) a copy of the Co-op Lease and the assignment of such Co-op Lease to the originator of the Mortgage Loan, with all intervening assignments showing a complete chain of title and an assignment thereof by Seller; (ii) the stock certificate together with an undated stock power relating to such stock certificate executed in blank; (iii) the recognition agreement in substantially the same form as standard a "AZTECH" form; (iv) copies of the financial statement filed by the originator as secured party and, if applicable, a filed UCC-3 Assignment of the subject security interest showing a complete chain of

A-1-2

title, together with an executed UCC-3 Assignment of such security interest by the Seller in a form sufficient for filing.

    11.    The original of any guarantee executed in connection with the Mortgage Note.

    Notwithstanding anything to the contrary herein, the Seller may provide one certificate for all of the Mortgage Loans indicating that the documents were delivered for recording.

**Exhibit A-2**

Contents of Servicing File

With respect to each Mortgage Loan, the Servicing File shall include each of the following items, which shall be available for inspection by the Purchaser:

1.      Mortgage Loan closing statement (Form HUD-1) and any other truth-in-lending or real estate settlement procedure forms required by law.

2.      Residential loan application.

3.      Uniform underwriter and transmittal summary (Fannie Mae Form 1008) or reasonable equivalent.

4.      Credit report on the mortgagor.

5.      Business credit report, if applicable.

6.      Residential appraisal report and attachments thereto.

7.      Verification of employment and income except for Mortgage Loans originated under a Limited Documentation Program, all in accordance with Seller's Underwriting Standards.

8.      Verification of acceptable evidence of source and amount of down payment, in accordance with Underwriting Standards.

9.      Photograph of the Mortgaged Property (may be part of appraisal).

10.     Survey of the Mortgaged Property, if any.

11.     Sales contract, if applicable.

12.     If available, termite report, structural engineer's report, water portability and septic certification.

13.     Any original security agreement, chattel mortgage or equivalent executed in connection with the Mortgage.

14.     Any ground lease, including all amendments, modifications and supplements thereto.

15.     Any other document required to service the Mortgage Loans.

**Exhibit B**

Form of Custodial Account Letter Agreement

_____ , 2005

To:


        As "Servicer" under the Seller's Purchase, Warranties and Interim Servicing Agreement, dated as of _____, 2005 (the "Agreement"), we hereby authorize and request you to establish an account, as a Custodial Account pursuant to Section 4.04 of the Agreement, to be designated as "_____, in trust for the Purchaser, Owner of Whole Loan Series 2005 WL_____". All deposits in the account shall be subject to withdrawal therefrom by order signed by the Servicer. This letter is submitted to you in duplicate. Please execute and return one original to us.


                    _____

                    SERVICER

                    By:_____
                    Name:_____
                    Title:_____


        The undersigned, as "Depository," hereby certifies that the above described account has been established under Account Number _____, at the office of the depository indicated above, and agrees to honor withdrawals on such account as provided above.


                    _____

                    By:_____
                    Name:_____
                    Title:_____

B-1

## Exhibit C

Form of Escrow Account Letter Agreement

_____, 2005

To:

      As "Servicer" under the Seller's Purchase, Warranties and Interim Servicing Agreement, dated as of _____, 2005 (the "Agreement"), we hereby authorize and request you to establish an account, as an Escrow Account pursuant to Section 4.06 of the Agreement, to be designated as "_____, in trust for the Purchaser, Owner of Whole Loan Series 2005 WL-_____, and various Mortgagors." All deposits in the account shall be subject to withdrawal therefrom by order signed by the Servicer. This letter is submitted to you in duplicate. Please execute and return one original to us.

_____
SERVICER

By:_____
Name:_____
Title:_____

      The undersigned, as "Depository," hereby certifies that the above described account has been established under Account Number _____, at the office of the depository indicated above, and agrees to honor withdrawals on such account as provided above.

By:_____
Name:_____
Title:_____

C-1

### Exhibit D

### Form of Assignment, Assumption and Recognition Agreement

This Assignment, Assumption and Recognition Agreement (this "Assignment Agreement"), dated as of _____, between DLJ Mortgage Capital, Inc., a Delaware corporation (the "Assignor"), _____, a _____ corporation (the "Assignee"), and _____ (the "Seller"):

For good and valuable consideration the receipt and sufficiency of which hereby are acknowledged, and of the premises and mutual covenants herein contained, the parties hereto hereby agree as follows:

1.      The Assignor hereby grants, transfers and assigns to Assignee all of the right, title and interest of Assignor, as Purchaser, in, to and under (a) those certain mortgage loans listed on Exhibit A attached hereto (the "Mortgage Loans"); and (b) the Seller's Purchase, Warranties and Interim Servicing Agreement dated as of _____, but only to the extent of the Mortgage Loans (the "Purchase Agreement"). For purposes of this Assignment Agreement, the term "Purchase Agreement" includes any separate bill of sale, assignment and conveyance or other instrument pursuant to which Seller and Assignor effectuated the purchase and sale of any Mortgage Loan following the execution and delivery of the Seller's Purchase, Warranties and Interim Servicing Agreement dated as of _____.

The Assignor specifically reserves and does not assign to the Assignee hereunder any and all right, title and interest in, to and under any all obligations of the Assignor with respect to any mortgage loans subject to the Purchase Agreement which are not the Mortgage Loans set forth on Exhibit A attached hereto and are not the subject of this Assignment Agreement.

2.      Each of the Seller and the Assignor represent and warrant to the Assignee that (a) the copy of the Purchase Agreement, attached hereto as Exhibit B, provided to the Assignee, is a true, complete and accurate copy of the Purchase Agreement, (b) the Purchase Agreement is in full force and effect as of the date hereof, (c) the provisions thereof have not been waived, amended or modified in any respect, nor have any notices of termination been given thereunder, (d) the Purchase Agreement contains all of the terms and conditions governing the sale of the Mortgage Loans by Seller to Assignor and the purchase of the Mortgage Loans by Assignor from Seller; provided, however, that the date of purchase and sale and the amount of payment for the Mortgage Loans may be set out in a Purchase Price and Terms Letter, as defined in the Purchase Agreement, and (e) Seller sold, conveyed and transferred each Mortgage Loan to Assignor pursuant to the Purchase Agreement.

3.      The Assignor warrants and represents to, and covenants with, the Assignee and the Seller that:

(a)      As of the date hereof, the Assignor is not in default under the Purchase Agreement;

(b)     The Assignor is the lawful owner of the Mortgage Loans with the full right to transfer the Mortgage Loans and any and all of its interests, rights and obligations under the Purchase Agreement, free from any and all claims and encumbrances arising out of the Assignor's ownership thereof, and the Mortgage Loans, as well as the Purchase Agreement, upon the transfer thereof to the Assignee as contemplated herein, shall be free and clear of all such liens, claims and encumbrances or any lien claim or encumbrance arising out of the ownership of the Mortgage Loans by any person at any time after Assignor first acquired any Mortgage Loan from the Seller;

(c)     The Assignor has not received notice of, and has no knowledge of, any offsets, counterclaims or other defenses available to the Seller with respect to the Purchase Agreement or the Mortgage Loans;

(d)     The Assignor has not waived or agreed to any waiver under, or agreed to any amendment or other modification of, the Purchase Agreement or the Mortgage Loans. The Assignor has no knowledge of, and has not received notice of, any waivers under or amendments or other modifications of, or assignments of rights or obligations under or defaults under, the Purchase Agreement, or the Mortgage Loans;

(e)     The Assignor is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, and has all requisite corporate power and authority to sell, transfer and assign the Mortgage Loans;

(f)     The Assignor has full corporate power and authority to execute, deliver and perform under this Assignment Agreement, and to consummate the transactions set forth herein. The consummation of the transactions contemplated by this Assignment Agreement is in the ordinary course of the Assignor's business and will not conflict with, or result in a breach of, any of the terms, conditions or provisions of the Assignor's charter or by-laws, or any legal restriction, or any material agreement or instrument to which the Assignor is now a party or by which it is bound, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Assignor or its property is subject. The execution, delivery and performance by the Assignor of this Assignment Agreement, and the consummation by it of the transactions contemplated hereby, have been duly authorized by all necessary corporate action of the Assignor. This Assignment Agreement has been duly executed and delivered by the Assignor and constitutes the valid and legally binding obligation of the Assignor enforceable against the Assignor in accordance with its respective terms except as enforceability thereof may be limited by bankruptcy, insolvency, or reorganization or other similar laws now or hereinafter in effect relating to creditor's rights generally and by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or in law;

(g)     No material consent, approval, order or authorization of, or declaration, filing or registration with, any governmental entity is required to be obtained or made by the Assignor in connection with the execution, delivery or performance by the Assignor of this Assignment Agreement, or the consummation by it of the transactions contemplated hereby; and

(h)     The Assignor has paid the purchase price for the Mortgage Loans and has satisfied any conditions to closing required of it under the terms of the Purchase Agreement.

D-2

4.     The Assignee warrants and represents to, and covenants with, the Assignor and the Seller that:

(a)     The Assignee is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, and has all requisite corporate power and authority to acquire, own and purchase the Mortgage Loans;

(b)     The Assignee has full corporate power and authority to execute, deliver and perform under this Assignment Agreement, and to consummate the transactions set forth herein. The consummation of the transactions contemplated by this Assignment Agreement is in the ordinary course of the Assignee's business and will not conflict with, or result in a breach of, any of the terms, conditions or provisions of the Assignee's charter or by-laws, or any legal restriction, or any material agreement or instrument to which the Assignee is now a party or by which it is bound, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Assignee or its property is subject. The execution, delivery and performance by the Assignee of this Assignment Agreement, and the consummation by it of the transactions contemplated hereby, have been duly authorized by all necessary corporate action of the Assignee. This Assignment Agreement has been duly executed and delivered by the Assignee and constitutes the valid and legally binding obligation of the Assignee enforceable against the Assignee in accordance with its respective terms except as enforceability thereof may be limited by bankruptcy, insolvency, or reorganization or other similar laws now or hereinafter in effect relating to creditor's rights generally and by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or in law;

(c)     No material consent, approval, order or authorization of, or declaration, filing or registration with, any governmental entity is required to be obtained or made by the Assignee in connection with the execution, delivery or performance by the Assignee of this Assignment Agreement, or the consummation by it of the transactions contemplated hereby; and

(d)     The Assignee agrees to be bound, as Purchaser, by all of the terms, covenants and conditions of the Purchase Agreement and the Mortgage Loans, and from and after the date hereof, the Assignee assumes for the benefit of each of the Seller and the Assignor all of the Assignor's obligations as Purchaser thereunder, with respect to the Mortgage Loans.

5.     The Seller warrants and represents to, and covenants with, the Assignor and the Assignee that:

(a)     The Seller is not a natural person or a general partnership and is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, and has all requisite power and authority to service the Mortgage Loans;

(b)     The Seller has full power and authority to execute, deliver and perform under this Assignment Agreement, and to consummate the transactions set forth herein. The consummation of the transactions contemplated by this Assignment Agreement is in the ordinary course of the Seller's business and will not conflict with, or result in a breach of, any of the terms, conditions or provisions of the Seller's charter or by-laws, or any legal restriction, or any material agreement or instrument to which the Seller is now a party or by which it is bound, or

D-3

result in the violation of any law, rule, regulation, order, judgment or decree to which the Seller or its property is subject. The execution, delivery and performance by the Seller of this Assignment Agreement, and the consummation by it of the transactions contemplated hereby, have been duly authorized by all necessary corporate action of the Seller. This Assignment Agreement has been duly executed and delivered by the Seller and constitutes the valid and legally binding obligation of the Seller enforceable against the Seller in accordance with its respective terms except as enforceability thereof may be limited by bankruptcy, insolvency, or reorganization or other similar laws now or hereinafter in effect relating to creditors' rights generally and by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or in law;

     (d)    No material consent, approval, order or authorization of, or declaration, filing or registration with, any governmental entity is required to be obtained or made by the Seller in connection with the execution, delivery or performance by the Seller of this Assignment Agreement, or the consummation by it of the transactions contemplated hereby;

     (e)    As of the date hereof, the Seller is not in default under the Purchase Agreement; and

     (f)    No event has occurred or has failed to occur, during the period commencing on date on which Assignor acquired the Mortgage Loans and ending on the date hereof, inclusive, which would make the representations and warranties set forth in Section 3.02 of the Purchase Agreement untrue if such representations and warranties were made with respect to the Mortgage Loans effective as of the date hereof.

     Within sixty (60) days of the earlier of either, discovery by the Seller or notice to the Seller from the Assignee, of a breach of any of the foregoing representations and warranties with respect to a Mortgage Loan which materially and adversely affects the value of such Mortgage Loan or the Assignee's interests therein, the Seller shall use its best efforts to cure such breach in all material respects and, if such breach is not cured within such sixty (60) day period, the Seller shall, at the Assignee's option, repurchase such Mortgage Loan at a price equal to the unpaid principal balance of the Mortgage Loan as of the date or repurchase, plus accrued interest thereon to, but not including, the date of repurchase.

     In connection with any repurchase of a Mortgage Loan, the Assignee shall reassign the provisions of the Purchase Agreement to the Seller with respect to such Mortgage Loan, and provide for the prompt delivery of the related custodial file to the Seller or its designee, as applicable.

     6.    From and after the date hereof, the Seller shall recognize the Assignee as the owner of the Mortgage Loans, and shall look solely to the Assignee for performance from and after the date hereof of the Assignor's obligations with respect to the Mortgage Loans. Effective the date hereof, the Seller, the Assignor and the Assignee agree that with respect to the Mortgage Loans, the interim servicing provisions of the Purchase Agreement shall be restated and amended to conform to **[enter servicing standard here]**; provided, however, that Seller shall interim service the Mortgage Loans for a fixed interim servicing fee of _____ per Mortgage Loan per month. The obligation of the Assignee to compensate the Seller for interim servicing of

the Mortgage Loans shall survive the sale by the Assignee to any trust created for the purpose of securitizing the Mortgage Loans, and Assignee agrees not to assign its obligation to pay the interim servicing fee to any such trust. Assignee may assign its obligation to pay the interim servicing fee to the person to which Assignee transfers the mortgage servicing rights for the Mortgage Loans. Seller acknowledges receipt of the [**name of servicing guide related to the servicing standard stated above**].

7.    On _____ (the "Transfer Date"), or such other date as Assignee and Seller shall agree, Seller shall transfer servicing to Assignee's designee, _____, in accordance with the Servicing Transfer Procedures attached hereto as Exhibit C.

8.    Notice Addresses.

(a)    The Assignee's address for purposes of all notices and correspondence related to the Mortgage Loans and this Assignment Agreement is:

_____
_____
_____
Attention: _____

(b)    The Assignor's address for purposes for all notices and correspondence related to the Mortgage Loans and this Assignment Agreement is:

DLJ Mortgage Capital, Inc.
c/o Credit Suisse First Boston Corporation
Eleven Madison Avenue, 4th Floor
New York, New York 10010
Attention: _____

(c)    The Seller's address for purposes of all notices and correspondence related to the Mortgage Loans and this Assignment Agreement is:

_____
_____
_____
Attention: _____

9.    This Assignment Agreement shall be construed in accordance with the substantive laws of the State of New York (without regard to conflict of laws principles) and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws, except to the extent preempted by federal law.

10.    This Assignment Agreement shall inure to the benefit of the successors and assigns of the parties hereto. Any entity into which the Seller, the Assignor or the Assignee may be merged or consolidated shall, without the requirement for any further writing, be deemed the Seller, the Assignor or the Assignee, respectively, hereunder.

11.    No term or provision of this Assignment Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

12.    This Assignment Agreement shall survive the conveyance of the Mortgage Loans and the assignment of the Purchase Agreement by the Assignor.

13.    Notwithstanding the assignment of the Purchase Agreement by either the Assignor or Assignee, this Assignment Agreement shall not be deemed assigned by the Seller or the Assignor unless assigned by separate written instrument.

14.    For the purpose for facilitating the execution of this Assignment Agreement as herein provided and for other purposes, this Assignment Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute and be one and the same instrument.

[signatures on following page]

IN WITNESS WHEREOF, the parties have caused this Assignment Agreement to be executed by their duly authorized officers as of the date first above written.

DLJ Mortgage Capital, Inc.
Assignor

By: _____
Name: _____
Title:  Vice President


_____
Assignee

By: _____
Name: _____
Title: _____


_____
Seller

By: _____
Name: _____
Title: _____

D-7

## Exhibit E

Form of Monthly Servicing Report

On the Reporting Date set forth in Section 5.02 of the Agreement, the Purchaser shall have received from the Servicer electronic information related to each mortgage loan serviced on behalf of the Purchaser. All reports shall be generated by the Servicer's loan servicing system and outline loan activity that transpired during the immediately preceding calendar month.

All electronic information shall contain and be sorted by the Purchaser's loan identification number as well as contain the Servicer's loan identification number. Information regarding the Purchaser's inventory must be clearly separated from that reported to other investors.

Each remittance must be clearly reconciled to detailed loan level remittance information. All adjustments between information sent and actual remittance must be identifiable at loan level.

The Loans Transferred In and Loans Transferred Out must be reconciled to collective Notices of Servicing Transfer or Sale Notices received effective during the respective Due Period. A monthly reconciliation of new loans added and loans removed must be submitted.

The monthly electronic remittance file shall include the following data elements at a minimum.

| Field Name | | Field Description | Field Type |
|---|---|---|---|
| CSFB Loan # | Required | The loan identification number assigned by CSFB | Numeric, no comma's and no special characters (i.e $ and %) |
| Previous Servicer Loan # | | | Numeric, no comma's and no special characters (i.e $ and %) |
| Servicer loan number | Required | Servicer loan number | Numeric, no comma's and no special characters (i.e $ and %) |
| Actual interest collected | | Actual Interest amount collected from borrower (at note rate) | Signed Numeric, no comma's and no special characters (i.e $ and %) |
| Fnma Action code | Required | Standard FNMA Action Code for payoff loans coded with 60-69 series of action code | Numeric, no comma's and no special characters (i.e $ and %) |
| Fnma Action date | Required | Payoff date ( I.e., 01-MAY-2001) | Date : DD-MMM-CCYY |
| Interest remitted | Required | Net Interest dollars remitted. Actual interest dollars collected from borrower less service fee. | Signed Numeric, no comma's and no special characters (i.e $ and %) |
| Beginning Scheduled note rate | Required if reporting Scheduled / Scheduled | Scheduled note rate used to calculate the payment being reported<br><br>Only apply to Scheduled/Scheduled Loans. If this is an Actual/Actual loan, leave blank | Signed Numeric, no comma's and no special characters (i.e $ and %) |
| Beginning Scheduled P&I payment | Required if reporting Scheduled / Scheduled | Scheduled P&I payment amount used to calculate the payment being reported<br><br>Only apply to Scheduled/Scheduled Loans. If this is an Actual/Actual loan, leave blank | Signed Numeric, no comma's and no special characters (i.e $ and %) |
| Beginning Scheduled service fee rate | Required if reporting Scheduled / Scheduled | Scheduled service fee rate used to calculate the payment being reported<br><br>Only apply to Scheduled/Scheduled Loan. If this is an Actual/Actual loan, leave blank | Signed Numeric, no comma's and no special characters (i.e $ and %) |
| Ending Due Date | Required | Loan due date per trial balance report (I.e., 01-MAY-2001) | Date : DD-MMM-CCYY |
| Ending Current rate | Required | Current Note rate per trial balance report | Signed Numeric, no comma's and no special characters (i.e $ and %) |
| Ending participant UPB | Required | Ending participant principal balance (Always equal to the 'Ending 100% UPB' for wholly owned loans) | Signed Numeric, no comma's and no special characters (i.e $ and %) |
| Ending 100% P&I pmt | Required | Ending 100% P&I payment amount | Signed Numeric, no comma's and no special characters (i.e $ and %) |
| Ending 100 %UPB | Required | Ending 100% principal balance | Signed Numeric, no comma's and no special characters (i.e $ and %) |
| Other fees remitted | Required | Fees remitted from Servicer<br>This should be your share of the fees | Signed Numeric, no comma's and no special characters (i.e $ and %) |
| Ancillary Fees Received (HELOCs) | Required | | |
| Principal remitted | Required | Total Principal amount remitted (includes curtailments and payoffs) | Signed Numeric, no comma's and no special characters (i.e $ and %) |
| Ending Service fee rate | Required | Current Service Fee rate per trial balance report | Signed Numeric, no comma's and no special characters (i.e $ and %) |
| Ending Security Balance | Required if reporting Scheduled / Scheduled | Ending security balance<br><br>Only apply to Scheduled/Scheduled Loan. If this is an Actual/Actual loan, leave blank | Signed Numeric, no comma's and no special characters (i.e $ and %) |
| Servicer Name | Required | Servicer Name | Text |
| Servicer's Investor Code<br><br><br><br>Servicer Investor Code 1<br><br>Servicer Investor Code 2<br><br><br>Primary Borrower Last Name | Required | The distinct investor code assigned by the servicer to the pool of mortgage loans being reported to identify the loans separate from other pools being serviced<br>Code utilized by Servicer to segregate and identify each pool of mortgage loans<br>Additional code utilized by Servicer to further segregate and identify subset of mortgage loans within Servicer Investor Code 1 | Text<br><br><br><br><br><br><br><br><br>Text |

· D-2

| | | |
|---|---|---|
| Primary Borrower Social Security Number | | Numeric, no comma's and no special characters (i.e $ and %) |
| Property Street Address | | Text |
| Property City | | Text |
| Property State | | Text, 2 characters |
| Property Zip Code | | Numeric, no comma's and no special characters (i.e $ and %) |

From time to time, the Purchaser may reasonably request the Servicer to add or modify information being reported on the electronic reports at the Servicer's expense. The Servicer must notify the Purchaser in the event servicing circumstances dictate file layout changes

In addition to the electronic information set forth above, the Servicer shall submit, on compact disc or other acceptable format, industry standard reports outlined below in addition to electronic information. The financial elements provided in the electronic information provided above must clearly reconcile to information set-forth in these reports. From time to time, the Purchaser may reasonably request the Servicer to add or remove standard industry reports at the Servicer's expense.

| Description of Report | Example: Reference Report Number (Alltel System) |
|---|---|
| Trial Balance | P139 |
| Payments Collected showing split of Principal & Interest Payment | S215 |
| Paid-in Full/Liquidation Reports | S214 |
| Loans Removed –Transfers Out [B] | T62R |
| Curtailments | S213 |
| New loans added/Transfers In [B] | T62B |
| Non-financial Adjustments Report | |
| Payoffs / Interim Cutoff Report | S210 |
| Pre-paid Loans (non-payoffs) | S212 |
| Delinquent Loans | |
| Arm Change Report | 24N |

Delivery
Remittance reports and related electronic information not suitable for electronic transmission are to be delivered via overnight mail to the addressed to:

> Remittance Processing
> 302 Carnegie Center
> Suite 200
> Princeton, NJ 08540

Delivery of Electronic Reports

Electronic data files shall be delivered to:

**Remittance.Data@CSFB.com; residential.mortgagepi@re.csfb.com**

Delivery of Remittances:
Funds to be remitted pursuant to this Agreement shall be delivered via wire transfer using the following instructions:

Citibank NYC
ABA: 021000089
Acct name: DLJ Mortgage Capital Corp
Acct: 30489038
RE: (reason for wire)
Attn: Whole Loan P&I

## **Exhibit F**

Mortgage Loan Schedule

## Exhibit G

Request for Release of Documents and Receipt

RE:    Mortgage Loan #_____

BORROWER:_____

PROPERTY:  _____

Pursuant to a Seller's Purchase, Warranties and Interim Servicing Agreement (the "Agreement") between the Seller, the Servicer and the Purchaser, the undersigned hereby certifies that he or she is an officer of the Servicer requesting release of the documents for the reason specified below. The undersigned further certifies that:

(Check one of the items below)

_____          On _____, the above captioned mortgage loan was paid in full or the Servicer has been notified that payment in full has been or will be escrowed. The Servicer hereby certifies that all amounts with respect to this loan which are required under the Agreement have been or will be deposited in the Custodial Account as required.

_____          The above captioned loan is being repurchased pursuant to the terms of the Agreement. The Servicer hereby certifies that the repurchase price has been credited to the Custodial Account as required under the Agreement.

_____          The above captioned loan is being placed in foreclosure and the original documents are required to proceed with the foreclosure action. The Servicer hereby certifies that the documents will be returned to the Purchaser in the event of reinstatement.

_____          Other (explain)

_____

_____

All capitalized terms used herein and not defined shall have the meanings assigned to them in the Agreement.

Based on this certification and the indemnities provided for in the Agreement, please release to the Servicer all original mortgage documents in your possession relating to this loan.

Dated:_____    By:_____
                                          Signature

                                   _____
                                   Title

Send documents to:    _____
                      _____
                      _____

Acknowledgment:

Purchaser hereby acknowledges that all original documents previously released on the above captioned mortgage loan have been returned and received by the Purchaser.

Dated:_____    By:_____
                                          Signature

                           Title:_____

**<u>Exhibit H</u>**

Servicing Transfer Procedures

<u>**Exhibit I**</u>

**Form of Bring Down Letter**

[DLJ Mortgage Capital, Inc. Letterhead]

_____, 200_

[Name of Seller and Servicer]
[Address of Seller and Servicer]

Re: Seller's Purchase, Warranties and Interim
Servicing Agreement, dated as of ____, 200_

Ladies and Gentlemen:

Reference is made to Section 11.01(b)(iii) of the referenced Seller's Purchase, Warranties and Servicing Agreement, dated as of _____, 200_ (the "Agreement"), among DLJ Mortgage Capital, Inc., as Purchaser and _____, as Seller and Servicer. Capitalized terms used herein and not otherwise defined have the meanings set forth in the Agreement.

Pursuant to such Section 11.01(b)(iii), we hereby notify you that the representations and warranties set forth in Sections 3.01 and 3.02 of the Agreement with respect to the Mortgage Loans identified on Exhibit A hereto are being made by you as of ____, 200_ (the "Bring-Down Date").

This letter will be the only document evidencing your obligation to make the representations and warranties set forth in Sections 3.01 and 3.02 with respect to the Mortgage Loans identified on Exhibit A hereto as of the Bring-Down Date. Reference is made to Section 3.03 of the Agreement for the procedures to be followed by the parties to the Agreement in the event of any breach of a representation and warranty and the remedies therefore.

Very truly yours,

DLJ Mortgage Capital, Inc.,
as Purchaser

By: _____
    Name:
    Title:

I-1

# EXHIBIT B

# Credit Suisse Securities (USA) LLC

DLJ Mortgage Capital, Inc. •Eleven Madison Avenue, 4th Floor, New York, New York 10010-3629 •(212) 325-2000

**By Overnight Courier**

November 28, 2006

Mr. Leif Johnson
Secured Bankers Mortgage Company
14761 Califa Street
Van Nuys, CA, 91411

RE: **Repurchase of Mortgage Loans With Early Payment Defaults**

Dear Mr. Johnson:

Pursuant to Section 3.05 of the Seller Purchase, Warranties and Interim Servicing Agreement, dated as of April 01, 2005 (the "Agreement"), by and between DLJ Mortgage Capital, Inc. ("DLJMC") and Secured Bankers Mortgage Company (the "Seller"), please accept this letter as DLJMC's request for repurchase of the Loans (as defined herein) in the amount of $500,139.41. All terms used herein and not otherwise defined shall have the meanings ascribed to them in the agreement.

Section 3.05 of the Agreement requires the Seller to repurchase at the repurchase price, each loan with an early payment default (as described in such Section). The borrower's failure to pay certain monthly payments due under the Agreement for each of the loans listed on the attached Schedule A (the "Loans") violates the terms of Section 3.05 of the Agreement. The attached schedule B details the computation of the amount due. Borrower pay history and collector comments have also been enclosed to assist you in the review.

Accordingly, please wire the above funds on December 05, 2006 to DLJMC as follows:

> Citibank
> New York, NY
> ABA #:021-000-089
> Account:DLJ Mortgage Capital, Inc.
> Account #:30489038
> Attn:Frederick Hahn
> Ref: Secured Bankers Mortgage Company

For a repurchase date after the above date, please increase the amount due DLJMC by $154.18 per diem interest. In addition to the foregoing, the Seller shall reimburse the loan servicer for outstanding corporate and escrow advances related to the Loans at the time of the servicing transfer.

If have any questions or if you should require any additional information, please contact Ms. Olivia Hafner of our Client Management Group at 212-325-7624 or e-mail her at olivia.hafner@credit-suisse.com.

Please call Rick Hahn at (212) 538-1426 when the funds are wired to DLJMC and to discuss the return of the collateral files.

Sincerely,
DLJ Mortgage Capital, Inc.

By: Demetri.E Catis

cc: – Olivia Hafner
cc: – Phyllis Raessner



# EXHIBIT C

# Credit Suisse Securities (USA) LLC

DLJ Mortgage Capital, Inc. ●Eleven Madison Avenue, 4th Floor, New York, New York 10010-3629 ●(212) 325-2000

**By Overnight Courier**

December 21, 2006

Mr. Leif Johnson
Secured Bankers Mortgage Company
14761 Califa Street
Van Nuys, CA, 91411

RE: **Repurchase of Mortgage Loans With Early Payment Defaults**

Dear Mr. Johnson:

Pursuant to Section 3.05 of the Seller Purchase, Warranties and Interim Servicing Agreement, dated as of April 01, 2005 (the "Agreement"), by and between DLJ Mortgage Capital, Inc. ("DLJMC") and Secured Bankers Mortgage Company (the "Seller"),   please accept this letter as DLJMC's request for repurchase of the Loans (as defined herein) in the amount of $125,330.97. All terms used herein and not otherwise defined shall have the meanings ascribed to them in the agreement.

Section 3.05 of the Agreement requires the Seller to repurchase at the repurchase price, each loan with an early payment default (as described in such Section). The borrower's failure to pay certain monthly payments due under the Agreement for each of the loans listed on the attached Schedule A (the "Loans") violates the terms of Section 3.05 of the Agreement. The attached schedule B details the computation of the amount due. Borrower pay history and collector comments have also been enclosed to assist you in the review.

Accordingly, please wire the above funds on January 04, 2007 to DLJMC as follows:

> Citibank
> New York, NY
> ABA #:021-000-089
> Account:DLJ Mortgage Capital, Inc.
> Account #:30489038
> Attn:Frederick Hahn
> Ref: Secured Bankers Mortgage Company

For a repurchase date after the above date, please increase the amount due DLJMC by $41.46 per diem interest. In addition to the foregoing, the Seller shall reimburse the loan servicer for outstanding corporate and escrow advances related to the Loans at the time of the servicing transfer.

If have any questions or if you should require any additional information, please contact Ms. Olivia Hafner of our Client Management Group at 212-325-7624 or e-mail her at olivia.hafner@credit-suisse.com.

Please call Rick Hahn at (212) 538-1426 when the funds are wired to DLJMC and to discuss the return of the collateral files.

Sincerely,
DLJ Mortgage Capital, Inc.


By: Demetri.E Catis

cc: – Olivia Hafner
cc: – Phyllis Raessner

DLJ Mortgage Capital, INC.
C/O Credit Suisse Securities (USA) LLC
Eleven Madison Avenue - 4th Floor
New York, NY 10010-3629

Purchaser: Secured Bankers Mortgage Company

Issue Date: N/A - Actual
Settlement Date: January 4, 2007

| DLJ MC Loan # | Reviewer Loan # | Prior Reviewer Loan # | Seller Loan # | Name | Settlement Date | Lien Position | Servicer | As of Date | Balance | Next Due Date | Note Rate | Daily Interest | Days Interest To Repurchase | Interest To Repurchase | Total Interest | Repurchase Price/Fund | Receipt of Fund Premium | Total Due DLJ MC | Class Status | Reason For Repurchase |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3278 | 147 | | 13728 | | 09/07/05 | 2 | FA/IBK | 11/20/05 | $41,238.88 | 1/30/05 | 12.9000 | $14.43 | 123 | $1,775.57 | $1,775.57 | 101.4950 | $612.82 | $43,627.87 | | 30 Days Late for Sept & 60 Days Late for Oct |
| 3280 | 134 | | 13732 | | 09/07/05 | 2 | FA/IBK | 11/20/05 | $39,742.05 | 1/30/06 | 12.9000 | $13.91 | 123 | $1,710.81 | $1,710.81 | 101.4950 | $590.34 | $42,043.41 | | 30 Days Late for Sept & 60 Days Late for Oct |
| 3281 | 162 | | 13738 | | 09/07/05 | 2 | FA/IBK | 11/20/05 | $37,460.81 | 1/30/06 | 12.9000 | $13.12 | 123 | $1,613.97 | $1,613.97 | 101.4950 | $557.11 | $39,661.89 | | 30 Days Late for Sept & 60 Days Late for Oct |
| | | | | | | | | | $118,470.35 | | | $41.46 | | $5,100.35 | $5,100.35 | | $1,760.27 | $125,333.17 | | |

TOTAL DUE DLJ MORTGAGE CAPITAL, INC.: $125,333.17

The following are DLJ Mortgage Capital, Inc. wiring instructions:
Citibank NYC
ABA: 021-000-089
A/C #: 3048938
A/C: DLJ Mortgage Capital, Inc.
Reference: Secured Bankers Mortgage Company
Attn: Bob Horn

Per Claim (for repurchase after settlement date): $41.46
In addition to the foregoing, please note that you (The Purchaser) shall be responsible to reimburse the buyer all costs of reasonable diligence and escrow of funds related to the form at the time of the servicing transfer.

# EXHIBIT D

# Credit Suisse Securities (USA) LLC

DLJ Mortgage Capital, Inc. •Eleven Madison Avenue, 4th Floor, New York, New York 10010-3629 •(212) 325-2000

**By Overnight Courier**

January 26, 2007

Mr. Leif Johnson
Secured Bankers Mortgage Company
14761 Califa Street
Van Nuys, CA, 91411

RE: **Repurchase of Mortgage Loans With Early Payment Defaults**

Dear Mr. Johnson:

Pursuant to Section 3.05 of the Seller Purchase, Warranties and Interim Servicing Agreement, dated as of April 01, 2005 (the "Agreement"), by and between DLJ Mortgage Capital, Inc. ("DLJMC") and Secured Bankers Mortgage Company (the "Seller"), please accept this letter as DLJMC's request for repurchase of the Loans (as defined herein) in the amount of $142,477.46. All terms used herein and not otherwise defined shall have the meanings ascribed to them in the agreement.

Section 3.05 of the Agreement requires the Seller to repurchase at the repurchase price, each loan with an early payment default (as described in such Section). The borrower's failure to pay certain monthly payments due under the Agreement for each of the loans listed on the attached Schedule A (the "Loans") violates the terms of Section 3.05 of the Agreement. The attached schedule B details the computation of the amount due. Borrower pay history and collector comments have also been enclosed to assist you in the review.

Accordingly, please wire the above funds on February 02, 2007 to DLJMC as follows:

> Citibank
> New York, NY
> ABA #:021-000-089
> Account:DLJ Mortgage Capital, Inc.
> Account #:30489038
> Attn:Frederick Hahn
> Ref: Secured Bankers Mortgage Company

For a repurchase date after the above date, please increase the amount due DLJMC by $37.84 per diem interest. In addition to the foregoing, the Seller shall reimburse the loan servicer for outstanding corporate and escrow advances related to the Loans at the time of the servicing transfer.

If have any questions or if you should require any additional information, please contact Ms. Olivia Hafner of our Client Management Group at 212-325-7624 or e-mail her at olivia.hafner@credit-suisse.com.

Please call Rick Hahn at (212) 538-1426 when the funds are wired to DLJMC and to discuss the return of the collateral files.

Sincerely,
DLJ Mortgage Capital, Inc.


By: Demetri.E Catis

cc: – Olivia Hafner
cc: – Phyllis Raessner

DLJ Mortgage Capital, INC.
C/O Credit Suisse Securities (USA) LLC
Eleven Madison Avenue - 4th Floor
New York, NY 10010-3629

Purchaser: Secured Bankers Mortgage Company

Issue Date: N/A - Actual
Settlement Date: February 2, 2007

| DLJMC Loan # | Servicer Loan # | Prior Servicer Loan # | Name | Settlement Date | Loan Position | Servicer | As of Date | Balance | Next Due Date | Note Rate | Daily Interest | Days Interest To Repurchase | Total Interest | Repurchase Price | Receipt of Premium | Total Due Pt amt | Loan Status | Reason for Repurchase |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4295 | 1304 | 12458 | | 04/07/06 | 2 | FAIRBK | 12/31/08 | $135,579.80 | 1/01/08 | 10.8250 | $37.84 | 121 | $4,578.49 | 101-4800 | $2,399.17 | $142,477.46 | | 30 Days Late for Sept & Dec; 60 Days Late for Nov; 'Borrower' Claims He's a Victim of Fraud |
| | | | | | | | | $135,579.80 | | | $37.84 | | $4,578.49 | | $2,399.17 | | | |

TOTAL DUE DLJ MORTGAGE CAPITAL, INC.: $142,477.46

Per Diem (for the repurchase after settlement date): $37.84

In addition to the foregoing, please note that you (The Purchaser) shall be responsible to reimburse the loan servicer for outstanding corporate and escrow advances related to the loans at the time of the servicing transfer.

The following are DLJ Mortgage Capital, Inc. wiring instructions:
Citibank NYC
ABA: 021-000-089
A/C # 30400333
A/C: DLJ Mortgage Capital, Inc.
Reference: Secured Bankers Mortgage Company
Attn: Rick Horn

# EXHIBIT E

# Credit Suisse Securities (USA) LLC

DLJ Mortgage Capital, Inc. ●Eleven Madison Avenue, 4th Floor, New York, New York 10010-3629 ●(212) 325-2000

**By Overnight Courier**

February 20, 2007

Mr. Leif Johnson
Secured Bankers Mortgage Company
14761 Califa Street
Van Nuys, CA, 91411

RE: **Repurchase of Mortgage Loans With Early Payment Defaults**

Dear Mr. Johnson:

Pursuant to Section 3.05 of the Seller Purchase, Warranties and Interim Servicing Agreement, dated as of April 01, 2005 (the "Agreement"), by and between DLJ Mortgage Capital, Inc. ("DLJMC") and Secured Bankers Mortgage Company (the "Seller"),   please accept this letter as DLJMC's request for repurchase of the Loans (as defined herein) in the amount of $34,156.77. All terms used herein and not otherwise defined shall have the meanings ascribed to them in the agreement.

Section 3.05 of the Agreement requires the Seller to repurchase at the repurchase price, each loan with an early payment default (as described in such Section). The borrower's failure to pay certain monthly payments due under the Agreement for each of the loans listed on the attached Schedule A (the "Loans") violates the terms of Section 3.05 of the Agreement. The attached schedule B details the computation of the amount due. Borrower pay history and collector comments have also been enclosed to assist you in the review.

Accordingly, please wire the above funds on February 27, 2007 to DLJMC as follows:

> Citibank
> New York, NY
> ABA #:021-000-089
> Account:DLJ Mortgage Capital, Inc.
> Account #:30489038
> Attn:Frederick Hahn
> Ref: Secured Bankers Mortgage Company

For a repurchase date after the above date, please increase the amount due DLJMC by $10.08 per diem interest. In addition to the foregoing, the Seller shall reimburse the loan servicer for outstanding corporate and escrow advances related to the Loans at the time of the servicing transfer.

If have any questions or if you should require any additional information, please contact Ms. Olivia Hafner of our Client Management Group at 212-325-7624 or e-mail her at olivia.hafner@credit-suisse.com.

Please call Rick Hahn at (212) 538-1426 when the funds are wired to DLJMC and to discuss the return of the collateral files.

Sincerely,
DLJ Mortgage Capital, Inc.



By: Demetri.E Catis

cc:  – Olivia Hafner
cc:  – Phyllis Raessner

DLJ Mortgage Capital, INC.
C/O Credit Suisse Securities (USA) LLC
Eleven Madison Avenue - 4th Floor
New York, NY 10010-3629

Purchaser: Secured Bankers Mortgage Company

Issue Date: N/A - Actual
Settlement Date: February 27, 2007

| DLJMC Loan # | Servicer Loan # | Prior Servicer Loan # | Seller Loan # | Name | Settlement Date | Lien Position | Servicer | As of Date | Balance | Next Due Date | Note Rate | Daily Interest | Days Interest To Repurchase | Total Interest | Repurchase Price | Repurchase Premium | Total Due CS_INC | Clean Status | Reason For Repurchase |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6601 | 8048 | | 8868 | | 07/11/08 | 2 | FAIRBK | 01/01/07 | $32,915.72 | 01/01/07 | 11.0250 | $10.06 | 86 | $865.92 | 101.1900 | $374.13 | $34,155.77 | | 30 Days Late for July & Sept |
| | | | | | | | | | $32,915.72 | | | $10.06 | | $865.92 | | $374.13 | $34,155.77 | | |

TOTAL DUE DLJ MORTGAGE CAPITAL, INC.:        $34,155.77

Per Diem (for repurchase after settlement date):        $10.06
In addition to the foregoing, please note that you (The Purchaser) shall be responsible to reimburse the Item BROKER for substantive corporate and escrow advances related to the issue of the loans of the secondary transfer.

The Following are DLJ Mortgage Capital, Inc. wiring instructions:
Citbank NYC
ABA : 021-000-089
A/C # 30489238
A/C: DLJ Mortgage Capital, Inc.
Reference: Secured Bankers Mortgage Company
Attn: Bob Hahn

# EXHIBIT F

# Credit Suisse Securities (USA) LLC

DLJ Mortgage Capital, Inc. ●Eleven Madison Avenue, 4th Floor, New York, New York 10010-3629 ●(212) 325-2000

**By Overnight Courier**

March 23, 2007

Mr. Leif Johnson
Secured Bankers Mortgage Company
14761 Califa Street
Van Nuys, CA, 91411

RE: **Repurchase of Mortgage Loans With Early Payment Defaults**

Dear Mr. Johnson:

Pursuant to Section 3.05 of the Seller Purchase, Warranties and Interim Servicing Agreement, dated as of April 01, 2005 (the "Agreement"), by and between DLJ Mortgage Capital, Inc. ("DLJMC") and Secured Bankers Mortgage Company (the "Seller"), please accept this letter as DLJMC's request for repurchase of the Loans (as defined herein) in the amount of $114,294.60. All terms used herein and not otherwise defined shall have the meanings ascribed to them in the agreement.

Section 3.05 of the Agreement requires the Seller to repurchase at the repurchase price, each loan with an early payment default (as described in such Section). The borrower's failure to pay certain monthly payments due under the Agreement for each of the loans listed on the attached Schedule A (the "Loans") violates the terms of Section 3.05 of the Agreement. The attached schedule B details the computation of the amount due. Borrower pay history and collector comments have also been enclosed to assist you in the review.

Accordingly, please wire the above funds on March 30, 2007 to DLJMC as follows:

        Citibank
        New York, NY
        ABA #:021-000-089
        Account:DLJ Mortgage Capital, Inc.
        Account #:30489038
        Attn:Frederick Hahn
        Ref: Secured Bankers Mortgage Company

For a repurchase date after the above date, please increase the amount due DLJMC by $34.28 per diem interest. In addition to the foregoing, the Seller shall reimburse the loan servicer for outstanding corporate and escrow advances related to the Loans at the time of the servicing transfer.

If have any questions or if you should require any additional information, please contact Ms. Olivia Hafner of our Client Management Group at 212-325-7624 or e-mail her at olivia.hafner@credit-suisse.com.

Please call Rick Hahn at (212) 538-1426 when the funds are wired to DLJMC and to discuss the return of the collateral files.

Sincerely,
DLJ Mortgage Capital, Inc.


By: Demetri.E Catis

cc:  – Olivia Hafner
cc:  – Phyllis Raessner

Purchaser: | Secured Bankers Mortgage Company |

DLJ Mortgage Capital, INC.
C/O Credit Suisse Securities (USA) LLC
Eleven Madison Avenue - 4th Floor
New York, NY 10010-3629

Issue Date: N/A - Actual
Settlement Date: | March 30, 2007 |

| DLJMC Loan # | Servicer Loan # | Prior Servicer Loan # | Seller Loan # | Name | Settlement Date | Lien Position | Servicer | As of Date | Balance | Next Due Date | Note Rate | Daily Interest | Days To Repurchase | Total Interest | Repurchase Price | Receipts of Premium | Total Due DLJMC | Loan Status | Reason For Repurchase |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8532 | 8922 | | 7846 | | 08/2006 | 2 | FAIRBK | 02/2007 | $107,765.41 | 12/01/06 | 11.6500 | $34.28 | 149 | $5,107.86 | 101.3000 | $1,401.21 | $111,296.60 | 30 Days Late for Aug | |
| | | | | | | | | | $107,765.41 | | | $34.28 | | $5,107.86 | | $1,401.21 | $111,296.60 | | |

TOTAL DUE DLJ MORTGAGE CAPITAL, INC.: | $111,296.60 |

The Following are DLJ Mortgage Capital, Inc. wiring Instructions:

Citibank NYC
ABA : 021-000-089
A/C # 30469533
A/C: DLJ Mortgage Capital, Inc.
Reference: Secured Bankers Mortgage Company
Attn: Rick Nish

Per Diem (for repurchase after settlement date): | $34.28 |

In addition to the foregoing, please note that you, (the Purchaser) shall be responsible to purchase the loan servicer for outstanding corporate and escrow advances related to the loans at the time of the servicing transfer.

# EXHIBIT G

.

# Credit Suisse Securities (USA) LLC

DLJ Mortgage Capital, Inc. ●Eleven Madison Avenue, 4th Floor, New York, New York 10010-3629 ●(212) 325-2000

**By Overnight Courier**

April 17, 2007

Mr. Leif Johnson
Secured Bankers Mortgage Company
14761 Califa Street
Van Nuys, CA, 91411

RE: **Repurchase of Mortgage Loans With Early Payment Defaults**

Dear Mr. Johnson:

Pursuant to Section 3.05 of the Seller Purchase, Warranties and Interim Servicing Agreement, dated as of April 01, 2005 (the "Agreement"), by and between DLJ Mortgage Capital, Inc. ("DLJMC") and Secured Bankers Mortgage Company (the "Seller"),  please accept this letter as DLJMC's request for repurchase of the Loans (as defined herein) in the amount of $103,030.58. All terms used herein and not otherwise defined shall have the meanings ascribed to them in the agreement.

Section 3.05 of the Agreement requires the Seller to repurchase at the repurchase price, each loan with an early payment default (as described in such Section). The borrower's failure to pay certain monthly payments due under the Agreement for each of the loans listed on the attached Schedule A (the "Loans") violates the terms of Section 3.05 of the Agreement. The attached schedule B details the computation of the amount due. Borrower pay history and collector comments have also been enclosed to assist you in the review.

Accordingly, please wire the above funds on April 24, 2007 to DLJMC as follows:

> Citibank
> New York, NY
> ABA #:021-000-089
> Account:DLJ Mortgage Capital, Inc.
> Account #:30489038
> Attn:Frederick Hahn
> Ref: Secured Bankers Mortgage Company

For a repurchase date after the above date, please increase the amount due DLJMC by $33.28 per diem interest. In addition to the foregoing, the Seller shall reimburse the loan servicer for outstanding corporate and escrow advances related to the Loans at the time of the servicing transfer.

If have any questions or if you should require any additional information, please contact Ms. Olivia Hafner of our Client Management Group at 212-325-7624 or e-mail her at olivia.hafner@credit-suisse.com.

Please call Rick Hahn at (212) 538-1426 when the funds are wired to DLJMC and to discuss the return of the collateral files.

Sincerely,
DLJ Mortgage Capital, Inc.


By: Demetri.E Catis

cc: – Olivia Hafner
cc: – Phyllis Raessner

DLJ Mortgage Capital, INC.
C/O Credit Suisse Securities (USA) LLC
Eleven Madison Avenue - 4th Floor
New York, NY 10010-3629

Purchaser: Secured Bankers Mortgage Company

Issue Date: N/A - Actual
Settlement Date: April 24, 2007

| DLJMC Loan # | Servicer Loan # | Prior Servicer Loan # | Seller Loan # | Name | Settlement Date | Loan Position | Servicer | As of Date | Balance | Next Due Date | Note Rate | Daily Interest | Days Interest To Repurchase | Total Interest | Repurchase Price | Repurchase Premium | Total Due DLJMC | Loan Status | Reason For Repurchase |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3294 | 1720 | | 6499 | | 09/07/05 | 2 | FARBK | 03/31/07 | $96,848.99 | 12/01/06 | 12.5000 | $33.28 | 173 | $5,757.58 | 101.4860 | $1,424.31 | $103,030.58 | | 30 Days Late for Sept |
| | | | | | | | | | $96,848.99 | | | $33.28 | | $5,757.58 | | $1,424.31 | | | |

TOTAL DUE DLJ MORTGAGE CAPITAL, INC.:  $103,030.58

Per Diem (for repurchases after settlement date):  $33.28

In addition to the foregoing, please note that you (the Purchaser) shall be responsible to reimburse the loan servicer for outstanding corporate and escrow advances related to the loans at the time of the servicing transfer.

The following are DLJ Mortgage Capital, Inc. wiring instructions:
Cashless NYC
ABA : 021-000-089
A/C # 3164003
A/C: DLJ Mortgage Capital, Inc.
Reference: Secured Bankers Mortgage Company
Attn: Rick Kuhn